**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| INTERVARSITY CHRISTIAN FELLOWSHIP/ USA, and INTERVARSITY GRADUATE CHRISTIAN FELLOWSHIP, | Civ. Action No.: _____ _____ |
| *Plaintiffs*, | **COMPLAINT** |
| v. | |
| THE UNIVERSITY OF IOWA; BRUCE HARRELD, in his official capacity as President of the University of Iowa and in his individual capacity; MELISSA S. SHIVERS, in her official capacity as Vice President for Student Life and in her individual capacity; WILLIAM R. NELSON, in his official capacity as Associate Dean of Student Organizations, and in his individual capacity; ANDREW KUTCHER in his official capacity as Coordinator for Student Organization Development; and THOMAS R. BAKER, in his official capacity as Student Misconduct and Title IX Investigator and in his individual capacity, | |
| *Defendants*. | |

Matt M. Dummermuth
Hagenow Gustoff & Dummermuth, LLP
600 Oakland Rd. NE
Cedar Rapids, IA 52402
(319) 849-8390 phone
(888) 689-1995 fax
*mdummermuth@whgllp.com*

Eric S. Baxter*
   *Lead Counsel*
Daniel H. Blomberg*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*ebaxter@becketlaw.org*
*dblomberg@becketlaw.org*

*Counsel for Plaintiffs*

*\*Admission pro hac vice pending*

1.   This dispute arises from unconstitutional and unlawful discrimination by the University of Iowa and the Defendant Officers (collectively, "the University") against Plaintiff InterVarsity Graduate Christian Fellowship, a graduate student group that the University recently deregistered *solely* because it requires its student leaders to believe and follow its Christian faith.

2.   InterVarsity Graduate Christian Fellowship is a Christian student ministry that has served graduate students at the University for 25 years. InterVarsity has hosted student activities, joined the University's annual MLK Day of Service, sponsored annual Christmas food drives for the poor, and participated in the Johnson County C.R.O.P. Hunger Walk (as the top fund-raising organization in six of the last seven years). Anyone is welcome to participate in its activities and all students may join as members.

3.   Throughout its 25 years on campus, InterVarsity has asked its student leaders—who lead the group in prayer, worship, and religious teaching—to hold to the same faith that animates and unites the group. Yet now, for the first time, the University claims that InterVarsity may not require its leaders to affirm that they share its religious beliefs.

4.   On June 1, 2018—weeks after the end of spring semester classes—the University abruptly emailed InterVarsity's student leaders and instructed them that they had until June 15 to change their leadership selection practices or be deregistered.

5.   When InterVarsity's student leaders responded emphasizing the importance of having Christian leadership, the University stated that it "recognize[d] the wish to have leadership requirements based on Christian beliefs," but that "[h]aving a restriction on leadership related to religious beliefs" is impermissible. The University further stated that InterVarsity student leaders could not even be "strongly encouraged" to agree with InterVarsity's faith.

6.   The University has now stripped InterVarsity of its registered student group status, along with all of the many valuable rights and benefits available only to groups with that status, and relegated InterVarsity to second-class status. No complaints have ever been filed against InterVarsity for any reason. The only basis for deregistration was InterVarsity's religious leadership requirement.

7.   The University has also reportedly done the same to numerous other religious student groups on campus, including the Chinese Student Christian Fellowship, the Geneva Campus Ministry, the Imam Mahdi Organization, the Latter-day Saint Student Association, and the Sikh Awareness Club. *See* Vanessa Miller, The Gazette, *University of Iowa deregisters another 38 groups*, (Jul. 20, 2018), http://bit.do/etNrR.

8.   The University's purge of dissenters causes uniquely existential harm to religious groups. A group's leaders are the embodiment of its identity and mission. While the University allows political and other ideological groups to select leaders based on shared identity and mission, the University's position makes it impossible for religious groups to do so. A religious group denied religious leadership will ultimately cease to be religious.

9.   The University's position is also discriminatory. For instance, the University (rightly) allows fraternities to have only male leaders and members, and female athletic clubs to have only female leaders and members. Republicans and Democrats can each choose to be led by those who share their political beliefs. Yet while it makes broad exceptions for political groups, fraternities, sororities, and sports clubs to select both their leadership and membership, it denies a narrower accommodation for religious groups to select their leaders.

10. Finally, the University's attempt to control religious groups in this way impermissibly entangles the government in religious affairs. The State of Iowa has no business telling religious groups who their religious leaders should be.

11. In sum, the University's discrimination against dissenting religious groups is unfair and unconstitutional. It should be reversed, and InterVarsity allowed to resume providing the same service to the community that it has for the past 25 years.

## JURISDICTION AND VENUE

12. This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

13. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

14. Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## IDENTIFICATION OF PARTIES

15. Plaintiff InterVarsity Christian Fellowship/USA is an Illinois not-for-profit corporation with its headquarters in Madison, Wisconsin. InterVarsity is a Christian ministry active in campus ministry on hundreds of campuses across the United States, including many in Iowa.

16. Plaintiff InterVarsity Graduate Christian Fellowship is an unincorporated association which conducts religious ministry at the University of Iowa in Iowa City, Iowa. The association is a constituent chapter of InterVarsity.

17. Defendant University of Iowa is a public university that is an arm of the State of Iowa.

18. Defendant Bruce Harreld is the President of the University of Iowa and is sued in his official and individual capacities.

19.  Defendant Melissa S. Shivers is the Vice President for Student Life and is sued in her official and individual capacities.

20.  Defendant William R. Nelson is the Associate Dean of Student Organizations and is sued in his official and individual capacities.

21.  Defendant Andrew Kutcher is a University official who is in charge of Student Organization Development at the Center for Student Involvement and Leadership and is sued in his official and individual capacities.

22.  Defendant Thomas R. Baker is the University's Student Misconduct and Title IX investigator and is sued in his official and individual capacities.

23.  All Defendants are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### InterVarsity Christian Fellowship/USA

24. InterVarsity Christian Fellowship/USA is active in campus ministry on hundreds of campuses across the United States and Iowa. It has over 1,000 individual chapters. It is a charter member of the International Fellowship of Evangelical Students, an association of over 160 evangelical Christian student movements worldwide.

25. InterVarsity was founded by students at the University of Cambridge in 1877. In 1938, students at the University of Michigan formed the first InterVarsity chapter in the United States. *See* InterVarsity, *InterVarsity and IFES History,* https://intervarsity.org/about-us/intervarsity-and-ifes-history.

26. InterVarsity currently has chapters at many other public and private universities and colleges in Iowa, including at Buena Vista University, Central College, Coe College, Des Moines Community College, Drake University, Grinnell College, Iowa State University, Iowa Wesleyan

College, Northwestern College of Iowa, and the University of Dubuque. *See* InterVarsity, *Find a Chapter,* https://intervarsity.org/chapters?state=IA.

27. InterVarsity's purpose "is to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord[.]" *See* InterVarsity, *Our Purpose,* https://intervarsity.org/about-us/our-purpose.

28. InterVarsity currently has three chapters at the University of Iowa: InterVarsity Graduate Christian Fellowship, Multiethnic Undergrad Hawkeye InterVarsity (also known as Black Campus Ministries), and International Neighbors.

29. While all three chapters require their student leaders to embrace the chapters' faith, and have constitutions that make this requirement explicit, only the Graduate chapter was deregistered by the University.

**InterVarsity Graduate Christian Fellowship**

30. InterVarsity Graduate Christian Fellowship ("InterVarsity") was founded 25 years ago at the University of Iowa. It celebrated its 25th anniversary at a dinner in May 2018, which featured prayer and presentations by alumni testifying to how InterVarsity helped sustain their faith and improve their academic experience at the University.

31. InterVarsity is a student-led group that helps graduate and professional students and faculty learn more about Christ, grow spiritually, and live faithfully. One of its primary objectives is to invite the University's academic community to take a fresh look at the life and message of Jesus. It also provides a teaching and fellowshipping community to help Christians from all backgrounds develop as Christian disciples.

32. InterVarsity fulfills its mission at the University in a number of ways. It hosts monthly large-group religious meetings that feature prayer, worship, and religious teaching. It also provides

regular small-group Bible studies which often meet on a weekly or bi-weekly basis. It participates and sponsors activities facilitating campus discussions on important religious and social issues.

33. InterVarsity also supports the University and local communities through a variety of service projects. During the past 25 years, InterVarsity has provided hundreds of hours of service. For instance, for the past sixteen years, InterVarsity has actively participated in the C.R.O.P Hunger Walk. *See*, *e.g.*, Iowa City Crop Hunger Walk, *Crop Hunger Walk,* https://www.crophungerwalk.org/iowacityia/ivgcf. The C.R.O.P. Hunger Walk is a charity event where teams and individuals walk to raise money, which is then donated to fight hunger around the globe. InterVarsity has been the top fundraiser for six of the past seven years, and has raised over $54,000 for the C.R.O.P. program.

34. InterVarsity has also partnered with Oxfam to raise funds to alleviate the effects of poverty by conducting "Hunger Banquets." At times, InterVarsity members have also conducted a Hunger Fast, wherein they have abstained from food for a day and donated the money that they would normally have spent on that day's meals to Oxfam.

35. InterVarsity has also organized fundraisers for Wild Bill's Coffee Shop and Uptown Bill's Coffee Shop, two coffeeshops that are dedicated to providing jobs to those with special needs. *See* The University of Iowa School of Social Work, *Wild Bill's Coffeeshop,* https://clas.uiowa.edu/socialwork/resources/wild-bills-coffeeshop (describing Wild Bill's as "a service learning project in the School of Social Work at the University of Iowa" which "is operated by adult persons with learning disabilities"); *see also Uptown Bill's Coffee House,* https://www.facebook.com/pg/uptownbills/about/?ref=page_internal (describing Uptown Bill's as the "crosstown cousin of Wild Bill's Coffee Shop," sharing a similar mission). InterVarsity substituted for the staff of these two venues for an evening, providing free service and

entertainment, selling their own additional baked goods, and then donating all of the proceeds to the respective coffee shop to assist with their charitable efforts.

36. Each year at Christmas, InterVarsity organizes a food drive to help meet the needs of people served by the Johnson County Crisis Center. Last year alone, InterVarsity donated approximately 160 pounds of food.

37. InterVarsity also regularly participates in the University's annual MLK Day of Service. *See*, *e.g.*, The University of Iowa, *Leadership and Service Programs*, https://leadandserve.uiowa.edu/programs/mlk/.

38. In Spring 2006, InterVarsity was honored with an award from the University for its outstanding services to the student body.

39. InterVarsity welcomes all students and faculty to join its events, including its religious discussions, activities, prayer times, worship services, and Bible studies. It also welcomes all students to join the organization as members. It has members of different religious backgrounds, or no religious background, who attend its Bible studies and other events. InterVarsity is also multiethnic and has many international student members, which helps people from a wide variety of backgrounds feel welcome. Most of the group's regular participants and leaders are women.

40. InterVarsity has always required its leaders to share the group's faith and exemplify its Christian values. Because of the important spiritual role that leaders play, all student leaders must affirm InterVarsity's doctrine and purpose statements. This requirement is stated in InterVarsity's constitution. *See* Exhibit A (InterVarsity Graduate Christian Fellowship Constitution).

41. The InterVarsity constitution spells out the "basic biblical truth of Christianity" that all student leaders must affirm, including its Trinitarian theology and belief in the authority of Scripture; that all humans have inherent dignity and value because they are created in God's image;

that Jesus Christ was divine and sinless; that he died a substitutionary death followed by a bodily resurrection; that people can be saved from their sin and reunited with God by God's grace and through faith in Christ's sacrifice; that God lives in believers in the form of the Holy Spirit; and that all believers are called to unity and to worship together in Christian communities. *Id.* at Art. II.

42. Applicants to serve as student leaders are informed that each official leadership role for InterVarsity "involves significant spiritual commitment." *Id.* at Art. IV at § 3. Thus, "leaders are expected to indicate their agreement with InterVarsity Christian Fellowship/USA's Doctrine and Purpose Statements" and to "exemplify Christ-like character, conduct, and leadership (1 Pet. 5:1-7, 1 Tim. 3:1-13; Gal. 5:19-26; and 1 Cor. 6:7-11)." *Id.*

43. Student leaders are primarily responsible for InterVarsity's ministry on campus. They personally lead many of the religious meetings and Bible studies; lead and participate in prayer, worship, and religious teaching; determine the religious content of meetings; select guest speakers and identify religious topics to cover during events; minister to their peers individually; plan and schedule ministry events on campus; and determine what kind of outreach and service activities to engage in to advance the group's religious mission.

44. Student leaders are helped in their ministry responsibilities by Kevin Kummers, the Senior Campus Minister who advises the InterVarsity Graduate chapter. He meets regularly with each student leader to develop their leadership skills and assist them in providing religious guidance to their peers. He also helps the students learn to lead the various weekly small groups, such as Bible study groups or prayer groups. Kummers has been InterVarsity's advisor for 21 years.

45. An example of InterVarsity's campus ministry is its monthly religious meetings. The meetings last for about two hours. A typical format starts with a time of fellowship while students

arrive, followed by 10-15 minutes of prayer that is generally led by a student leader or Kevin. The group then has 10-15 minutes of worship, which is generally led by student leaders and uses songs selected by student leaders. Worship is followed by an hour of religious teaching and discussion, which is again either led by student leaders or features a guest speaker selected by student leaders. The meeting then typically closes with prayer by a student leader and a brief time of fellowship. The content, format, timing, and location of the meetings are coordinated and led by student leaders; they are responsible for ensuring that the event is conducted in a manner that reflects and is consistent with InterVarsity's faith.

46. Student leaders also oversee and participate in InterVarsity's small-group Bible studies, which often take on a weekly or bi-weekly basis.

47. As a Registered Student Organization, InterVarsity has long received many important rights and benefits from the University that allowed them to host their meetings, attract new students, and serve the community. These rights included the ability to access student orientation activities, especially graduate and international student orientations; the Fall and Spring student organization fairs; a webpage on the University's OrgSync website, which allows the group to connect with students and advertise activities; other University resources to communicate about events; funding; and free campus meeting space.

**The University's Policies and Practices**

48. The University's written guidelines for student organizations recognize the right of students to organize according to common beliefs and values.

49. For example, the University's published policy regarding "Registration of Student Organizations" states that it is "the policy of the University that all registered student organizations be able to exercise *free choice of members* on the basis of their merits as individuals without restriction in accordance with the University Policy on Human Rights." *See* University of Iowa

Registration          of          Student          Organizations          Policy          at          I(B)(2)(b),

https://dos.uiowa.edu/policies/registration-of-student-organizations/ ("RSO Policy").

50.   The policy further recognizes that students have the right to "organize and associate with like-minded students" and thus that "any individual *who subscribes to the goals and beliefs of a student organization* may participate in and become a member of the organization." *Id.* (emphasis added).

51.   The policy clarifies that student groups like InterVarsity are not an official arm of the University and that registration "does not constitute an endorsement of [the organization's] program or its purposes, but is merely a charter to exist." *Id.* at I.

52.   The University has further emphasized to student groups that "student organizations are voluntary special interest groups organized for educational, social, recreational, and service purposes," and that they are "separate legal entities from the University of Iowa and legally are not treated the same as University departments or units." *Id.*

53.   Student organizations at the University frequently require their members to share the missions of the organizations they seek to join.

54.   These requirements for members to support their organizations' missions make sense in light of the University's goal that student organizations bring "like-minded students" together. *Id.* at I(B)(2)(b).

55.   Thus, *preventing* Plaintiffs from creating space for students of like-minded religious beliefs violates, not upholds, the University's published policies.

56.   The University also accommodates other groups' leadership and membership requirements.

57. The University's Human Rights Policy states that "in no aspect of [the University's] program shall there be differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual." The University of Iowa, *Operations Manual*, Ch. 3.1 Human Rights Policy and Rationale, https://opsmanual.uiowa.edu/community-policies/human-rights#3.1.

58. Despite this language, the University allows its 42 registered student sports clubs to require members and leaders to be of a particular sex. For instance, the University's female volleyball club can require all participants to be female, and the University's male ultimate frisbee club can require all participants to be male. The University accordingly does not require sports clubs to comply with the Human Rights Policy against sex-based discrimination.

59. Similarly, the University exempts registered student fraternities and sororities, allowing them to select members and leaders on the basis of their sex.

60. The University of Iowa actively encourages students to join fraternities and sororities despite the fact that they discriminate on the basis of gender. For instance, a University Vice President for Student Life wrote the introduction to a booklet promoting Greek life on campus, stating that "[b]eing a member of a fraternity or sorority provides one of the best ways to becoming an involved student at Iowa." Iowa Fraternity & Sorority Life 2016-2017 at 2, *See* http://iowafsl.publishpath.com/Websites/iowafsl/images/1426-1_-_FSL_2016-2017_Booklet_Updates.pdf.

61. Likewise, Defendant William Nelson stated in a guide for family members of students considering joining Greek organizations that he "encourage[s] [students and families] to look into

what many believe to be the best way to spend your collegiate years – a member of the UI Fraternity and Sorority Community." *See* Family Guide: The University of Iowa Fraternity & Sorority Life at 1, https://fsl.uiowa.edu/assets/Uploads/2082-1-16.75x11.25-FSL-Family-Guide-2017-color-front.pdf.

62.   Fraternities and sororities are governed by the University Policy on Human Rights just as other student organizations are. *See* RSO Policy at I.G.2 (explaining that rules and regulations of governing social fraternities must be "consistent with the University Policy on Human Rights").

63.   The University has not demonstrated that it cannot accommodate religious organizations by granting them exemptions similar to the ones the University grants to sports clubs, fraternities, and sororities.

64.   Indeed, religious accommodation is both required by and consistent with University policy. The University's Statement of Religious Diversity emphasizes that "[r]eligious history, religious diversity, and spiritual values have formed a part of The University of Iowa's curricular and extracurricular programs since the founding of the University" and that "[a]s a public institution, the University neither promotes any particular form of religion nor discriminates against students, staff, or faculty on the basis of their religious viewpoints." Dean of Students, The University of Iowa, *Statement of Religious Diversity,* https://dos.uiowa.edu/policies/statement-of-religious-diversity-and-the-university-calendar/.

65.   The University's Human Rights Policy similarly forbids discrimination on the basis of "creed" or "religion," promising that "equal opportunity and access to facilities shall be available to all," including in "policies governing programs of extracurricular life and activities." The University of Iowa, *Operations Manual*, ch. 3.1 Human Rights Policy and Rationale, https://opsmanual.uiowa.edu/community-policies/human-rights#3.1.

66. The University's Human Rights Policy also declares that "[c]onsistent with state and federal law, reasonable accommodations will be provided . . . to accommodate religious practices." *Id.*

67. Additionally, the University's RSO Policy states that "[t]he reasons for denying or withdrawing registration of a student organization shall not violate the University Policy on Human Rights," which would preclude withdrawing registration on the grounds of "creed" or "religion." *See* RSO Policy at I.

68. The University has previously admitted that, under these policies, a student religious group is entitled to require a statement of faith as a pre-condition for leading the group and that asking prospective leaders to sign a statement of faith would not violate the Human Rights Policy.

69. Registered student organizations are eligible to receive certain privileges and benefits, which include:

(a) official status as a University organization;

(b) establishment of a financial account and purchasing privileges;

(c) the ability to receive school funding;

(d) inclusion in University publications;

(e) use of University organizational software;

(f) use of the University's trademarks;

(g) use of campus facilities for meetings;

(h) use of University fleet services vehicles;

(i) use of University of staff and programming resources;

(j) use, once a semester, to use Information Technology Services Mass Mail;

(k) the ability to apply for honors and awards granted to registered organizations; and

(l) use of office and storage space.

*See* RSO Policy at I(A) (listing benefits of registered status).

70. The University also reserves a number of important speech opportunities solely for registered student organizations. Those include:

    a. **Rallies and demonstrations**. *See* The University of Iowa, *Rallies and Demonstrations,* https://imu.uiowa.edu/event-services/policies/rallies-and-demonstrations/ ("Student Organizations may host a political rally or demonstration in Hubbard Commons, Hubbard Park, and/or the South Lobby entrance (departments or university guests may not conduct a rally or demonstration)").

    b. **Digital Displays**. *See* The University of Iowa, *Online Reservations,* https://imu.uiowa.edu/event-services/contact-us/ ("Digital Displays are reserved for Registered UI Student Organizations and Departments only"); *see also Digital Displays* https://imu.uiowa.edu/event-services/policies/digital-display/ (explaining that the displays are "slides [that] run on TV screens throughout the IMU building" and that "[d]igital displays are a designated public forum for registered student organizations and university departments").

    c. **Chalking**. *See* The University of Iowa, *Chalking,* https://imu.uiowa.edu/event-services/policies/chalking/ ("Chalking is defined as the marking of a surface with chalk in order to publicize an upcoming event sponsored by a registered student organization. . . . Only registered student organizations may chalk.")

    d. **Ground Floor Displays**. *See* The University of Iowa, *Display Case Guidelines and Policies,* https://md.studentlife.uiowa.edu/clients/imu-ground-floor-display-case-guidelines-and-policies/ ("Thank you for choosing to advertise your event using the IMU ground floor displays! We're excited to promote your event and look forward to working with you! Registered student organizations and University departments are allowed to reserve display space on the ground floor of the Iowa Memorial Union (IMU). . . . This is a great opportunity to get the word out about your event for an entire month and make students/faculty more aware of your student organization or department!").

    e. **Information Tables**. *See* The University of Iowa, *Information Tables & Bake Sales,* https://imu.uiowa.edu/event-services/advertising-and-promotion/information-tables/ ("Information tables are provided so that registered student organizations and UI departments may make contact with students for the dissemination of information or to collect funds or other support (e.g., signatures, supplies) from persons outside its membership. . . . University guests or other non-university vendors or companies are not allowed at the information tables for sales-related, fundraising, or commercial activity without being sponsored by a

registered student organization in good standing with the Center for Student Involvement and Leadership").

    f.  **Hubbard Park Fence**. *See* The University of Iowa, *Hubbard Park Fence,* https://imu.uiowa.edu/event-services/policies/hubbard-park-fence/ ("Three (3) spaces are available on the Hubbard Park Fence for registered student organizations and university departments to hang signs and/or banners for the purpose of promoting special events or activities occurring on Hubbard Park or in the Iowa Memorial Union.").

71. The University also reserves a number of financial benefits and opportunities to registered student organizations. These include:

    a.  **Bake Sales**. *See* The University of Iowa, *Bake Sales,* https://imu.uiowa.edu/event-services/advertising-and-promotion/information-tables/bake-sales/ ("Registered student organizations are permitted to conduct bakes sales in the IMU at specified tabling areas or on Hubbard Park.").

    b.  **Subsidized space rentals**. *See* The University of Iowa, *Student Organizations,* https://imu.uiowa.edu/event-services/policies/student-organizations/ ("Registered student organizations in good standing with the Center for Student Involvement and Leadership (CSIL) are eligible to reserve space and receive a subsidized rate for use of the space"). Examples of subsidized rates include:

        i.  The Danforth Chapel. *See* The University of Iowa, *Danforth Chapel,* https://imu.uiowa.edu/event-services/outdoor-spaces/danforth-chapel-2/ (free for registered student organizations, $300 for the general public).

        ii.  The Sunporch. *See* The University of Iowa, *Sunporch,* https://imu.uiowa.edu/event-services/spaces/sunporch/ ($105 rate for registered student organizations, $525 for the general public);

        iii.  The Black Box Theater. *See* The University of Iowa, Black Box Theater – Room #360, https://imu.uiowa.edu/event-services/spaces/black-box-theater/ ($100 rate for registered student organizations; $400 for the general public).

    c.  **University catering discounts**. *See* The University of Iowa, *Catering,* https://catering.uiowa.edu/students ("University Catering has a full menu for student organizations at a discounted rate. . . . Student discounts are only offered to student organizations paying directly out of their student account.").

    d.  **Discounts on audiovisual equipment rental and University services**. *See* The University of Iowa, *A/V, Equipment, & Services,* https://imu.uiowa.edu/event-

[services/fees/](services/fees/) (listing dozens of discounts for student organizations on a variety of equipment and University services).[1]

**The University Deregisters InterVarsity**

72. On June 1, 2018, InterVarsity's student leaders received an email from the University stating that InterVarsity's existing constitution did not contain the following language verbatim:

*In no aspect of its programs shall there be any difference in the treatment of persons on the basis of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification which would deprive the person of consideration as an individual. The organization will guarantee that equal opportunity and equal access to membership, programming, facilities, and benefits shall be open to all persons. Eighty percent (80%) of this organization's membership must be composed of UI students.*

*See* Exhibit B.

73. The e-mail stated that if InterVarsity's constitution was not resubmitted with the language included verbatim by June 15, 2018, InterVarsity would be deregistered. *Id.*

74. The email was the first notice that any of InterVarsity's leaders had of the University's position that their constitution was noncompliant or otherwise needed to be updated.

75. The email linked to an FAQ document which stated that all submitted constitutions would be reviewed. *See* Exhibit C. Organizations that submitted accepted constitutions would receive confirmation of acceptance, and organizations that submitted noncompliant constitutions would be informed as much and told what they needed to change. *Id.* at 1-2.

76. InterVarsity's constitution already included a previous version of the required language, which was substantially identical to the language that the University now required. InterVarsity

---

[1] The University also allows registered student groups to reserve many specialized rooms at no cost while charging members of the general public $150 to reserve the rooms. *See* [https://imu.uiowa.edu/event-services/meetings/wisconsin-room/](https://imu.uiowa.edu/event-services/meetings/wisconsin-room/) (Wisconsin Room); [https://imu.uiowa.edu/event-services/meetings/miller-room/](https://imu.uiowa.edu/event-services/meetings/miller-room/) (Miller Room); [https://imu.uiowa.edu/event-services/meetings/kirkwood-room/](https://imu.uiowa.edu/event-services/meetings/kirkwood-room/) (Kirkwood Room); [https://imu.uiowa.edu/event-services/meetings/river-room-ii](https://imu.uiowa.edu/event-services/meetings/river-room-ii) (River Room Two).

updated its constitution to include the new language, but otherwise made no changes. It submitted the updated constitution on June 2, 2018.

77.   On June 12, 2018, the University emailed InterVarsity Graduate Christian Fellowship, informing them that their constitution did not comply with the University's requirements for RSOs, and stating that the University had "sent a few emails, and left a few voicemails, over the past few months" informing the group of the problem. *See* Exhibit D. The University told InterVarsity's student leaders that they had to update their constitution by the next day, June 13, 2018, or be deregistered. *Id.*

78.   That same day, Katrina Schrock, the incoming president of InterVarsity, responded to the email and said that she believed her group had already submitted their updated constitution. Andrew Kutcher, the Coordinator for Student Organization Development, replied that an updated constitution was not on file. *Id.* Ms. Schrock accordingly re-submitted the group's constitution, with the required language, and let Mr. Kutcher know. *Id.*

79.   That same day, Mr. Kutcher replied to Ms. Schrock and told her that although InterVarsity's constitution included the required language, it was deemed noncompliant because it also contained language limiting "the ability to become a member or to hold leadership positions." *Id.*

80.   Ms. Schrock explained to Mr. Kutcher that membership and participation is open to all students without restriction, and that the only restrictions were that leadership must ascribe to InterVarsity's faith. *Id.* She explained that this was because it is "important to have Christian leadership in a Christian organization," since that was necessary "to the fulfillment of our purpose." *Id.*

81. Mr. Kutcher responded that he "recognize[d] the wish to have leadership requirements based on Christian beliefs," but "[h]aving a restriction on leadership related to religious beliefs is contradictory" to the University's position. *Id.*

82. Ms. Schrock asked whether it would matter if InterVarsity changed its leadership requirement to be a strong preference that "strongly encouraged" leaders to share InterVarsity's faith. *Id.* She emphasized that this question was purely provisional and that she would have to talk with her leadership team to see if such a change would be permissible, but she was asking to try to explore potential solutions with the University. *Id.*

83. Mr. Kutcher responded that he would "discuss [the question] with our university attorney." *See* Exhibit E. About five hours later, he sent a follow-up email to Ms. Schrock stating that he had "just received word that we would not approve the change in language you proposed" because "the University and the Center for Student Involvement and Leadership must enforce our Human Rights Clause when it comes to leadership and membership." *See* Exhibit D.

84. Mr. Kutcher further stated that InterVarsity would be "deregistered" if it failed to submit a constitution with the required change, and that student groups could only "become reregistered when they submit governing documents compliant with the Human Rights Clause." *Id.*

85. Over a month later, on Friday July 20, 2018, it was reported that the University had deregistered the InterVarsity along with several other religious organizations including the Christian Pharmacy Fellowship, the Chinese Student Christian Fellowship, the Geneva Campus Ministry, the Imam Mahdi Organization, the J. Reuben Clark Law Society, the Latter-day Saint Student Association, and the Sikh Awareness Club. *See* Vanessa Miller, The Gazette, *University of Iowa deregisters another 38 groups* (July 20, 2018),

https://www.thegazette.com/subject/news/education/university-of-iowa-deregisters-another-38-groups-20180720.

86. Because it had been deregistered, InterVarsity was removed from the University website that the University provides for students to find and join student groups, OrgSync. *See* University of Iowa, Center for Student Involvement & Leadership (2018), http://uiowa.orgsync.com/. It is no longer listed on the web page.

87. When InterVarsity's members and leaders attempted to access InterVarsity's OrgSync webpage, which had allowed them to advertise announcements and group information online for interested students, they were confronted with a message that the page had been "disabled" because their group was "Defunct" as of "Summer 2018." *See*  https://orgsync.com/17566/disabled.



88. When InterVarsity leaders attempted to login to the administrative part of the OrgSync page, they saw a message that their page had been "disabled by the administrators of Center for Student Involvement & Leadership" because InterVarsity had "requested to be de-registered based on lack of interest from students."



89. As the University knows from its discussions with InterVarsity, it is completely false that InterVarsity "requested to be de-registered" or that there was "lack of interest from students."

90. InterVarsity had about $200 deposited in its student financial account maintained by the University. The University required InterVarsity to maintain all of its funds in that account. Some of the funds were derived from University sources; some were given by student members to support InterVarsity's religious mission. When the University deregistered InterVarsity, it also froze those funds and has denied InterVarsity access to them.

91.  Upon information and belief, the University had received no complaints about the Student Groups' leadership selection policies and practices.

92.  The two other InterVarsity groups on campus—International Neighbors and Black Campus Ministries—also submitted constitutions before the June 15 deadline that included the required verbatim language *and* the same Christian leadership requirements that the University relied on to deregister the InterVarsity Graduate chapter. Both those other groups are still registered, though neither ever heard back from the University either accepting or rejecting their constitutions. *See* Exhibit C at 1-2 (stating that the University would respond to submitted constitutions with either acceptance or rejection).

93.   Deregistration harms InterVarsity in a number of ways. In addition to the harm of having its First Amendment rights violated and suffering discriminatory stigma, it also prevents InterVarsity from having equal access to graduate and professional students during student orientation events and student organization fairs, or via communication mediums controlled by the University (such as OrgSync, informational tables, sidewalks, and digital and physical messaging boards). Further, a significant percentage of the population that InterVarsity serves is international students, who are particularly less likely to join a group that is not registered by the University both because of access issues and because of the stigma associated with deregistration. And because many of InterVarsity's participants and leaders are commuters, being denied equal access to meeting space uniquely hampers their ability to reach students who are only on campus for short periods of time.

94.   The University recently released student activity calendars showing that the Graduate Student Fair is on August 15, 2018, and the Registered Student Organization Fair is on August 30, 2018.

## CLAIMS

## COUNT I

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise & Establishment Clauses**
**Ministerial Exception**

95. Plaintiffs incorporate by reference all preceding paragraphs.

96.   Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the right to select their leaders without government interference. *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012).

97. Plaintiffs are religious organizations created to provide Christian ministry to students.

98.    Plaintiffs' leaders provide spiritual ministry by leading the study of scripture, prayers, and worship, and by selecting ways that their group can serve in the community and with other religious ministries as a means of expressing and developing its faith.

99.    Plaintiffs' leaders are selected based upon their agreement with their organization's religious beliefs, their willingness to live according to those beliefs, and their ability to express those beliefs effectively.

100.  Plaintiffs' leaders are the primary means by which the group shares its religious beliefs with others and are responsible for determining how it will express its faith to others.  Their leaders embody its faith.

101.  By threatening to revoke Plaintiffs' status as a registered student group, with the rights, benefits, and privileges that flow from that status, unless the Plaintiffs revise their statements of faith and modify their leadership standards, the University infringes their First Amendment rights to select their own leaders.

102.  By limiting Plaintiffs' ability to select their own leaders, the University also impermissibly entangles itself in the Plaintiffs' internal religious beliefs and internal religious affairs.

103.  Absent injunctive and declaratory relief against the University, the Plaintiffs have been and will continue to be irreparably harmed.

## COUNT II

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise & Establishment Clauses**
**Internal Autonomy**

104.    Plaintiffs incorporate by reference all preceding paragraphs.

105.  Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

106.  Plaintiffs are religious organizations created to establish a community on campus that helps students and faculty learn more about Christ, grow spiritually, and live faithfully.

107.  The Statement of Faith adopted in Plaintiffs' constitution sets forth their core religious beliefs that define their mission, guide their work, and help them select their leadership.

108.  Plaintiffs require their leaders to affirm the Statement of Faith to ensure that they are committed to the group's mission and are capable of authentically conveying the group's beliefs to other members.

109.  Plaintiffs' means of selecting their leadership is calibrated toward installing individuals who share and can express the group's faith.

110.  By conditioning access to registered student group status, along with the rights, benefits, and privileges that flow from that status, on an agreement to revise their internal method of selecting religious leaders, the University infringes Plaintiffs' First Amendment right to determine the content of their faith and to govern themselves regarding the expression of their faith to their members.

111. Absent injunctive and declaratory relief against the University, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT III

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Religious Animus/Targeting of Religious Beliefs**

112.  Plaintiffs incorporate by reference all preceding paragraphs.

113.  "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

114.  The government has no authority to control the content of or the expression of religious beliefs within the context of private religious associations. *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) ("The freedom to hold religious beliefs and opinions is absolute.").

115.  The University deregistered Plaintiff InterVarsity because the University claims that its leadership policies violate the University's position regarding its Human Rights policy.

116.  Other student organizations at the University are permitted to select their leadership, and even membership, on the basis of their values, purposes, and beliefs. This is true even when it results in excluding potential members or leaders on the basis of a class that is enumerated in the University's Human Rights policy.

117.  The University knows that it is unlawful to penalize Plaintiffs because of the content of their religious beliefs.

118.  By stripping Plaintiff InterVarsity's registered status because of its religious leadership requirements, the University is targeting and seeking to control Plaintiffs' religious beliefs as such, which violates the Free Exercise Clause of the First Amendment to the United States Constitution.

119.  The University's actions reflect animus toward religion, and Plaintiffs' religious beliefs in particular.

120. Absent injunctive and declaratory relief against the University, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT IV

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Not Generally Applicable**

121. Plaintiffs incorporates by reference all preceding paragraphs.

122. "[L]aws burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

123. The University's position regarding student group leadership selection is not applied to or enforced equally against all student organizations.

124. The Human Rights Policy requires that membership and participation in student organizations must be open to all students without regard to "race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual" and that "equal opportunity and equal access to facilities shall be available to all."

125. Many student organizations on campus, including fraternities and sororities, explicitly restrict membership and/or leadership on the basis of one or more of the categories identified in the Human Rights Policy.

126. Many student organizations on campus have an uninterrupted pattern of restricting membership and/or leadership on the basis of one or more of the categories identified in the Human Rights Policy.

127.   The University has failed to consistently enforce the Human Rights Policy against student organizations that restrict membership and/or leadership on the basis of one or more of the categories identified in the Human Rights Policy.

128.   Plaintiffs do not restrict *membership* on the basis of any of the categories identified in the Human Rights Policy, and they do not restrict *leadership* on the basis of any of the categories identified in the Human Rights Policy other than on the basis of religion.

129.   By stripping Plaintiff InterVarsity of its registered student organization status because of its religious leadership standards, the University is applying a standard to InterVarsity that is not generally applicable to other student organizations on campus.

130.   The University's enforcement position is under-inclusive in that it fails to restrict nonreligious conduct that endangers the University's stated interests in a similar or greater degree than does Plaintiffs' conduct.

131.   The University does not have a compelling government interest pursued by the least restrictive means to justify this unequal position against Plaintiffs.

132.   The University's discriminatory position violates the Free Exercise Clause of the First Amendment to the United States Constitution.

133.   Absent injunctive and declaratory relief against the University, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT V

**42 U.S.C. §1983**
**Violation of the First Amendment to the U.S. Constitution**
**Establishment Clause**
**Denominational Discrimination**

134.   Plaintiffs incorporate by reference all preceding paragraphs.

135.  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

136.  The University seeks to penalize Plaintiffs because of their religious beliefs.

137.  The University has not penalized some other religious groups on campus for their religious beliefs and leadership selection.

138.  The University's preference for some religious beliefs and leadership selection practices over Plaintiffs' religious beliefs and leadership selection practices violates the Establishment Clause of the First Amendment to the United States Constitution.

139.  Absent injunctive and declaratory relief against the University, the Student Groups and their members have been and will continue to be irreparably harmed.

## COUNT VI

### 42 U.S.C. §1983
### Violation of the First Amendment to the U.S. Constitution
### Free Speech Clause
### Expressive Association

140.  Plaintiffs incorporate by reference all preceding paragraphs.

141.  Applying the University's position to Plaintiffs would compel the groups to select leaders who do not share or live out the groups' religious beliefs.

142.  Plaintiffs are associations of like-minded Christians who seek to express their Christian faith through word and deed.

143.  Plaintiffs believe that their activities and organization are a witness of their members' faith and thus inherently expressive, having inescapable religious significance.

144. Causing Plaintiffs to accept leaders who do not believe and act in accordance with Plaintiffs' religious beliefs would force them to associate with and promote a message with which

they disagree and which runs contrary to the expressive purposes for which the Plaintiffs were created and operate.

145.   Compelling Plaintiffs to associate with and promote a message with which they disagree and which runs contrary to the expressive purposes for which they were created and operate is not narrowly tailored to a compelling governmental interest.

146.   Compelling Plaintiff InterVarsity to associate with leaders who do not believe and act in accordance with its religious beliefs would put into jeopardy its status as a chapter of the national InterVarsity organization and deprive the chapter of the opportunity to associate with likeminded believers.

147.   Defendants' actions thus violate Plaintiffs' right of expressive association as secured to it by the First Amendment of the United States Constitution.

148.   Absent injunctive and declaratory relief against the University's position, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT VII

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Compelled Speech**

149.   Plaintiffs incorporates by reference all preceding paragraphs.

150.   Applying the University's position to Plaintiffs would force them to accept leaders who do not share the group's faith and allow those leaders to pray, worship, teach, lead, and speak on behalf of the group.

151.   This forced inclusion of leaders who may not share Plaintiffs' religious beliefs and mission would communicate both to Plaintiffs' own members as well as to the community at large that Plaintiffs' views are different than what they actually espouse.

28

152.    Defendants' actions would thus violate Plaintiffs' right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

153.    Compelling Plaintiffs to convey messages that they disagree with is not narrowly tailored to a compelling governmental interest.

154.    Absent injunctive and declaratory relief against such compelled speech, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT VIII

**42 U.S.C. §1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Viewpoint Discrimination**

155.    Plaintiffs incorporate by reference all preceding paragraphs.

156.    Governmental efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of impermissible speech restriction. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

157.    The University seeks to discriminatorily penalize Plaintiffs because of their religious opinions and perspectives.

158.    Discriminating against Plaintiffs' expressed religious opinions and perspectives is not narrowly tailored to a compelling governmental interest.

159.    Absent injunctive and declaratory relief against the University, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT IX

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Assembly Clause**

160.    Plaintiffs incorporate by reference all preceding paragraphs.

29

161.  By denying Plaintiff InterVarsity registered student group status because of its religious leadership requirements, the University infringes on Plaintiffs' First Amendment right to "peaceably to assemble" to engage in otherwise lawful religious worship and speech activities with persons of their choosing. *See Thomas v. Collins*, 323 U.S. 516, 530–40 (1945).

162.  The University allows other student groups with a wide variety of ideological tenets and a wide variety of restrictions on membership and leadership to use University resources to assemble on campus.

163.  Without registered student group status, Plaintiff InterVarsity is denied University resources that are important for it to be able to meet, share its message, and grow its membership. These resources are available to other registered student groups.

164.  Absent injunctive and declaratory relief, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT X

**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**Equal Protection**

165.  Plaintiffs incorporate by reference all preceding paragraphs.

166.  The Equal Protection Clause prohibits discrimination on the basis of religion.

167.  The University's position penalizes Plaintiffs because of their religious beliefs by denying Plaintiff InterVarsity registered status while allowing other religious and non-religious groups with leadership and membership qualifications to maintain registered status.

168.  Organizations that espouse religious beliefs contrary to those espoused by Plaintiffs are allowed to maintain registered status.

169.  Other organizations that limit membership or leadership on the basis of a class that is listed in the University's Human Rights policy are allowed to maintain registered status.

170.  By preferring some types of membership and leadership requirements over Plaintiffs' leadership requirements, the University violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

171.  Absent injunctive and declaratory relief, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT XI

### Violation of the Iowa Human Rights Act

172.  Plaintiffs incorporates by reference all preceding paragraphs.

173.  Section 216.9 of the Iowa Human Rights Act declares that "[i]t is an unfair or discriminatory practice for any educational institution to discriminate on the basis of . . . religion."

174.  Such discrimination includes "[e]xclusion of a person or persons from participation in, denial of the benefits of, or subjection to discrimination in any . . . extracurricular . . . or other program or activity." *Id.* at § 216.9(a).

175.  The University has discriminated against Plaintiffs, their leadership, and their members on account of their religious beliefs and religious practices.

176.  Further, by deregistering Plaintiff InterVarsity, the University is denying Plaintiff InterVarsity the ability to fully participate in University life on equal grounds with all other student groups.

177.  Such denials constitute a violation of the Iowa Human Rights Act.

178.  Absent injunctive and declaratory relief on the grounds that the University has violated the Iowa Human Rights Act, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT XII

**Violation of the Iowa Constitution Article I, § 3**
**Free Exercise Clause**

179.  Plaintiffs incorporate by reference all preceding paragraphs.

180.  Article I, § 3 of the Iowa Constitution provides that "[t]he General Assembly shall make no law . . . prohibiting the free exercise" of religion.

181.  Plaintiffs exercise their religion when they select leaders who embrace and follow their beliefs.

182.  The University, an arm of the State of Iowa, substantially burdens Plaintiffs' free exercise of religion by denying Plaintiff InterVarsity registered status, and the benefits that come with that status, because Plaintiffs require their leaders to embrace and follow their religious beliefs.

183.  A decree forcing Plaintiffs to have leaders who believe and act in direct contradiction to their religious beliefs, or lose registered status, would not be narrowly tailored to accomplishing a compelling government interest.

184.  Forcing Plaintiffs to have leaders who believe and act in direct contradiction to their religious beliefs, or lose registered status, would violate the rights secured to them by Article I, § 3 of the Iowa Constitution.

185.  Absent injunctive and declaratory relief against the University's enforcement of its position, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT XIII

### Violation of the Iowa Constitution Article I, § 4
### No Punishment for Religious Beliefs

186.  Plaintiffs incorporate by reference all preceding paragraphs.

187.  Article I, § 4 of the Iowa Constitution provides that "no person shall be deprived of any of his rights, privileges, or capacities, or disqualified from the performance of any of his public or private duties . . . in consequence of his opinions on the subject of religion[.]"

188.  Applying the University's position against Plaintiffs for selecting leaders who endorse and abide by their religious beliefs would punish Plaintiffs and their members for their religious beliefs in violation of the rights secured to them by Article I, § 4 of the Iowa Constitution.

189.  Absent injunctive and declaratory relief against Defendants' enforcement of its position, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT XIV

### Violation of the Iowa Constitution Article I, § 7
### Compelled Speech

190.  Plaintiffs incorporate by reference all preceding paragraphs.

191.  Article I, § 7 of the Iowa Constitution provides that "Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right.  No law shall be passed to restrain or abridge the liberty of speech."

192.  Applying the University's position to Plaintiffs would force them to accept leaders who do not share their faith, and force them to allow those leaders to teach Bible studies, lead prayer, worship, and other outreach activities, and generally carry the groups' message.

193.  This forced inclusion of leaders who do not share Plaintiffs' religious beliefs and mission would communicate both to Plaintiffs' own members as well as to the community at large that Plaintiffs' beliefs are insincere and are different than what they actually espouse.

194.  Defendants' actions would thus violate Plaintiffs' right to be free from compelled speech as secured to them by Article 1, § 7 of the Iowa Constitution.

195.  Compelling Plaintiffs to convey messages that they disagree with is not narrowly tailored to a compelling governmental interest.

196.  Absent injunctive and declaratory relief against such compelled speech, Plaintiffs and their members have been and will continue to be harmed.

## COUNT XV

### Violation of the Iowa Constitution Article I, § 7
### Viewpoint Discrimination

197.  Plaintiffs incorporate by reference all preceding paragraphs.

198.  Governmental efforts to regulate speech based on the viewpoint of the speaker are impermissible viewpoint discrimination.

199.  The University seeks to penalize Plaintiffs because of their religious opinions and perspectives.

200.  The University's position privileges the expression and views of groups that have different beliefs and perspectives.

201.  The University's preference for one set of opinions and perspectives about religious leadership and against Plaintiffs' religious beliefs violates Article I, Section 7 of the Iowa Constitution.

202.   Discriminating against Plaintiffs' expressed religious opinions and perspectives is not narrowly tailored to a compelling governmental interest.

203. Absent injunctive and declaratory relief against the University, Plaintiffs and their members have been and will continue to be irreparably harmed.

## COUNT XVI

**Violation of the Iowa Constitution Article I, § 7**
**Expressive Association**

204. Plaintiffs incorporate by reference all preceding paragraphs.

205. Applying the University's position to Plaintiffs would compel them to select leaders who believe and live in contradiction to Plaintiffs' religious beliefs.

206. Plaintiffs are associations of like-minded Christians who seek to express their Christian faith through word and deed.

207. Plaintiffs believe that their activities and organization are a witness of their faith and thus inherently expressive, having inescapable religious significance.

208. Causing Plaintiffs to accept leaders who do not believe and act in accordance with Plaintiffs' religious beliefs would force the groups to associate with and promote a message with which it disagrees and which runs contrary to the expressive purposes for which Plaintiffs were created and operate.

209. Defendants' actions thus would violate Plaintiffs' right of expressive association as secured to it by Article I, Section 7 of the Iowa Constitution.

210. Absent injunctive and declaratory relief against the University's position, Plaintiffs and its members have been and will continue to be harmed.

## COUNT XVII

**Violation of Article I, § 20 of the Iowa Constitution**
**Assembly Clause**

211. Plaintiffs incorporate by reference all preceding paragraphs.

212.  Article I, § 20 of the Iowa Constitution provides that "The people have the right freely to assemble together to counsel for the common good; to make known their opinions to their representatives and to petition for a redress of grievances."

213.  The University infringes on Plaintiffs' right of assembly by denying Plaintiff InterVarsity registered status because of their religious decision to require their leaders to share their religious beliefs.

214.  Without registered student group status, Plaintiff InterVarsity is not eligible to use University resources to meet, share the Plaintiffs' message, or grow their membership numbers.

215.  Absent injunctive and declaratory relief against such compelled speech, Plaintiffs and their members have been and will continue to be harmed.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

a.  Declare that the First and Fourteenth Amendments to the United States Constitution, the Iowa Constitution, and the Iowa Human Rights Act require Defendants to cease discriminating against Plaintiffs and to cease withholding registered student organization status on the basis of Plaintiffs' religious leadership selection policies.

b.  Issue an injunction prohibiting the University from denying Plaintiffs registered student organization status based on the content of their religious leadership selection policies.

c.  Award Plaintiffs damages and nominal damages for the loss of their rights as protected by the United States and Iowa Constitutions.

d.  Award Plaintiffs the costs of this action and reasonable attorney's fees; and

e.      Award such other and further relief as the Court deems equitable and just.

## JURY REQUEST/DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted,

/s/ *Matt M. Dummermuth*
Matt M. Dummermuth
Hagenow Gustoff & Dummermuth, LLP
600 Oakland Rd. NE
Cedar Rapids, IA 52402
(319) 849-8390 phone
(888) 689-1995 fax
*mdummermuth@whgllp.com*

Eric S. Baxter*
      *Lead Counsel*
Daniel H. Blomberg*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketlaw.org*
*dblomberg@becketlaw.org*

**Counsel for Plaintiff**

    *Admission pro hac vice pending*