**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IOWA
EASTERN DIVISION**

INTERVARSITY CHRISTIAN      )
FELLOWSHIP/USA, *ET AL.,*       )     Civil Action No.: 3:18-cv-00800-SMR-SBJ
                          )
      Plaintiff,            )
                          )
      vs.                )
                          )
THE UNIVERSITY OF IOWA, *ET AL.*,  )
                          )
      Defendants.         )
_____)

---

**BRIEF OF PROPOSED *AMICI CURIAE*
JEWISH COALITION FOR RELIGIOUS LIBERTY AND ASMA UDDIN
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................... 3

IDENTITY AND INTEREST OF AMICI CURIAE.................................................... 4

INTRODUCTION .................................................................................................... 5

ARGUMENT ........................................................................................................... 6

I.    The University's Ban on Faith Requirements for Religious Leaders is Particularly Harmful to Minority Religions ........................................................... 7

    A.    The Free Exercise Clause is Especially Important to Minority Religions ............. 7

    B.    There are Unique Aspects of *Amici*'s Faith That Would Make a Ban on Faith Requirements for Leaders Particularly Harmful .................................................. 10

        1.    Judaism is a faith that must be experienced.................................................... 10

        2.    Jewish and Muslim leadership must be dedicated to the principles of their faith. ................................................................................................................. 11

        3.    Forcing Jewish or Muslim religious organizations to accept leaders that do not adhere to their faith would make it more difficult for such groups to function on campus. ....................................................................................................... 12

II.   The Policy Violates InterVarsity's Free Exercise Rights ................................... 13

    A.    The Policy Infringes Religious Student Organizations' Right to Choose Their Own Leaders ...................................................................................................... 13

    B.    The Policy Discriminates Against Religion and Cannot Satisfy Strict Scrutiny. . 16

        1.    The Policy Discriminates Against Religion.................................................... 16

        2.    The Policy does not satisfy strict scrutiny. .................................................... 17

CONCLUSION........................................................................................................ 19

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. Civ. P. 7.1, *Amicus Curiae* the Jewish Coalition for Religious Liberty hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.  *Amicus Curiae* Asma T. Uddin is an individual and is thus not subject to Rule 7.1.

## **IDENTITY AND INTEREST OF *AMICI CURIAE***

The Jewish Coalition for Religious Liberty is an association of American Jews concerned with the current state of religious liberty jurisprudence.  It aims to protect the ability of all Americans to practice their faith freely and to foster cooperation between Jews and other faith communities.  Its founders have worked on amicus briefs in the Supreme Court of the United States and lower federal courts, submitted op-eds to prominent news outlets, and established an extensive volunteer network to spur public statements and action on religious liberty issues by Jewish communal leadership, including resolutions from the Rabbinical Council of America.

Asma T. Uddin is a religious liberty lawyer and scholar working for the protection of religious expression for people of all faiths in the U.S. and abroad.  Her areas of expertise include law and religion (church/state relations), international human rights law on religious freedom, and Islam and religious freedom.  Uddin has worked on religious liberty cases at the U.S. Supreme Court, federal appellate courts, and federal trial courts. She has defended religious claimants as diverse as Evangelicals, Sikhs, Muslims, Native Americans, Jews, Catholics, and members of the Nation of Islam. Her legal, academic, and policy work focuses on freedom of expression such as religious garb, land use, access to religious materials in prison, rights of parochial schools, religious arbitration, *etc.*

## **INTRODUCTION**

*Amici* write to express their alarm at the actions of the University of Iowa in de-registering religious student organizations that require their religious leaders to adhere to a statement of faith. This includes InterVarsity Graduate Christian Fellowship, the plaintiff here, and several minority religious organizations, including Muslim, Sikh, Latter-day Saints, and a Chinese Protestant religious organization.   According to the University, these faith requirements contradict the University's Policy of Human Rights, which prohibits registered student organizations from discriminating on the basis of protected categories, including religion, race, and sex.   The University claims that a religious student organization that requires its religious leaders to affirm a statement of faith discriminates on the basis of religion.

The University's actions "violate[] the Nation's essential commitment to religious freedom." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 524 (1993).   While *Amici* do not share InterVarsity's faith, *Amici* maintain that the University's attempt to dictate to *any* religious student organization who it may—and who it may not—choose as its religious leaders threatens the First Amendment rights of all religious students—especially of those who belong to minority faiths.   The Free Exercise Clause is designed to protect minority religions from the tyranny of the majority, and a ban on faith requirements threatens to allow majoritarian influences to erode the unique beliefs and practices of minority religions.   Further, there are several aspects of the *Amici*'s faith that would make a ban on faith requirements particularly challenging to overcome.

*Amici* also wish to point out, again with a focus on minority religious, that the University's actions also violate settled law.  Specifically, the University ignores the special autonomy that religious organizations have to select their leaders.  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, ___ U.S. ___, 132 S. Ct. 694, 699-702 (2012).  Forbidding a religious student organization from imposing religious criteria for its religious leadership eviscerates the group's right to govern its own belief and religious affairs.

In addition, the University's actions here were neither neutral nor generally applicable toward religion under *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990).  This is so because, among other things, (1) the Policy does not forbid non-religious issue-advocacy student groups from imposing a viewpoint requirement on its leaders, and (2) the University specifically allows numerous exceptions from the Policy for various non-religious student organizations.  Moreover, the University's invocation of "diversity" as the justification for the Policy does not satisfy strict scrutiny.  To be sure, diversity is a laudable goal, but enforcing the Policy to restrict religious leadership does not serve that goal, which is presumably the reason for the University's own myriad exceptions to Policy.  Furthermore, under the University's new interpretation of the Policy, the Policy would lead to *less* diversity in religious groups, not more. Instead of undermining diversity through policies that lead to the homogenization of religion on campus, the University ought to respect religious student organizations' differences and allow them to flourish.

## ARGUMENT

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  The Free Exercise Clause is applicable to the

states through incorporation into the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

I.     **The University's Ban on Faith Requirements for Religious Leaders is Particularly Harmful to Minority Religions**

A.   The Free Exercise Clause is Especially Important to Minority Religions

In evaluating whether the University's decision to ban faith requirements for religious leaders is a valid exercise of governmental power, it is particularly useful to look to the impact of such a decision on minority religions.  "Indeed, [the Free Exercise Clause] was specially concerned with the plight of minority religions."  *See* Amar, A., *The Bill of Rights as a Constitution*, 100 Yale L. J. 1131, 1159 (1991).  As Justice O'Connor stated in her concurrence in *Smith*:

> the First Amendment was enacted precisely to protect the rights of those whose religious practices are not shared by the majority and may be viewed with hostility. Indeed, . . . "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

*Smith*, 494 U.S. at 902-03 (quoting West *Virginia State Bd. of Ed. v. Barnett*, 319 U.S 624, 638 (1942)).

The Free Exercise Clause thus recognizes that minority religions are uniquely vulnerable to the tyranny of the majority, and it insulates minority religions from those threats.  These rights are crucial, because, even putting aside the extensive instances of overt religious discrimination against minority religions in our nation's history, the Free Exercise Clause recognizes that even well-meaning members of the majority can unwittingly infringe upon religious practices with which they are unfamiliar.  When government action intersects with its citizens' faith, as it often does, the religious practices of the majority are often unthinkingly accommodated, both through

written laws and unwritten social mores, whereas the religious practices of minorities simply don't register in the collective consciousness of the lawmaking majority.

Indeed, even seemingly neutral laws can inordinately burden the religious practices of minority groups. *See* Berg, T., *Minority Religions and the Religion Clauses*, 82 Wash. U. L. Rev. 919, 965 (2004) ("Because laws tend to reflect the majority's values, rules that on their face treat all faiths equally, and reflect no intent to discriminate, will nevertheless have an unequal impact on different faiths."). As Justice Brennan stated in his dissent in *Goldman v. Weinberger*:

> Definitions of necessity [in justifying governmental infringements on religion] are influenced by decisionmakers' experiences and values. As a consequence, in pluralistic societies such as ours, institutions dominated by a majority are inevitably, if inadvertently, insensitive to the needs and values of minorities when these needs and values differ from those of the majority . . . . A critical function of the Religion Clauses of the First Amendment is to protect the rights of members of minority religions against quiet erosion by majoritarian social institutions that dismiss minority beliefs and practices as unimportant, because unfamiliar.

475 U.S. 503, 523-524 (1986). As an example of this point, during a recent oral argument, a judge on the Fifth Circuit Court of Appeals stated that turning "on a light switch every day" was a prime example of an activity that was unlikely to constitute a substantial burden on religious exercise. Oral Argument at 1:00:00, *East Texas Baptist Univ. v. Burwell*, 2015 WL 3852811 (5th Cir. Apr. 7, 2015). To an Orthodox Jew, however, turning on a light bulb on the Sabbath could constitute a violation of a biblical prohibition on lighting a fire on the Sabbath found in Exodus 35:3. The case law demonstrates the importance of the First Amendment, and laws protecting free exercise rights, to minority religions and minority religious practice. *See, e.g. Holt v. Hobbs*, ___ U.S. ___, 135 S. Ct. 853 (2015) (Muslim practice of wearing a beard), *Gonzalez v. O Centro*, 546 U.S. 418 (2006) (UDV practice of consuming hallucinogenic drugs); *Church of the Lukumi*, 508 U.S. 520 (Church of the Lukumi practice of animal sacrifice); *Goldman*, 475 U.S. 503 (Jewish practice of wearing a yarmulke); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) (Jehovah's Witness

practice of refusing to participate in wars); *Sherbert*, 374 U.S. 398 (Seventh Day Adventist observance of Saturday Sabbath); *Barnette*, 319 U.S. 624 (Jehovah's Witness practice of refusing to pledge allegiance to our nation during a time of war).

Against this backdrop, the University's ban on faith requirements for leaders is likely to be particularly harmful to minority religious groups.  Either due to overt discrimination or simple misunderstanding, minority religious groups are more vulnerable to erosion of their group identity through majoritarian influences.  Indeed, the University's own review of its registered student organizations found that most student organizations that had a status-based requirement in violation of the Policy *were minority groups*—*i.e.*, groups who were trying to form themselves around a certain racial, gender, or cultural minority. (*See* IVCF App 411 ("Student organizations with language inconsistent with the [Policy] are primarily those associated with one of the protected classes/characteristics in the statement.  *The inconsistency is typically related to the class/characteristic with which the group is associated*." (emphasis added)).)  Despite the fact that these non-religious minority student organizations are operating in clear violation the Policy by discriminating on the basis of a protected category, the University has attempted to accommodate them through a variety of formal exemptions and non-enforcement policies, as explained in InterVarsity's Memorandum in Support of its Motion for Summary Judgment.  The University, however, has made no such accommodation for religious belief.  If this practice is left to stand, it will likely lead to erosion of minority religious student organizations' unique identity.

The ultimate impact of the University's application of the Policy is to remove religion from the public square. This effect is particularly harmful to minority religions because if other Americans cannot interact with these groups in public, they are less likely to understand and appreciate them.  In this way, the secularization of civil society presents a unique threat to minority

religions: not only do their beliefs put them outside the mainstream, but without meaningful public interaction with others, their beliefs will be viewed with suspicion and likely deemed less worthy of protection. *See* McConnell, M., *Religious Participation in Public Programs: Religious Freedom at a Crossroads*, 59 U. Chi. L. Rev. 115, 168 (1992) ("The more serious threat to religious pluralism today is a combination of indifference to the plight of religious minorities and a preference for the secular in public affairs.  This translates into an unwillingness to enforce the Free Exercise Clause when it matters . . . .").

B. <u>There are Unique Aspects of *Amici*'s Faith That Would Make a Ban on Faith Requirements for Leaders Particularly Harmful</u>

Bans on faith requirements for leaders of student religious groups are unconstitutional and disproportionately harm minority religions.  Certain aspects of the nature of Jewish and Muslim practice makes it essential that their religious organizations be permitted to appoint their own adherents as leaders.

1. *Judaism is a faith that must be experienced.*

For many Jews, Judaism is more than the mere intellectual assent to certain religious principles.  Although that is part of what it means to be an observant Jew, Judaism must be lived in order to be appreciated.  Anyone can read a book about observing the Sabbath, repenting on the holiday of Yom Kippur, communally mourning national tragedies on the fast of the 9th of Av, or the national origin story of Passover.  But mere passive knowledge is no substitute for living out those practices and internalizing them as a member of the community with a shared sense of history, obligation, and belonging. Only someone who has experienced these practices as an insider can fully understand and appreciate them.

The Passover service (Seder) focuses on the notion that Jews should see themselves as if they were personally taken out of Egypt.  The services on the fast of the 9th of AV include Jewish

rituals and restrictions of mourning. Jews spend the day acting in a manner similar to how they would act if a close family member had recently died. These are matters of personal experience—not intellectual assent—and there is simply no substitute for having experienced these activities "on the inside" as a member of the community.

A Jewish religious organization must be allowed to pick its leaders because it would be almost impossible for a member of another faith to fully appreciate Judaism as a lived faith. Therefore, observant Jewish leaders are uniquely qualified to lead a religious Jewish organization whose mission includes propagating religious ideals. This does not disparage any other human being; it merely recognizes that people who have first-hand experience with Judaism are uniquely qualified to lead religious Jewish organizations.

2. *Jewish and Muslim leadership must be dedicated to the principles of their faith.*

For Jewish or Muslim religious organizations to host events that religious Jews or Muslims will be comfortable attending, the organizations must be led by people who are dedicated and personally adhere to the principles, traditions, and laws of the faith.

Take, for example, Jewish laws that relate to the Sabbath. Sabbath laws govern nearly every activity that a religious Jewish person conducts on Saturday. This includes restrictions or prohibitions on activities including writing, the use of electricity, cooking, and spending money. In many cases, religious Jews believe that it is forbidden even to benefit from another Jew's violation of the Sabbath. Many religious Jews would not attend a religious event hosted on Saturday unless he was certain that such strictures were adhered to.

Kosher laws are similar. Kosher food preparation requires an extensive knowledge of the laws and a willingness to adhere to those laws strictly despite the difficulties they entail. Many religious Jews, for example, go through a rigorous process of washing vegetables and checking to make sure that they do not contain bugs—because bugs are not kosher. Many religious Jews would

not eat vegetables unless they were certain that such processes were strictly followed. Kosher laws do not only apply to the food that is served as an event; instead, they govern every aspect of the preparation and heating of the food, as well as the utensils and cooking-ware used to prepare for the food. Importantly, these laws require both a knowledge of the requirements and a willingness to follow the restrictions even though it would be significantly easier to take shortcuts.

Many religious Jews would be far more comfortable joining an organization that performs Jewish religious functions if that organization is headed by another observant Jew. If the organization's events included Sabbath, holiday, or food related events, it would prove prohibitively difficult without religious leadership or supervision.

Islam also has dietary restrictions. At the most basic level, no alcohol, pork, or pork byproduct can be used in the meal. At a more complicated level, any other meat, such as chicken, beef, or lamb, must come from an animal that is ritually slaughtered in a process called zabihah. Muslim students would need to know that whoever is arranging their food-related events knows and respects these rules.

>   3. *Forcing Jewish or Muslim religious organizations to accept leaders that do not adhere to their faith would make it more difficult for such groups to function on campus.*

Jewish and Muslim history is replete with examples of persecution. This includes events like the crusades and the inquisition, attempts by groups like the Soviets and the Jacobins to secularize and assimilate Jews, and myriad more forms of persecution that still occur around the world on a daily basis today. It is thus crucially important that Jews and Muslims be permitted to safeguard their own religious identity. Here, the University has not singled out Jewish or Muslim student organizations for disparate treatment, but that does not make the threat of the University's actions to Jewish and Muslim religious identity any less real. These faiths are still distinctive minority faiths that are set apart from the majority secular and religious cultures.

12

If Jewish and Muslim religious organizations are not allowed to pick their own leaders, they are entirely at the mercy of their majoritarian neighbors. If, for example, members of the majority wanted to undermine the Jewish or Muslim nature of a religious organization—say, for reasons related to anti-Semitism, anti-Islam bias, or simply because the majority found the religious practice offensive—all they would have to do is join the organization and vote for leadership that would change the nature of the group. Moreover, and less drastically, even from within, Jewish and Muslim faith are not monolithic. If a potential religious leader did not ascribe to the religious tenets of the particular Jewish or Muslim religious group at issue, requiring the group to nevertheless select that leader presents a clear—and unwarranted—threat to its existence. For example, Shia Muslims' daily prayers are different from those of Sunni Muslims, and a leader of a Muslim student organization must understand and accommodate these types of differences. The two sects also differ on when to break the Ramadan fast: Sunnis break right at sunset, while Shias wait until it is fully dark. Student groups on campus usually provide break-fasting meals, so it is important for the leaders to understand these nuanced differences in practice.

## II.   The Policy Violates InterVarsity's Free Exercise Rights

Two principles of Free Exercise jurisprudence compel the conclusion that the University's ban on faith requirements for religious leaders is impermissible. First, the government is not permitted to interfere with the internal affairs of religious organizations, including their selection of religious leaders. Second, discriminatory laws that burden religion are subject to the highest form of scrutiny, and the University's actions do not satisfy that exacting standard here.

### A.   The Policy Infringes Religious Student Organizations' Right to Choose Their Own Leaders

The Free Exercise Clause safeguards the rights of both individuals and religious organizations. *Church of the Lukumi*, 508 U.S. at 533. As to organizations, the government may

not interfere with religious organizations' internal affairs; it cannot formulate their articles of faith, determine their methods of worship, select their holy texts, *etc.*  *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (noting that religious organizations must have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."); *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976) ("Civil courts [must protect the autonomy of religious groups] on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.").

Religious organizations' freedom with respect to their internal affairs extends to their selection of religious leaders.  In *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, a religious school fired one of its teachers for reasons the teacher contended violated federal anti-discrimination law.  565 U.S. 171, 178-181 (2012).  In response to the EEOC's lawsuit on the teacher's behalf, the Supreme Court unanimously held that it would violate the Religion Clauses if the government were to use federal law to interfere with the school employment decision. *Id.* at 188-89.  According to the Supreme Court,

> [r]equiring a [religious organization] to accept or retain an unwanted minister . . . intrudes upon more than a mere employment decision.  Such action interferes with the internal governance of the [organization,] depriving [it] of control over the selection of those who will personify its beliefs.  By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.

*Id.* at 706.  Indeed, the "very existence" of religious organizations is threatened by governmental intrusion into their "freedom to choose who is qualified to serve as a voice for their faith."  *Id.* at 712 (Alito, J., joined by Kagan, J., concurring); *see also Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985) ("The right to choose ministers without government restriction underlies the well-being of religious community, for perpetuation of a [religious organization's] existence may depend upon those whom it selects to preach its

values, teach its message, and interpret its doctrines both to its own membership and to the world at large." (internal citations omitted)).

The Free Exercise Clause does more than protect against government action that directly infringes upon religion. It also prohibits the government from discriminating against religious organizations when it disseminates publicly-available benefits. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, ___ U.S. ___, 137 S. Ct. 2012, 2022 (2017) ("To condition the availability of benefits . . . upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties."). For this reason, denial of access to a benefit, such as a public forum, based on an unconstitutional condition, such as the University's attempt to impose restrictions on who a religious organization may chose as its leaders, constitutes a violation of the Free Exercise Clause. *Id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 402 (1963) (noting that "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

Applying these principles here leads inexorably to the conclusion that the University's ban on faith requirements violates InterVarsity's Free Exercise rights. Just as a religious school must be permitted to select its own religious leaders, so to must religious organizations be permitted to select their own religious leaders. *Hosanna-Tabor*, 565 U.S. at 706 (concluding that a religious organization must be permitted to "shape its own faith and mission through its appointments"). Indeed, the "very existence" of InterVarsity at the University depends on it. *Id.* at 712 (Alito, J., joined by Kagan, J., concurring). And for reasons already discussed, it is crucially important that minority religions have the freedom to choose religious leaders so they may maintain their distinctive faith against the tide of majoritarianism.

B.  <u>The Policy Discriminates Against Religion and Cannot Satisfy Strict Scrutiny.</u>

Further, the University's ban on faith requirements also violates the Free Exercise Clause because it is being enforced in a discriminatory manner without sufficient justification.  If a law burdens religious exercise and is discriminatory toward religion, to comply with the Free Exercise Clause, it must "advance interests of the highest order" and be "narrowly tailored in pursuit of those interests."  *Church of the Lukumi*, 508 U.S. at 546 (internal quotation marks omitted).  Laws are discriminatory toward religion if they are either (1) not neutral as it pertains to religion (or among religions) or (2) not generally applicable to religions and non-religions alike (or not generally applicable as among religions).  *Id.* at 547; *Smith*, 494 U.S. at 880; *see also Larson v. Valente,* 456 U.S. 228, 244 (1982) ("[G]overnment cannot "prefer one religion over another").

1.  *The Policy Discriminates Against Religion.*

Here, the University's ban on faith requirements for religious leaders discriminates against religion and, therefore, is neither neutral nor generally applicable.  For one thing, the University's application of the Policy overtly discriminates against religion as such.  Although the University interprets the Policy to preclude ***religious*** student organizations from imposing faith requirements on its leaders, the Policy allows ***non-religious*** issue-advocacy student organizations to require their leaders to adhere to the secular principles advocated by those groups.  But the only difference between a faith requirement and secular viewpoint requirement is that the first view is rooted in religion and the second view is not.  When the government regulates religious conduct but does not regulate analogous secular conduct, the government has impermissibly burdened religion.  *Church of the Lukumi*, 508 U.S. at 545-46 (observing that a regulation "society is prepared to impose upon [religious groups] but not itself" is the "precise evil the requirement of general applicability is designed to prevent" (internal quotation marks omitted)).

16

For another thing, the University has not applied the Policy in an evenhanded manner as between **religion** and the **other protected categories** under the Policy. On its face, the Policy forbids student organizations from discriminating on several bases other than religion, including race and sex. Despite this fact, as set forth in InterVarsity's Memorandum in Support of its Motion for Summary Judgment, the University has, by policy, allowed scores of non-religious minority student organizations to discriminate openly on the basis of race and sex, among other things, in direct violation of the Policy, while no such exemption has ever been formally granted to a religious student organization. When the government allows exemptions from a policy on non-religious grounds but not religious ones, it makes an "impermissible value judgment" preferring the non-religious over the religious, thereby discriminating against religion. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.); *see also Smith*, 494 U.S. at 884 ("[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason.").

2. *The Policy does not satisfy strict scrutiny.*

Because the University's actions here burden religion and are neither neutral nor generally applicable, the University must satisfy strict scrutiny. This it cannot do. In the *Business Leaders in Christ* case, the University invoked *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) to defend the Policy, arguing that it adopted the Policy in an effort "to create a diverse student body." (*See Business Leaders in Christ v. University of Iowa, et al.*, No. 3:17-cv-00080, SMR-SBJ (S.D. Iowa 2018), Defendants' Brief in Support of Resistance to Plaintiff's Motion for Preliminary Injunction at 14.) This argument does not satisfy the University's burden. As an initial matter, the University's own myriad exclusions from and exceptions to the Policy undermines any claim that diversity is a compelling interest here. *Church of the Lukumi*, 508 U.S. at 546-47 ("Where government restricts only conduct protected by the First Amendment and fails to enact feasible

17

measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling.").

Moreover, this case is easily distinguishable from *Grutter*.  In *Grutter*, the Supreme Court held that "student body diversity is a compelling state interest that can justify the use of race in university ***admissions***."  539 U.S. at 325 (emphasis added).  This case, by contrast, involves the University's restrictions on the registration of organizations of students who are ***already admitted to the University***.  By definition, banning faith requirements for leaders of student groups cannot increase the diversity of the student body.

In fact, far from ***increasing*** diversity, the University's ban on faith requirements will actually ***decrease religious diversity*** on campus.  "A civil society is formed by people who create voluntary associations, often around a particular identity," and university "[c]ampuses are one of the places where young people learn how to do this."  Eboo Patel, Should Colleges De-Register Student Groups, Inside Higher Ed (September 28, 2018), available online at https://www.insidehighered.com/blogs/conversations-diversity/should-colleges-de-register-student-groups, last visited December 21, 2018.  Indeed, university campuses should be the quintessential "marketplace of ideas."  *Healy v. James*, 408 U.S. 169, 180 (1972).

Before the University banned faith requirements for leaders of religious student groups, many different religions were represented in the University's public forum.  The response to the University's ban, however, if not overturned, will be that religious groups will either (1) attempt to conform to the University's forced inclusion, thus compromising the very thing that makes them unique or (2) more likely, simply leave campus entirely.  Either way, the result will be a campus that has ***fewer*** opportunities for religious expression:  Religious organizations that chose to leave will be gone, and those that choose to stay will invariably have their principles of faith watered

down or otherwise altered by leaders who may or may not adhere to the organizations' religious principles.[1]

This dilution and forced homogenization of religion through governmental control—where the few religious organizations left standing are required to sacrifice their distinct religious character—is not the type of pluralism envisioned by the Free Exercise Clause, nor does it honor the principle of diversity invoked by the University here.   Instead, true diversity is attained by allowing each religious organization the ability to practice *its own* unique religion free from unwarranted governmental interference.   True diversity entails providing a forum where different groups can both maintain their own unique identities and enrich society as a whole.   A diverse civil society is "a place where people with differing identities and deep disagreements can collectively flourish, respecting one another's identities, building relationships across disagreements a cooperating where they can to serve the common good." *See* Patel, *supra*.   That is precisely what the Free Exercise Clause envisions, and it is the antithesis of what the University is proposing here.

## CONCLUSION

In evaluating whether the University's ban on faith requirements for religious leaders has violated the Free Exercise Clause, the Court should take special care to consider the impact of the University's actions on minority religions.   As demonstrated herein, that impact would be grave; indeed, the very existence of minority student religious organizations would be at risk. Under a

---

[1] There are two variants of the threat to religious organizations posed by the University's ban on faith requirements for leaders.   One is that, in the absence of such a faith requirement, a group of students who overtly disagree with a religious organization's statement of faith will take over the student organization and change its message to suit their views.   The other is that the religious organization will simply lose control of its ability to ensure the student organization's doctrinal conformity with its own principles of faith, which will invariably result in some measure of either dilution or alteration of the religious organization's statement of faith.

straightforward application of existing jurisprudence, there can be only one conclusion—the University has violated the Free Exercise Clause.

Respectfully submitted,

BEATTIE LAW FIRM, P.C.,

By:/s/ Brett J Beattie
Brett J. Beattie (IA License # AT0008988)
4300 Grand Ave.
Des Moines IA 50312
Phone: (515) 263-1000
FAX: (515) 263-1411
brett.beattie@beattielawfirm.com

AND

GORDON & REES LLP


By: */s/Josh Dixon*

Josh Dixon
40 Calhoun Street, Suite 350
Charleston, SC  29401
Telephone: 843.714.2500
E-mail:jdixon@grsm.com
*Pro Hac Vice Admission Pending*

**Attorneys for Jewish Coalition for Religious Liberty and Asma Uddin**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of December, 2018, I electronically filed a true and accurate copy of the foregoing Brief of Proposed Amici Curiae Jewish Coalition for Religious Liberty and Asma Uddin with the Clerk of Court using the CM/ECF system.  All participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

Respectfully submitted on this 21st day of December, 2018.

By:/s/ Brett J Beattie_____

Attorneys for Jewish Coalition for Religious
Liberties and Asma Uddin