# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| INTERVARSITY CHRISTIAN FELLOWSHIP/USA, and INTERVARSITY GRADUATE CHRISTIAN FELLOWSHIP, | ) ) ) ) | CASE NO. 3:18-CV-00080 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| THE UNIVERSITY OF IOWA; BRUCE HARRELD, in his official capacity as President of the University of Iowa and in his individual capacity; MELISSA S. SHIVERS, in her official capacity as Vice President for Student Life and in her individual capacity; WILLIAM R. NELSON, in his official capacity as Associate Dean of Student Organizations, and in his individual capacity; ANDREW KUTCHER, in his official Capacity as Coordinator for Student Organization Development; and THOMAS R. BAKER, in his official capacity as Student Misconduct and Title IX Investigator and in His individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... 4

INTRODUCTION ............................................................................................ 6

SUMMARY JUDGMENT STANDARD ........................................................... 6

LEGAL ARGUMENT

I.  Plaintiff's Claims Against The Individual Defendants Should Be
    Dismissed Under The Doctrine Of Qualified Immunity ............................. 7

    A.  Procedure For Analyzing Defendants' Qualified Immunity Defense .. 7

    B.  The Constitutional Rights Plaintiff Claims Were Violated Were Not
        Clearly Established At The Time Of Defendants' Alleged Misconduct  9

        1.  What Is The Question Before The Court ...................................... 9

        2.  Standard For Determining Whether A Right Was "Cleary
            Established" At The Time Of Defendants' Alleged Misconduct .. 10

        3.  Basic Precepts Of First Amendment Law Were Established At
            The Time Of The Events At Issue In The Complaint, But The
            Law In Regard To A Direct Conflict Between Civil Rights Laws
            And First Amendment Protections Was Not "Clearly
            Established ................................................................................. 12

            a.  Public Universities May Limit Access To The Limited
                Public Forums They Have Created ........................................ 13

            b.  This Court Should Distinguish Between Policies Which
                Compel A Party To Act, And Those Which Merely
                Withhold Benefits ................................................................. 14

            c.  Viewpoint Neutral Regulations In An Educational Forum
                Are Subject To A Lower Standard Of Review ....................... 15

            d.  First Amendment Law Relating To Student Groups
                Seeking Special Dispensation In Order To Discriminate
                Based On Their Religious Perspective On University
                Campuses Is Not Well-Settled And Continues To Develop ... 16

            e.  What's Left Unsettled After Martinez ................................... 23

II. Defendants Are Entitled To Judgment As A Matter Of Law On Counts
    I and II Of Plaintiff's Petition ........................................................ 25

    A.  Count I – The Ministerial Exception ................................................. 26

    B.  Count II – Internal Autonomy ........................................................... 28

III. Plaintiffs' Claims Under The Iowa Constitution Are Barred As A
Matter of Law ................................................................................ 30

    A. Plaintiffs Failed To Exhaust Required Administrative Remedies
And The Doctrine Of Sovereign Immunity ........................................ 30

IV. Plaintiffs' Claims For Declaratory And Injunction Relief Are Moot .......... 31

    A. Mootness, Generally .................................................................. 31

    B. Plaintiff's Claims For Declaratory And Injunctive Relief ................... 32

    C. Senate File 274 ........................................................................ 32

    D. In Light Of SF 274, The Alleged Wrongful Conduct Cannot
Reasonably Be Expected To Recur ................................................. 33

CONCLUSION .............................................................................. 34

# TABLE OF AUTHORITIES

*CASES*                                                          **PAGE**

*Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (2011) ...............     24
*Alpha Delta Chi-Delta Chapter v. Reed*, 565 U.S. 1260 (2012) ...............     25
*Anderson v. Creighton*, 483 U.S. 635 (1987) .........................     10-11
*Anderson v. Indus. Elec. Reels, Inc.*, 812 F. Supp. 999 (D. Neb. 1993) ..      7
*Arizonans for Official English v. Arizona*, 117 S. Ct. 1055 (1997) ..........     31
*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...............................     11
*Bloomquist v.Wapello County*, 500 N.W.2d 1 (Iowa 1993) ....................     30-31
*Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*,
  496 U.S. 226 (1990) ...............................................     14
*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ...........................     14
*Boy Scouts v. Dale*, 530 U.S. 640 (2000) ...................................     17,21
*Butz v. Economou*, 438 U.S. 478 (1978) .................................     7-8
*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City University of*
  *New York,* 502 F.3d 136 (2007) ................................     19,20
*Christian Legal Society v. Walker*, 453 F.3d 853 (2006) .......................     18
*Christian Legal Society Chapter of University of California,*
  *Hastings College of the Law v. Kane*, No. C 04-04484 JSW, 2006 WL
  997217, at *1–4 (N.D. Cal. May 19, 2006) ..............................     17
*Christian Legal Society Chapter of the University of California,*
  *Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010) .....     13-15, 17,22-25, 29
*City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1191
  L.Ed.2d 856 (2015) ..............................................     11
*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) .............     32
*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788 (1985)     13-14,29
*Crawford-El v. Britton*, 523 U.S. 574 (1998) .........................     8
*Dickerson v. Mertz*, 547 N.W.2d 208 (Iowa 1996) .................................     30
*Elrod v. Burns*, 427 U.S. 437 (1976) .....................................     18-19
*Every Nation Campus Ministries at San Diego State University v.*
  *Achtenberg*, 597 F. Supp. 2d 1075 (S.D. Cal. 2009) .............     21-22
*Ferezy v. Wells Fargo Bank, N.A.*, 755 F. Supp. 1010 (S.D. Iowa 2010)     7
*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC),*
  *Inc.*, 528 U.S. 167 (2000) .........................................     31
*Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017) ........................     13
*Gonzaga University v. Doe*, 536 U.S. 273 (2002) .................................     26
*Groh v. Ramirez*, 540 U.S. 551 (2004) ....................................     7
*Grove City College v. Bell*, 465 U.S. 555 (1984) ....................................     14
*Hansen v. State*, 298 N.W.2d 551 (Iowa 1977) ............................     30-31
*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................     7,10,12
*Healy v. James*, 408 U.S. 169 (1972) ...................................     16

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
   565 U.S. 171 (2012) ......................................................................... 26-27
*Hosty v. Carter*, 412 F.3d 731 (7th Cir. 2005) (en banc),
   *cert. denied*, 546 U.S. 1169 (2006) .............................................. 10-12
*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
   515 U.S. 557 (1995) ......................................................................... 21
*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in
   North America*, 344 U.S. 94 (1952) .............................................. 28-29
*Keefe v. Adams*, 840 F.3d 523 (8th Cir. 2016) ....................................... 10
*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)   29
*Lawrence v. Texas*, 539 U.S. 558 (2003) ................................................ 23
*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113
   (3d Cir. 2018) .................................................................................... 27
*McCabe v. MacAulay*, 551 F.Supp. 2d 771 (N.D. Iowa 2007) ................. 30-31
*Matter of Estate of Voss*, 553 N.W.2d 878 (Iowa 1996)......................... 30
*Minor v. State*, 819 N.W.2d 383 (Iowa 2012) ......................................... 12,26
*Morgan v. Swanson*, 755 F.3d 757 (5th Cir. 2014) ................................ 10
*Norwood v. Harrison*, 413 U.S. 455 (1973).............................................. 15-16
*Pearson v. Callahan*, 555 U.S. 223 (2009)............................................... 7-8,11
*Penn v. N.Y. Methodist Hospital*, 884 F.3d 416 (2d Cir. 2018) .............. 27
*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) .................................................... 15,16
*Roberts v. United States Jaycees*, 468 U.S. 609 (1984)......................... 20
*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)   13,17,29
*Saucier v. Katz*, 533 U.S. 194 (2001) ....................................................... 8
*Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360
   (8th Cir. 1991) .................................................................................. 27
*Stanton v. Sims*, 571 U.S. 3 (2013)........................................................... 10
*Truth v. Kent School District*, 499 F.3d 999 (9th Cir. 2007) ................. 20-21
*U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199 (1968) ...... 31-32
*United States v. Story Cnty.*, 28 F. Supp. 3d 861 (S.D. Iowa 2014) ....... 6-7
*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................... 15
*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003)............................... 33
*West v. Atkins*, 487 U.S. 42 (1988) .......................................................... 26
*White v. Pauly*, 137 S. Ct. 548 (2017)....................................................... 11
*Widmar v. Vincent*, 454 U.S. 263 (1981) ................................................. 13,16-17

## STATUTES

Federal Rule of Civil Procedure 56(a) ..................................................... 6-7
42 U.S.C. § 1983 .......................................................................................... 25
Iowa Code § 669 ......................................................................................... 29-31

## INTRODUCTION

Plaintiff InterVarsity brings seventeen counts against Defendants under a variety of theories for alleged violations of its First Amendment rights under the Constitution of the United States of America and the Iowa Constitution. *See* Petition, filed August 6, 2018. The individual Defendants move the Court to dismiss them in their individual capacities from each and every claim for money damages outlined in Plaintiff's Petition on the basis of qualified immunity.

Additionally, Plaintiff has brought claims relating to alleged violations of its federal First Amendment rights under the Religion Clauses on "Ministerial Exception" and "Internal Autonomy" theories. *See* Petition, Counts I and II. Even when the facts are viewed in the light most favorable to InterVarsity, there is no genuine dispute as to any material fact on Counts I and II and no reasonable jury could return a verdict for Plaintiff on those claims. As such, Counts I and II should be dismissed in their entirety as stated against the State and the individually named Defendants.

Further, Defendants assert that Plaintiff has failed to exhaust its administrative remedies in relation to its claims brought under the Iowa Constitution.

Finally, Defendants ask the Court to dismiss all of Plaintiff's claims for declaratory and injunctive relief as moot.

## STANDARDS FOR SUMMARY JUDGMENT

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord United States v. Story Cnty.*, 28 F. Supp. 3d

861, 867 (S.D. Iowa 2014). While the Federal Rules of Civil Procedure give "[d]ue deference" to the "rights of litigants to have their claims adjudicated by the appropriate finder of fact . . . equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy, and inexpensive determination of the action where the claims have no factual basis." *Anderson v. Indus. Elec. Reels, Inc.*, 812 F. Supp. 999, 1002 (D. Neb. 1993). Consequently, summary judgment is appropriate where resolution of a question of law is controlling. *See Ferezy v. Wells Fargo Bank, N.A.*, 755 F. Supp. 1010, 1013 (S.D. Iowa 2010).

## ARGUMENT

### I.   Plaintiff's Claims Against the Individual Defendants Should Be Dismissed Under the Doctrine of Qualified Immunity

#### A.  Procedure for analyzing Defendants' qualified immunity defense.

Under the doctrine of qualified immunity, government officials whose conduct has not "violated clearly established statutory or constitutional rights of which a reasonable person would have known" are not liable for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances the need to hold public officials accountable for their conduct with the need to shield public servants from harassment, distraction, and liability when their conduct has been reasonable. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Government officials who meet the above criteria are protected by qualified immunity whether the alleged error in conduct is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231, citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978), for

the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). Further, a qualified immunity defense "may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

Lower courts were once required to engage in a rigid two-step analysis to determine whether defendants were entitled to qualified immunity—first, analyzing the facts to decide whether a case could be made for a constitutional violation, and then determining whether, at the time of defendant's alleged misconduct, the constitutional right at issue was "clearly established." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, in *Pearson v. Callahan*, the United States Supreme Court did away with the rigid framework set forth in *Saucier* and determined that requiring courts to determine difficult constitutional questions in cases in which, for example, "it is plain that a constitutional right is not clearly established, but far from obvious whether in fact there is such a right" was an unwise use of scarce judicial resources. 555 U.S. at 236–37. Under *Pearson*, the procedure set forth in *Saucier* is no longer mandatory, and district court judges are encouraged to decide which prong of the test to address first in order to make a "fair and efficient disposition of each case." *Id.* at 236–42. A fair and efficient analysis of the case at hand will not require this court to determine whether there has been a violation of Plaintiff's constitutional rights. The more expedient analysis will be under the second prong of the *Saucier* test: whether the rights that Plaintiff claims were violated were "clearly established" such that a reasonable government official would have known that the rights would be violated by his or her conduct.

### B. The Constitutional Rights Plaintiff Claims Were Violated Were Not Clearly Established at The Time of Defendants' Alleged Misconduct.

### 1. What is the question before the court?

Plaintiff alleges that Defendants' requirement that InterVarsity adhere to the University of Iowa's Human Rights policy in its organization's constitution and in its selection of campus group leaders, violates its First Amendment Rights under the United States Constitution, the Iowa Constitution, as well as its rights to be free from discrimination on the basis of religion under the Iowa Civil Rights Act. *See* Petition, filed August 6, 2018. The University argues that it may regulate the speech and conduct of registered student groups which operate within the limited public forum it has created on campus by requiring student groups to comply with its Human Rights Policy.

The question before the court is whether clearly established law exists which sets forth the course a University official should take in protecting the First Amendment and civil rights of protected groups when those rights come into direct conflict with one another, such that the official could be said to be reasonably apprised of the law at the time of the alleged violations. More specifically: does a university's requirement that a student group adhere to its nondiscrimination and equal opportunity policies in order to receive state funding, recognition, and other peripheral benefits, violate that group's First Amendment Rights when that group's sincerely held religious beliefs are in direct conflict with state and federal civil rights law? This is a difficult question, and as Defendants will demonstrate, the law is hardly "clearly established."

## 2. Standard for determining whether a right was "clearly established" at the time of Defendants' alleged misconduct.

On a summary judgment motion, the Court may determine not only the law that is currently in effect, but also whether that law was clearly established at the time of the alleged violation of Plaintiff's rights. *Harlow*, 457 U.S. at 818. If the law was not clearly established at the time the alleged violation occurred, a government actor cannot be expected to "anticipate subsequent legal developments" or "'know' that the law forbade conduct not previously identified as unlawful." *Id.*

Whether a right is clearly established "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640 (internal citation omitted). Put differently: "'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); see also *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) ("educators are rarely denied immunity from liability arising out of First-Amendment disputes. The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional[.]"); *Keefe v. Adams*, 840 F.3d 523, 541 (8th Cir. 2016) (Kelly, J. concurring).

This requirement of "apparent unlawfulness" is well-reasoned, particularly in the rapidly-developing area of First Amendment rights. It is unreasonable to expect Defendants to predict the outcome of complicated and previously undecided First Amendment issues. *See Hosty v. Carter*, 412 F.3d 731, 739 (7th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1169 (2006) ("Many aspects of students' speech…are difficult to understand and apply[.] Public officials need not predict, at their financial peril, how constitutional uncertainties will be resolved."). As such, qualified immunity remains an important protection for government actors. As the United States Supreme Court recently reiterated,

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. See*, e.g.*, *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 n.3, 191 L.Ed.2d 856 (2015) (collecting cases). The Court has found this necessary both because qualified immunity is important to "society as a whole," *ibid.,* and because as "an immunity from suit," qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009).
>
> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al–Kidd,* 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.,* at 639, 107 S. Ct. 3034.

*White v. Pauly*, 137 S. Ct. 548, 551–52 (2017); *see also Hosty v. Carter*, 412 F.3d 731, 739 (7th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1169 (2006). Here, Defendants are stuck between protecting the rights of religious groups to freely speak and assemble and protecting the rights of students to be free from discrimination by a Registered Student Organization on the basis of protected class. Established law does not illuminate the

path for University officials on these difficult issues, in spite of their best efforts to seek legal review and make reasonable and fair decisions.

Additionally, as the U.S. District Court for the Southern District of Iowa noted in ruling on the University's motion for partial summary judgment on qualified immunity, the doctrine is important to society as a whole. ***See* Order on Cross-Motions for Summary Judgment, Case No. 3:17-CV-00080-SMR-SBJ, filed February 6, 2019 (attached).** As the Court noted, the social costs of claims brought against public officials "include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.*, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

### 3. Basic precepts of First Amendment law were established at the time of the events at issue in the Complaint, but the law in regard to a direct conflict between civil rights laws and First Amendment protections was not "clearly established."

The majority of the events at issue in Plaintiff's Complaint occurred in the summer of 2018. In the last ten years, courts' treatment of various First Amendment issues on university campuses—particularly as they related to religious groups— has evolved and continues to evolve. The issues at hand have not been discussed squarely by the Supreme Court, the Eighth Circuit Court of Appeals, or by the Iowa Supreme Court.[1]

---

[1] Plaintiff brings various claims regarding purported violations of its free speech and religious exercise rights under the Iowa Constitution. *See* Petition Counts XII–XVII. A search for relevant state court cases reveals that this is an issue of first impression in Iowa courts. Existing precedent is largely unhelpful, and the rights allegedly violated by Defendants can hardly be said to be "clearly established" under Iowa law. *See Minor v. State*, 819 N.W.2d 383, 400 (Iowa 2012) ("In addressing the defendants' claim of qualified immunity, we consider, in any order, whether the facts alleged by the plaintiff 'make out a violation of a constitutional right' and whether that right was 'clearly established' at the time of defendant's alleged misconduct."). Additionally, the Iowa Court of Appeals has recently clarified that while the area of torts brought pursuant to the Iowa Constitution is rapidly developing, "qualified immunity is available as an affirmative defense to constitutional tort claims" under Iowa law. *See Lennette v. State*, No. 17-2019, 2018 WL 6120049, at *4 (Iowa Ct. App. Nov. 21, 2018), citing *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017).

As such, the Court must look to decisions on similar issues and the decisions of other Circuit Courts for guidance.

   a) *Public universities may limit access to the limited public forums they have created.*

   The student groups supported by public funding and public resources at the University of Iowa exist within a government-created limited public forum, and a significant body of case law exists which discusses such forums in-depth. *See Gerlich v. Leath*, 861 F.3d 697, 704–05 (8th Cir. 2017), quoting *Martinez*, 561 U.S. 661, 679 (2010) ("A university 'establish[es] limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects.'") (hereinafter "*Martinez*"). In a limited public forum, a government actor may impose restrictions on speech that are 1) reasonable in light of the purposes of the forum and 2) viewpoint neutral. *Martinez*, 561 U.S. at 679, citing *Rosenberger v. Rector*, 515 U.S. 819, 829 (1995). "A university's student activity fund is an example of a limited public forum." *Gerlich*, 861 F.3d at 705, citing *Rosenberger*, 515 U.S. at 823–27. A state has the right "to preserve the property under its control for the use to which it is lawfully dedicated." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985).

   First Amendment rights must be analyzed "in light of the special characteristics of the school environment." *Id.*, quoting *Widmar v. Vincent*, 454 U.S. 263, 268 (1981). Public universities enjoy "a significant measure of authority over the type of officially recognized activities in which their students participate," though the Court makes the final decision regarding whether a public university has exceeded constitutional

---

As such, Defendants assert that summary judgment should be granted on any of Plaintiff's claims that rest on state law or are brought pursuant to the Iowa Constitution.

constraints. *See Martinez*, 561 U.S. at 685–86; *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*, 496 U.S. 226, 240 (1990). "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances. *Cornelius*, 473 U.S. at 809. A prime example of the power of a government entity to exclude speakers is its ability to "limit official student-group recognition to organizations comprising only students—even if those groups wish to associate with nonstudents." *Martinez*, 561 U.S. at 681. A State's restriction of access to the limited public forum it has created "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808.

    b) *This Court should distinguish between policies which compel a party to act, and those which merely withhold benefits.*

In evaluating First Amendment claims, Courts distinguish between policies which compel action, and those which merely withhold benefits. *See, e.g., Grove City College v. Bell*, 465 U.S. 555, 575–576 (1984); *Bob Jones Univ. v. United States*, 461 U.S. 574, 602–604 (1983). Here, the University of Iowa is not compelling InterVarsity to include non-Christians in its leadership team, but rather, has withheld the benefits of recognition as an official student group on the basis of InterVarsity's unwillingness to comply with the University's Human Rights policy. Defendants urge the Court to consider that the University has not expelled InterVarsity from campus—InterVarsity may still "speak." However, the citizens of the State of Iowa need not fund a group which seeks to exclude from its membership ranks students who are not Christian. "[T]hat the Constitution may compel toleration of private discrimination in some circumstances

does not mean that it requires state support for such discrimination." *Norwood v. Harrison*, 413 U.S. 455, 463 (1973).

   c) *Viewpoint neutral regulations in an educational forum are subject to a lower standard of review.*

Defendants acknowledge that laws and regulations which constrain associational freedom are typically subject to "close scrutiny," and survive only if they "serve 'compelling state interests' that are 'unrelated to the suppression of ideas'—interests that cannot be advanced through . . . significantly less restrictive [means]." *Martinez*, 561 U.S. at 680. However, as the Court explained in *Martinez*, the Court should apply a less restrictive level of scrutiny to speech in limited public forums where the regulation is viewpoint neutral, as opposed to other environments, given the state's interest in regulating the property in its charge and ability to reserve it for certain groups. *See id.* at 679–80; *see also Cornelius*, 473 U.S. at 806 ("[A] speaker may be excluded from" a limited public forum "if he is not a member of the class of speakers for whose special benefit the forum was created.").

Defendants' Human Rights and Equal Opportunity Policies are viewpoint neutral. InterVarsity is likely to argue that the policy is vulnerable to constitutional attack because it has a disparate impact on the First Amendment rights of religious groups on campus. However, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Martinez*, 561 U.S. at 696, quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992) ("Even if a regulation has a differential impact on groups wishing to enforce exclusionary membership policies, '[w]here the [State] does not target conduct on the

basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.'").

    *d) First Amendment law relating to student groups seeking special dispensation in order to discriminate based on their religious perspective on university campuses is not well-settled and continues to develop.*

        Over the past forty years, the United States Supreme Court has considered multiple cases between public universities and student groups seeking public funding and the attendant benefits of official recognition. However, the United States Supreme Court has never squarely addressed the interplay between a university's nondiscrimination policy and a religious group's First amendment rights. Though not an exhaustive overview, the following cases provide a fair summary of the law in this area as it has developed since the 1970s.

        In *Healy v. James*, a state college denied official recognition to an activist student group which the college believed to be capable of violent action. 408 U.S. 169 (1972). The Supreme Court held that a public university may require a student group to affirm its willingness to adhere to campus laws, but that a public educational institution exceeds constitutional bounds when it "restrict[s] speech or association simply because it finds the views expressed by [a] group to be abhorrent." *Id.* at 187–88.

        In *Widmar v. Vincent*, a public university denied a registered student group the use of university space for religious worship. 454 U.S. 263 (1981). The Supreme Court held that because the university had singled out religious organizations for disadvantageous treatment, its actions must be subjected to strict scrutiny. *Id.* at 269–70. The Court held that the school's interest in maintaining a separation of church and

state was not sufficiently compelling to justify the restrictions on the students' speech. *Id.* at 270.

In *Rosenberger v. Rector,* the Supreme Court reaffirmed that a university typically may not engage in viewpoint discrimination and withhold benefits from student groups on the basis of religion. 515 U.S. 819, 830–31 (1995).

In *Christian Legal Society Chapter of University of California, Hastings College of the Law v. Kane*, which eventually became *Martinez*, CLS refused to include the University's Nondiscrimination Policy in its constitution and bylaws, and required voting members of its group to sign a "Statement of Faith" espousing Christian beliefs. No. C 04-04484 JSW, 2006 WL 997217, at *1–4 (N.D. Cal. May 19, 2006). CLS brought claims against the University for violation of its free speech, expressive association, free exercise, and equal protection rights. *Id.* at 4. The U.S. District Court for the Northern District of California granted the University's motion for summary judgment on all of CLS's claims, upholding the University's right to require student groups which received state funding and the attendant benefits of official recognition to abide by the nondiscrimination policy. *Id.* at *1–*27. The court also held that the University's policy regulated speech rather than conduct, that the University's regulation of the group's conduct did not unconstitutionally infringe on CLS's freedom of speech, and that the University's policy was viewpoint neutral and reasonable under a limited public forum analysis. *Id.* While analyzing CLS's free association claims, the court made the important distinction between forced inclusion and withholding benefits, and refused to apply the *Dale* and *Roberts* line of forced-association cases. *Id.*

In *Christian Legal Society v. Walker*, CLS sued Southern Illinois University School of Law for violations of its First Amendment rights to free speech, expressive association, free exercise, and its Fourteenth Amendment equal protection and due process rights. 453 F.3d 853, 857 (2006). CLS brought suit after the dean of the law school revoked the group's "official" status upon determination that its membership policies violated the law school's nondiscrimination policies. *Id.* At that time, CLS precluded voting membership and leadership in the group for those who "engage in or affirm homosexual conduct" and disapproved of "active homosexuality." *Id.* at 857–58. The Seventh Circuit Court of Appeals reversed the district court's finding that CLS had not suffered irreparable harm as a result of the law school's regulations, as it still existed but did so without official student organization recognition and the attendant benefits. *Id.* at 859. The Seventh Circuit found that CLS had a "reasonable likelihood of success on the merits" of its claims, holding that the group should have been granted an injunction because the loss of First Amendment freedoms "even for minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 859, quoting *Elrod v. Burns*, 427 U.S. 437, 373 (1976). In its opinion, the Court noted that it doubted that CLS had violated the law school's nondiscrimination policies, and distinguished between groups which discriminate on the basis of *conduct* rather than *status. Id.* at 860.

The Court went on to analyze the case under the "forced association" line of cases, and determined that the law school's regulation of CLS's speech must be submitted to a strict scrutiny analysis. *Id.* at 860–61. The court discussed whether the law school's interest in preventing discrimination against homosexual students outweighed CLS's interest in expressing its disapproval of homosexual activity, and

determined that CLS had demonstrated a reasonable likelihood of success on its expressive association claims. *Id.* at 864. Notably, the court rejected the law school's argument that "because it [was] not forcing CLS to do anything at all, but [was] only withdrawing its student organization status" its actions were too insignificant to constitute a constitutional violation. *Id.* at 864.

Oddly, the court did not rule on CLS's free speech claims, instead holding that the determination of whether the law school had created a limited-public forum should be left to the district court. *Id.* at 866. Nevertheless, the Court went on to opine that there was "strong evidence that the policy has not been applied a viewpoint neutral way," and remanded the case to the district court for a finding on whether the law school's policy was reasonable "in light of the purposes the forum serves. . . ." *Id.* at 867.

In *Chi Iota Colony of Alpha Epsilon Pi Fraternity*, the Second Circuit Court of Appeals reversed the district court's grant of a preliminary injunction upon finding that the University was entitled to enforce its nondiscrimination policy against the fraternity. *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City University of New York,* 502 F.3d 136, 138–39 (2007). *Chi Iota* involved a fraternity which sought recognition as an official student group. *Id.* at 139–142. The University refused to grant the group's request unless the fraternity would consent to abide by the University's nondiscrimination policy and to permit women to join. *Id.* Rather than comply, the Fraternity sued, bringing various claims that the university had violated its rights under the First and Fourteenth Amendments. *Id.* at 142. The Court analyzed the Fraternity's associational interest and balanced that interest against the state's interest in stamping out gender discrimination. *Id.* at 144–49. The Court ultimately determined that the

University's regulation was constitutional. *Id.* The University had a compelling interest in eradicating gender discrimination and had crafted a narrowly tailored regulation in order to achieve its goals. *Id.*

In *Truth v. Kent School District*, a group of high school students sought to establish a Christian-centered student group ("Truth") and to have it officially recognized by the school's student government. 499 F.3d 999, 1001–04 (9th Cir. 2007). In its Charter, the group indicated that voting members would be required to sign a "statement of faith." *Id.* at 1003. The student body and school district refused to recognize Truth because that believed that the group's requirements around the profession of Christian beliefs violated the school district's equal opportunity policy and a state nondiscrimination and equal opportunity statute. *Id.* at 1004. Truth sued the District, claiming violations of the Equal Access Act, the First Amendment rights of free speech and expressive association, the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. *Id.* at 1002.

The Ninth Circuit Court of Appeals found that Truth's profession of faith—i.e., its "general membership restrictions" inherently exclude[d] non-Christians" and was in violation of the state anti-discrimination and equal opportunity law. *Id.* at 1009. In so finding, the Court noted that "States have the constitutional authority to enact legislation prohibiting invidious discrimination." *Id.* citing *Roberts v. United States Jaycees*, 468 U.S. 609, 624–26 (1984). The Court ultimately determined that the District's regulations were content neutral and that it had an interest in implementing them.

The Court went on to hold that though Truth argued that its members were being "forced" to associate with non-Christians, *Truth* was not a forced-inclusion case. *Truth*, 499 F.3d at 1014. The Court pointed out that unlike *Hurley* and *Dale*, the Truth's "general membership" were not even seeking leadership or voting roles. *Id.; see Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995); *Boy Scouts v. Dale*, 530 U.S. 640 (2000). As such, the impact on First Amendment interests was not as severe as in other cases. *Truth*, 499 F.3d at 1014. The Court dismissed Truth's free exercise claims as not colorable, and applied a rational basis test. *Id.* at 1015. The Court refused to reach the merits of Truth's Equal Protection and Establishment Clause claims holding that "Truth was not accorded unequal treatment, because the denial of its third charter was justified under the First Amendment and the Act based upon its general membership restrictions. This denial represented a neutral application of the Kent School District's non-discrimination policies and therefore did not constitute unequal treatment."

In *Every Nation Campus Ministries at San Diego State University v. Achtenberg*, four student organizations sought injunctive relief against the California State University (CSU) which had required the various student groups to comply with CSU's nondiscrimination policy by opening their membership to non-Christians and unapologetic homosexuals in order to receive recognition as an official student group and the attendant benefits of that recognition. 597 F. Supp. 2d 1075 (S.D. Cal. 2009). Every Nation Campus Ministries ("ENCM-SDSU") brought a lawsuit against the university, claiming various violations of its First Amendment rights of free speech, freedom of religion, and freedom of expressive association. *Id.* at 1078–79. Deciding

that the university's regulation of the plaintiffs' speech was both reasonable and viewpoint neutral in a limited public forum, the U.S. District Court for the Southern District of California granted the defendant University's motion for summary judgment. *Id.* at 1079–100.

In June of 2010, the United States Supreme Court decided the seminal case in this area. In *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, the Supreme Court held that a law school which required officially recognized student groups to accept "all-comers" into their membership did not violate a religious group's First Amendment rights to free association. 561 U.S. 661, 697 (2010). In its decision, the court determined that the school had several legitimate reasons for implementing its viewpoint-neutral "all-comers" policy, including the ability of all students to access all of the programs and groups to which his or her tuition money provides funds, bringing together students of diverse backgrounds and encouraging tolerance, permitting the school to more easily police the terms of its Nondiscrimination Policy, and generally declining to "subsidize with public monies and benefits conduct which the people of California disapprove." *Id.* at 687–90. Though CLS would ultimately not be able to take advantage of several benefits of official recognition—such as state funding and the school's mass e-mail system—the court determined that its ability to exist on campus without official recognition was relatively unhindered. *Id.* at 691. The Court pointed out that sororities and fraternities exist without official school affiliations, and the existence of the internet and prolific social media use by students made use of the school's mass email system less necessary. *Id.*

Importantly, the Court rejected CLS's request that the school permit exclusion based on *belief* rather than *status*, holding that making a distinction between the two is effectively impossible. *See id.* at 688. Citing *Lawrence v. Texas*, the Court explained that it has declined to distinguish between belief and status (or conduct) in this way. *Id.* citing 539 U.S. 558, 575 (2003) ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination); *id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class.").

e) *What's left unsettled after Martinez?*

Though *CLS* provided significant guidance to public universities which had adopted an "all-comers" policy in managing their student organizations and activity funds, it did not specifically address the issue in this case, which is: may a University require student groups to comply with a nondiscrimination policy which forbids groups from excluding students from their membership ranks on the basis of protected class or characteristic? Should religious groups get a "pass" to discriminate against their peers who belong to other protected groups? And how do these issues play out in the context of a restriction based on a non-discrimination policy informed by a public university's mission, rather than an "all-comers" policy? As an unsettled area of law, this topic has been the subject of much academic debate.[2]

---

[2] *See generally*, Eugene Volokh, *Freedom of Expressive Association and Government Subsidies*, 58 STAN. L. REV. 1919 (2006); Azhar Majeed, *Putting Their Money Where Their Mouth Is: The Case for Denying Qualified Immunity to University Administrators for Violating Students' Speech Rights*, 8 CARDOZO PUB. L. POL'Y & ETHICS J. 515 (2010); David Brown, *Hey! Universities! Leave Them Kids Alone!: Christian*

One case involving a student group seeking official recognition by an educational institution has reached the U.S. Courts of Appeals since *CLS v. Martinez*. In *Alpha Delta Chi-Delta Chapter v. Reed*, the Ninth Circuit Court of Appeals heard another case involving campus a Christian sorority and a Christian fraternity, each which had its own religious requirements for members, including "personal acceptance of Jesus Christ as Savior and Lord," among other requirements. 648 F.3d 790, 795 (2011). San Diego State repeatedly refused to approve plaintiffs' applications for official recognition, "because of Plaintiffs' requirement that their members and officers profess a specific religious belief, namely, Christianity." *Id.* at 796. The University indicated that the plaintiffs' membership requirements violated San Diego State's nondiscrimination policy. *Id.* at 796. Interestingly, the Ninth Circuit noted that the Supreme Court decision in *CLS v. Martinez* did not provide specific guidance on its decision, stating:

> The Supreme Court held in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez* that a public law school does not violate the Constitution when it "condition[s] its official recognition of a student group—and the attendant use of school funds and facilities—on the organization's agreement to open eligibility for membership and leadership to all students. The Court referred to the open membership requirement as an "all-comers policy" and concluded that such a policy was a "reasonable, viewpoint-neutral condition on access to the student-organization forum." The Court further held that the all-comers policy did not violate the Free Exercise Clause of the First Amendment.

*Legal Society v. Martinez and Conditioning Equal Access to a University's Student-Organization Forum*, 116 PENN ST. L. REV. 163 (2011); Erica Goldberg, *Amending Christian Legal Society v. Martinez: Protecting Expressive Association as an Independent Right in a Limited Public Forum*, 16 TEX. J. ON C.L. & C.R. 129 (2011); Michael Stokes Paulsen, *Disaster: The Worst Religious Freedom Case in Fifty Years*, 24 REGENT U. L. REV. 283 (2011); Andrew D. Brown, *Do As I Say, Not As I Do: The Myth of Neutrality in Nondiscrimination Policies at Public Universities*, 91 N.C. L. REV. 280 *(2012);* Blake Lawrence, *The First Amendment in the Multicultural Climate of Colleges and Universities: A Story Ending with Christian Legal Society v. Martinez*, 39 HASTINGS CONST. L.Q. 629 (2012); Andrew Seif, *The University Marketplace of Ideas Under Threat: Why Religious Student Groups on California's Public University Campuses Need to Follow the Rules*, 40 W. ST. U. L. REV. 105 (2012); Timothy Tracey, *Christian Legal Society v. Martinez: In Hindsight*, 34 U. HAW. L. REV. 71 (2012); Melanie Crouch*, The Public University's Right to Prohibit Discrimination*, 53 HOUS. L. REV. 1369 (2016);

**The Court expressly declined to address whether these holdings would extend to a narrower nondiscrimination policy that, instead of prohibiting *all* membership restrictions, prohibited membership restrictions only on certain specified bases, for example, race, gender, religion, and sexual orientation.** The constitutionality of such a policy is the issue before us in this case. We conclude that the narrower policy is constitutional.

*Id.* at 795 (internal citations omitted, emphasis added). The court, determining that it could "see no material distinction between San Diego State's student organization program and the student organization program discussed in *Christian Legal Society*" ultimately found that the narrower policy was constitutional in a limited-public forum analysis, but held that the plaintiffs had raised a fact issue for trial on whether the policy had been applied in a discriminatory fashion. *Id.* at 800. Whether the plaintiffs free exercise and equal protection rights had been violated was also a triable issue of fact. *Id.* at 804. Alpha Delta Chi petitioned for a writ of certiorari, but the Supreme Court declined to hear the case. *Alpha Delta Chi-Delta Chapter v. Reed*, 565 U.S. 1260 (2012).

## II.   Defendants are entitled to judgment as a matter of law on Counts I and II of Plaintiff's Petition.

Count I of Plaintiff's Petition outlines a 42 U.S.C. § 1983 claim for "Violation of the First Amendment to the U.S. Constitution, Free Exercise & Establishment Clauses, Ministerial Exception." *See* Petition, Count I. Count II of Plaintiff's Petition outlines a 42 U.S.C. § 1983 claim for "Violation of the First Amendment to the U.S. Constitution, Free Exercise & Establishment Clauses, Internal Autonomy." *See* Petition, Count II.  In order to prevail on a claim under 42 U.S.C. § 1983, Plaintiff must show that a state actor—in this case, Bruce Herrald, Melissa Shivers, William Nelson, Andrew Kutcher, and Thomas Baker—deprived Plaintiff of its first amendment rights through actions

taken under color of state law. *See West v. Atkins*, 487 U.S. 42 (1988); *Minor v. State*, 819 N.W.2d 383 (Iowa 2012). Section 1983 does not create rights, but rather, provides a mechanism for enforcing individual rights secured by the Constitution and the laws. *See Gonzaga University v. Doe*, 536 U.S. 273 (2002). In Counts I and II, Plaintiff asserts a claim for violations of its Constitutional rights which may be protected in other situations, but which are not protected in the context of a student group which exists in a limited public forum created by a public university.

### A. Count I – The Ministerial Exception

Citing *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,* Plaintiff claims that "[u]nder the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the right to select their leaders without government interference." *Id.* citing 565 U.S. 171 (2012). *Hosanna-Tabor* was an employment discrimination case in which the U.S. Supreme Court was asked to decide "whether the Establishment and Free Exercise Clauses of the First Amendment bar such an action when the employer is a religious group and the employee is one of the group's ministers." *Hosanna-Tabor*, 565 U.S. at 176–77. The dispute arose when a "called teacher" at Hosanna-Tabor, a religious school, was terminated. *Id.* at 178–79. The teacher believed that she had been terminated on the basis of a disability and filed a complaint with the EEOC, which subsequently sued the church administer of the school on her behalf under the Americans with Disabilities Act. *Id.* at 178–80. The church viewed the teacher as a religious leader and minister to the parish's youth, and argued that under the ministerial exception the government could not interfere with the church's selection of its ministers. *Id.* On appeal, the Supreme Court agreed, and held

that "[w]hen a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way." *Id.* at 196. In so holding, the Supreme Court expressly limited its ruling to employment disputes within religious institutions, stating

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers.

*Id.* at 196.

This case simply does not support InterVarsity's claim that a student group, existing in a public forum created by a government-funded University, has a right to make all decisions about group leadership without regulation while receiving public benefits. As the U.S. District Court for the Southern District of Iowa noted in ruling on an identical issue in the *BLinC* case,

> *Hosanna-Tabor* did not involve conditions on receiving public benefits, nor did it involve a limited public forum. More fundamentally, the ministerial exception has traditionally been used as a defense to claims asserted against a religious organization, not as its own cause of action. *See, e.g., Hosanna-Tabor*, 565 U.S. at 177–79; *Scharon v. St. Luke's Episcopal Presbyterian Hosps.¸* 929 F.2d 360, 361 (8th Cir. 1991); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 117–18 (3d Cir. 2018); *Penn v. N.Y. Methodist Hospital*, 884 F.3d 416, 418 (2d Cir. 2018). This is not surprising. The ministerial exception is concerned with disentangling the government from a religious organization's internal governance disputes; when the government burdens a religious organization's free exercise rights outside of this context, *Lukumi* and similar cases provide the appropriate framework to determine if the government has violated the First Amendment.

*Business Leaders in Christ v. The University of Iowa, et al.,* Case No. 3:17-CV-00080-SMR-SBJ, Order on Cross-Motions for Summary Judgment, 27–29 (S.D. Iowa February 6, 2019). Defendants have been unable to find any case which supports Plaintiff's claim that the ministerial exception would apply in this context. As such, even when the facts are viewed in a light most favorable to Plaintiff, Count I of Plaintiff's Petition should be dismissed as failing to state a claim.

### B. Count II – Internal Autonomy

Citing *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, Plaintiff claims that "[u]nder the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the 'power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *See* Petition, ¶ 105, citing 344 U.S. 94, 116 (1952). In *Kedroff,* the Supreme Court reviewed an act by the Legislature of New York, Article 5—C, which "provided for the incorporation and administration of Russian Orthodox churches" by requiring that "all the churches formerly administratively subject to the Moscow synod and patriarchate should for the future be governed by the ecclesiastical body and hierarchy of the American metropolitan district." 344 U.S. 98–99. The law formed the basis of an ejectment action by a corporation created for the purpose of acquiring a cathedral for the Russian Orthodox Church in North America and Benjamin Fedchenkoff, the then-Archbishop of the Archdiocese of North America and the Aleutian Islands, who, after a long and complicated history of tension between the Russian and American factions of the church, were feuding about who had the right to occupy the cathedral. *Id.* at 96. Application of the law at issue in the ejectment action involved a determination by New

York State Courts regarding which ecclesiastical body would properly govern the church. *Id.* at 97–98.

On review, the Supreme Court determined that the law at issue displaced one church administrator with another, and passed "the control of matters strictly ecclesiastical from one church another," thus intruding "for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.* at 119. As such, the Court held that "New York's Article 5—C directly prohibits the free exercise of an ecclesiastical right, the Church's choice of its hierarchy." *Id.*

The application of *Kedroff* to Plaintiff's claims in the instant case is tenuous. Though *Kedroff* does support the idea that a religious group may select its own leaders without government interference, it simply does not apply in the limited public forum created by the University for speech by its student groups. Public educational institutions may "legally preserve the property under [their] control for the use to which it is dedicated." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993). A university may restrict access to the public forum it has created, as long as the restrictions are "reasonable in light of the purpose served by the forum." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), quoting *Cornelis v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 809 (1985). Public universities enjoy "a significant measure of authority over the type of officially recognized activities in which their students participate," though the Court makes the final decision regarding whether a public university has exceeded constitutional constraints. See *Martinez*, 561 U.S. 661, 685–86 (2010). Unlike *Kedroff*, which

involved a direct intervention by a state legislature into matters of church governance, the University's requirement that InterVarsity comply with its Human Rights Policy in establishing leadership criteria does not infringe Plaintiff's constitutional rights. Plaintiff may select any leader it likes, if it chooses to forgo the benefits associated with RSO status. Even when the facts are viewed in the light most favorable to Plaintiff, Count II of Plaintiff's Petition should be dismissed.

## III. Plaintiffs' Claims Under the Iowa Constitution Are Barred as A Matter of Law

### A. Plaintiffs Failed to Exhaust Required Administrative Remedies and The Doctrine of Sovereign Immunity Applies

A tort claim against the State of Iowa "must be brought, if at all, pursuant to Chapter 669.11." *Dickerson v. Mertz*, 547 N.W.2d 208, 213 (Iowa 1996); Iowa Code Chapter 669. A "claim" for purposes of the Iowa Tort Claims Act ("ITCA") includes

> Any claim against the state of Iowa for money only, on account damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the state while acting within the scope of the employee's office or employment, under circumstances where the state, if a private person, would be liable to the claimant for such damage, loss, injury, or death.

Iowa Code § 669.2(3)(a). A Plaintiff must comply with the substantive and procedural requirements of the ITCA before jurisdiction of the subject matter and parties are obtained. *Hansen v. State*, 298 N.W.2d 551, 555 (Iowa 1977). The Iowa Courts lack jurisdiction over lawsuits falling under the provisions of the Iowa Tort Claims Act against the State of Iowa as well as its employees unless the procedures prescribed in the Iowa Tort Claims Act have been timely exhausted. *Matter of Estate of Voss*, 553 N.W.2d 878, 880 (Iowa 1996); *Bloomquist v. Wapello County*, 500 N.W.2d 1, 8 (Iowa 1993).

Pursuant to Iowa Code § 669.13, claims under the Iowa Tort Claims Act are barred "unless within two years after such claim accrued, the claim is made in writing to the State Appeal Board under this chapter." In addition, "[n]o suit shall be permitted under this chapter unless the State Appeal Board has made final disposition of the claim...." Iowa Code § 669.5.

In *McCabe v. MacAulay*, 551 F. Supp. 2d 771, 785–86 (N.D. Iowa 2007), the Court ruled that claims under the Iowa Constitution are "tort claims."[3] Plaintiff's claims should be dismissed as a matter of law.

Plaintiff did not file a claim as required by law, and as such, its claims for money damages arising under the Iowa Constitution are barred. (*See* Affidavit of Barry, Attachment 1).

## IV. Plaintiff's Claims for Declaratory and Injunctive Relief Are Moot.

### A. Mootness, Generally

The mootness doctrine requires that the personal interest that must exist at the commencement of the litigation must continue throughout the litigation's existence. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189–90 (2000) (discussing the doctrine of mootness and describing the interplay between mootness and standing), citing *Arizonans for Official English v. Arizona*, 117 S. Ct. 1055, fn. 22 (1997). A case may become moot if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203

---

[3] Additionally, the Iowa Tort Claims Act includes a provision for the indemnification of state employees for claims arising "under the Constitution, statutes, or rules of the United States or of any state." Iowa Code 669.21(1).

(1968). The burden of demonstrating that the challenged conduct cannot reasonably be expected to recur is on the party asserting mootness. *Id.* While a defendant may voluntarily agree to stop whatever conduct has brought about the litigation, a defendant's cession of a challenged practice does not deprive the court of its power to decide the controversy. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). A party's mere statement that the conduct is unlikely to recur is not sufficient to satisfy such a burden. *Id.*

### B. Plaintiff's Claims for Declaratory and Injunctive Relief

Plaintiff filed its 17-count Petition and asked the Court for the following relief:

a.      Declare that the First and Fourteenth Amendments to the United States Constitution, the Iowa Constitution, and the Iowa Human Rights Act require Defendants to cease discriminating against Plaintiffs and to cease withholding registered student organization status on the basis of Plaintiffs' religious leadership selection policies.

b.      Issue an injunction prohibiting the University from denying Plaintiffs' registered student organization status based on the content of their religious leadership selection policies.

c.      Award Plaintiffs damages and nominal damages for the loss of their rights as protected by the United States and Iowa Constitutions.

d.      Award Plaintiffs damages and nominal damages for the loss of their rights as protected by the United States and Iowa Constitutions.

e.      Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f.      Award such other and further relief as the Court deems equitable and just.

Complaint, filed 08/06/2018, p. 36–37.

### C. Senate File 274

On March 27, 2019, Iowa Governor Kim Reynolds signed Senate File 274 ("SF 274" (Attachment 2), a new law which mandates that:

> a public institution of higher education shall not deny any benefit or privilege to a student organization based on the student organization's requirement that the leaders of the student organization agree to and support the student organization's beliefs, as those beliefs are interpreted and applied by the organization, and to further the student organization's mission.

SF 274, sec. 3(3) (Attachment 2). The law addresses the core issues in this case, and took effect upon enactment. SF 274, Sec. 7 (Attachment 2). The University of Iowa is working to implement SF 274 and has no plans to violate it by enforcing its Human Rights Policy against groups which maintain leadership restrictions. At this time, InterVarsity is in good standing with the University and may participate freely in all campus activities and conduct its regular business. There is currently no threat of irreparable harm to InterVarsity or any similarly-situated group. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.").

### D. In Light of SF 274, The Alleged Wrongful Conduct Cannot Reasonably Be Expected to Recur.

This case revolves around the constitutionality of the University of Iowa's enforcement of its Human Rights Policy. In signing Senate File 274, the Iowa Legislature has decreed that the University may not enforce its Human Rights Policy against registered student organizations where their ability to maintain restrictions on its leadership-level members is concerned. No such law existed at the time the Human Rights Policy and the RSO governing documents were drafted, at the time of the events at issue in the BLinC litigation, or at the time of the events at issue in the Complaint. In order to continue enforcing its policy against InterVarsity, the University of Iowa would have to knowingly violate state law and expose itself to further student complaints and potential litigation. *See* SF 274, Sec. 5.3 (Attachment 2). The harm that InterVarsity

allegedly suffered cannot reasonably be expected to recur, particularly given the clarity with which the Iowa Legislature has set forth its expectations. As such, Defendants ask this Court to dismiss Plaintiff's claims for injunctive and declaratory relief as moot.

## CONCLUSION

Under the doctrine of qualified immunity, the individual Defendants may not be held liable for money damages if, at the time of Defendants' alleged misconduct, the constitutional right at issue was not "clearly established." The individual Defendants urge this Court to grant their Motion for Partial Summary judgment on all of Plaintiff's claims against the individual Defendants. Additionally, the individual and State Defendants ask the Court to dismiss Counts I and II of Plaintiff's Petition for failure to state claim upon which relief can be brought, and to decide that Plaintiff has failed to exhaust its administrative remedies regarding its claims brought under the Iowa Constitution. Finally, Defendants ask the Court to issue an Order holding that Plaintiff's claims for injunctive and declaratory relief are moot, and to dismiss them on that basis.

**THOMAS J. MILLER**
Attorney General of Iowa

**/s/GEORGE A. CARROLL**
George A. Carroll
Assistant Attorney General
Hoover Building, Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
PHONE: (515) 281-8583
FAX: (515) 281-7219
E-MAIL:George.carroll@ag.iowa.gov
ATTORNEYS FOR DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on April 12, 2019:

☐ U.S. Mail          ☐ FAX
☐ Hand Delivery     ☐ Overnight Courier
☐ Federal Express    ☐ Other
☒ ECF System Participant (Electronic Service)

Signature: /s/Betty Christensen