IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

INTERVARSITY CHRISTIAN                )   Case No. 3:18-cv-00080-SMR-SBJ
FELLOWSHIP/USA, INTERVARSITY          )
GRADUATE CHRISTIAN FELLOWSHIP,        )
                                      )
    Plaintiffs,                       )
                                      )
v.                                    )   ORDER ON CROSS-MOTIONS FOR
                                      )   PARTIAL SUMMARY JUDGMENT
THE UNIVERSITY OF IOWA; BRUCE         )
HARRELD, in his official capacity as President )
of the University of Iowa and in his individual )
capacity; MELISSA S. SHIVERS, in her  )
official capacity as Vice President for Student )
Life and in her individual capacity; WILLIAM )
R. NELSON, in his official capacity as )
Associate Dean of Student Organizations and in )
his individual capacity; ANDREW KUTCHER, )
in his official capacity as Coordinator for )
Student Organization Development and in his )
individual capacity; and THOMAS R. BAKER, )
in his official capacity as Student Misconduct )
and Title IX Investigator and in his individual )
capacity,                             )
                                      )
    Defendants.                       )

Before the Court are the parties' cross-motions for partial summary judgment.  Plaintiffs

InterVarsity Graduate Christian Fellowship ("InterVarsity") and InterVarsity Christian

Fellowship/USA ("InterVarsity USA") seek partial summary judgment on their various claims that

Defendants—the University of Iowa (the "University"), Bruce Harreld, President of the

University; Melissa Shivers, the University's Vice President for Student Life; William Nelson, the

University's Associate Dean of Student Organizations; Andrew Kutcher, Coordinator for Student

Organization Development at the University; and Thomas Baker, the University's Student

Misconduct and Title IX Investigator—violated InterVarsity's rights under the First Amendment to the United States Constitution.  [ECF No. 21].  Defendants move for partial summary judgment as to several of Plaintiffs' claims on the grounds of qualified immunity, failure to exhaust administrative remedies, and—in the case of Plaintiffs' claims for injunctive and declaratory relief—mootness.  [ECF No. 51].  The Court held a hearing on the parties' motions on September 25, 2019.  The matter is fully submitted and ready for decision.  For the reasons stated herein, both motions are GRANTED in part and DENIED in part, and portions of Defendants' motion will be taken under advisement.

## I.  BACKGROUND[1]

### A.  *Registered Student Organizations at the University*

The University allows its students to form student organizations, defined as "voluntary special interest group[s] organized for educational, social, recreational, and service purposes and comprised of its members."  [ECF No. 21-3 at 114].  Such groups are separate legal entities from the University and may exist on campus whether or not they receive official recognition from the University.  [ECF No. 40-2 ¶¶ 12–13].

Student organizations may register with the University as Registered Student Organizations ("RSO").  *See generally* [ECF No. 21-3 at 114].  RSO status carries with it many benefits, including eligibility to apply for funds from mandatory Student Activity Fees, inclusion in University publications, utilization of the University's trademarks, and eligibility to use campus meeting facilities.  *Id.*  To be eligible for RSO status, a student organization must have at least five members, of which eighty percent must be University students, and have "purposes [that] are

---

[1] The facts are derived from the parties' respective statements of undisputed material facts and the documents cited therein.

consistent with the educational objectives of the University, and do not violate local, state or federal law." *Id.* at 115.  An eligible organization wishing to register as an RSO must first hold a pre-registration meeting with appropriate University staff.  *Id.*  University staff will review the organization's proposed constitution and application for RSO status, and then submit it to the University's Student Organization Review Committee for final review.  *Id.*

University policies impose various restrictions on RSOs.  For example, an RSO must "adhere to the mission of [the] University, its supporting strategic plan, policies and procedures." *Id.* at 114.  Also, an RSO's "goals, objectives, and activities must not deviate from established University policies and procedures."  *Id.*  Among those policies is the University's Policy on Human Rights (the "Human Rights Policy").  Relevantly, it states:

> [I]n no aspect of [the University's] programs shall there be differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all.

*Id.* at 124.  The University requires that nearly identical language (with minor, non-substantive differences) be incorporated into the constitution of each RSO through a mandatory "UI Human Rights Clause" (the "Human Rights Clause").  [ECF Nos. 33-3 at 100; 40-2 ¶ 19].

The University does not have an "all-comers policy" that requires all RSOs to accept all students as members and leaders of the groups.  [ECF No. 40-1 ¶ 16].  The University's "Registration of Student Organizations" policy (the "RSO Policy") "encourages the formation of student organizations around the areas of interests of its students, within the limits necessary to accommodate academic needs and ensure public safety."  [ECF No. 21-3 at 114].  Further, the RSO Policy states:

> It is the policy of the University that all registered student organizations be able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the [Human Rights Policy].   The University acknowledges the interests of students to organize and associate with like-minded students, therefore any individual who subscribes to the goals and beliefs of a student organization may participate in and become a member of the organization.

*Id.* at 115.  Within these parameters, the University has approved the constitutions of numerous RSOs that require members to subscribe to their respective missions.  [ECF No. 40-1 ¶ 33]. For example, the National Society of Black Engineers requires its leaders to "put forth the effort to accomplish the goals" to "assist," "promote," and "[i]nform African-American engineers," and the Latina/o Graduate Student Association limits membership to "[a]nyone who supports the purpose of the organization, and is willing to commit to its objectives."  *Id.*

However, the RSO Policy, incorporating the Human Rights Policy, stresses that membership and participation in an RSO

> must be open to all students without regard to race, creed, color, religion, national origin, age, sex (unless the organization is exempt under Title IX), pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual.

[ECF No. 21-6 at 163].   The parenthetical releasing Title IX-exempt organizations from the policy's limitations on sex-based discrimination was only added in the summer of 2018 and was meant as an explicit exemption for fraternities and sororities.  *Id.* at 147; [ECF No. 40-1 ¶ 27]. There is no dispute that the University's fraternities and sororities are RSOs or that they are generally segregated on the basis of sex.

Under the University's interpretation of the Human Rights Policy, religious RSOs are not permitted to require their leaders to agree with and live by the organizations' religious beliefs, as

this is viewed as a form of religious discrimination. [ECF No. 40-1 ¶ 208]. Further, the University does not allow religious groups to encourage their leaders to follow the groups' religious beliefs. *See* [ECF No. 21-8 at 61] (email from Defendant Kutcher to InterVarsity rejecting InterVarsity's proposal that it be allowed to "strongly encourage[]" its leaders to subscribe to its beliefs).

Yet, "[o]ther groups are still permitted to have statements requiring or 'encouraging' their leaders and members to be part of a class protected under the [Human Rights Policy]." [ECF No. 40-1 ¶ 209]. Sports clubs, which the University treats as RSOs, may restrict membership, participation, and leadership based on sex. *Id.* ¶¶ 42–43. The a capella student group Hawkapellas—Iowa controls membership through "vocal auditions" in order "to bring a sound of an all-female a capella group to Iowa," [ECF No. 21-8 at 86]; Intersection, a male a capella group, does the same for male singers, *id.* at 90; and Tau Sigma Military Dental Club restricts membership to "full-time, military-sponsored . . . students" at the University's College of Dentistry, [ECF No. 21-5 at 234]. The Iowa National Lawyer's Guild excludes individuals because of their political views, even though such an exclusion constitutes discrimination on the basis of creed. [ECF Nos. 21-6 at 183; 40-1 ¶ 211].[2] The Women in Science and Engineering Ambassadors encourage women to be members, [ECF No. 21-8 at 132], and the Iowa Edge Student Organization

---

[2] During a deposition, Defendant Nelson testified that the following is an accurate statement of the University's interpretation of the word "creed" for the purposes of the Human Rights Policy: "a formal statement of religious belief, confession of faith, or a system of beliefs, principles, or opinions, and it can be any strongly held philosophical beliefs, even if not a recognized religion." [ECF No. 21-3 at 45]. Nelson testified this included political views. *See id.* (stating that a Republican group excluding a Democratic leader would qualify as discrimination on the basis of creed); *id.* at 66 (stating that the Iowa National Lawyer's Guild discriminated on the basis of creed by excluding those who do not subscribe to the group's political beliefs). More broadly, Nelson confirmed he knew there were "lots of groups" at the University "that exclude leaders who don't share their creed." *Id.* at 46.

is "open to all [University] students with particular emphasis for," among other traits and interests, "students of color," *id.* at 94.[3]

Although the RSO Policy exempts fraternities and sororities from the Human Rights Policy's restrictions on sex-based discrimination, the membership or leadership requirements of some fraternities and sororities discriminate based on other protected characteristics. Zeta Beta Tau's constitution provides that, while an ordinary recruit "must attain a positive 70% vote of members" to join the fraternity, "any recruit who identifies as a man of Jewish faith" need only "receive 50.1% positive vote." [ECF No. 65-1 at 67]. The constitution of Pi Kappa Phi states that the fraternity "shall be composed of male persons of good moral character; believers in God; the highest ideals of Christian manhood; and the principles of good citizenship." *Id.* at 90.[4]

Further, the University does not appear to interpret the Human Rights Policy uniformly as to all religious groups. Notably, Love Works is a Christian group that requires its leaders to agree with the group's core beliefs, which include affirming those in the LGBTQ+ community and acknowledging that "Jesus will be at the center of everything we do." [ECF No. 21-8 at 82–83]. Although the University's review of the group's constitution appears to be on hold pending the outcome of this litigation, *see* [ECF No. 47-2 at 58], Kutcher testified in a deposition that Love

---

[3] Each of the organizations in this paragraph limit leadership to the groups' respective members. Thus, any membership criteria also constitute leadership criteria.

[4] As a less direct example, the membership of Delta Phi Lambda is "open to any female who is willing to commit to the organization." [ECF No. 65-1 at 87]. It is difficult to square this openness with the preamble of the group's constitution, by which members pledge to "improve the image of the Asian American . . . by acknowledging and spreading *our* unique Asian heritage." *Id.* at 86 (emphasis added). The preamble also states that "[t]he bond between the sisters will set an example for *others in the Asian community*." *Id.* (emphasis added).

Works's constitution was compliant with the Human Rights Policy, [ECF No. 57-1 at 166–68].[5] Other filings in this case also confirm the University considers Love Works to be in compliance with the Human Rights Policy. *See* [ECF No. 73 at 2] ("University staff believed that . . . Love Works['s] . . . constitution was compliant with the Human Rights policy.").

Defendants argue that allowing student participation in RSOs serves several purposes, including: (1) providing a space for students to associate based on shared beliefs and interests; (2) developing student leadership and a quality campus environment; (3) promoting diversity and ensuring that all students are granted equal access to educational opportunities within the forum; (4) enhancing students' educational experiences by giving them the opportunity to participate in activities with students of diverse backgrounds; and (5) providing a safe environment for all students. [ECF No. 50 at 12–13, 29]. Defendants argue the exemptions the University grants from the Human Rights Policy are justified because they "serve the specific purposes of its limited public forum and educational mission." *Id.* at 29.

### B.  Business Leaders in Christ

In 2017, the University investigated a complaint by a student against RSO Business Leaders in Christ ("BLinC"). *See* Summ. J. Order at 7, *Bus. Leaders in Christ v. Univ. of Iowa*, 3:17-cv-00080-SMR-SBJ (S.D. Iowa Feb. 6, 2019), ECF No. 108 (hereafter, the "*BLinC Case*"). The student alleged he was denied a leadership position in BLinC because he was homosexual; BLinC maintained he was denied a position because he disagreed with the group's religious beliefs, particularly that same-sex sexual activity was contrary to the Bible's teachings on sexual

---

[5] Kutcher was designated as the University's Federal Rule of Civil Procedure 30(b)(6) witness on, among other issues, all RSOs at the University "that have employed criteria for leadership positions, membership, or participation related to any protected class under the University's Human Rights Clause or political affiliation." [ECF No. 57 ¶ 249(c)].

conduct.  *See id.* at 6–7.  The University concluded that BLinC denied the student a leadership position because of his sexual orientation, in violation of the Human Rights Policy.  *See id.* at 7.

BLinC appealed.  *Id.*  As part of that process, it was agreed BLinC could require its leaders to embrace its mission, provided that the group did not intend to pursue illegal activity.  *Id.* at 8. University officials informed BLinC that it could retain its RSO status if, among other requirements, it submitted a list of qualifications for its leaders designed to prevent future disqualifications based on characteristics protected by the Human Rights Policy.  *Id.* at 8–9. In response, BLinC made various changes to its constitution.  Relevantly, the group included therein a statement of faith—which endorsed the view that sexual activity should be limited to that between a husband and wife, and that each person should embrace his or her "God-given sex"—and an express requirement that its leaders "accept and seek to live by" the group's religious beliefs.  *Id.* at 9 (citations omitted).  The changes were rejected on the grounds that the statement of faith and leadership affirmation would effectively disqualify individuals from leadership positions on the basis of sexual orientation and gender identity.  *Id.*  BLinC was then deregistered as an RSO.  Two of the Defendants in this matter—Nelson and Baker—were involved in the University's investigation and deregistration of BLinC.

Litigation followed.  BLinC filed suit in this district against the University and several University administrators, including Nelson and Baker.  *See* Compl., *BLinC Case* (Dec. 11, 2017), ECF No. 1.  The crux of BLinC's complaint focused on violations of its rights to freedom of speech, freedom of association, and freedom of religious exercise under the First Amendment to the United States Constitution.

Early in the litigation, BLinC sought a preliminary injunction that would require the University to restore the group's RSO status.  *See generally* Order on P.'s Mot. for Prelim. Inj.,

*BLinC Case* (Jan. 23, 2018), ECF No. 36.  The Court granted the injunction in January 2018 for a period of ninety days after determining BLinC was likely to succeed on the merits of its free speech claim.  *Id.* at 28.  The Court reasoned that the University created a limited public forum by allowing student organizations to register as RSOs; however, the record showed that at least one other RSO was permitted to limit membership based on religious beliefs.  *See id.* at 20, 27–28.  The Court concluded that "[i]n light of this selective enforcement [of the Human Rights Policy]. . . BLinC has established the requisite fair chance of prevailing on the merits of its claims under the Free Speech Clause."  *Id.* at 28.  BLinC later asked the Court to renew the preliminary injunction.  *See generally* Order on P.'s Renewed Mot. for Prelim. Inj., *BLinC Case* (June 28, 2018), ECF No. 55.  The Court granted the motion in June 2018, leaving the injunction in place until the conclusion of that action.  *Id.* at 3.  In reaching its decision, the Court considered data in the record relating to the administration of the Human Rights Policy and observed, "[i]t appears a large number of student organizations were operating in violation of the University's stated policies at the time the University revoked BLinC's registered student organization status."  *Id.* at 2.

Ultimately, the Court granted BLinC summary judgment on its First Amendment free speech, free association, and free exercise claims.  *See* Summ. J. Order at 27, *BLinC Case*.  It is not necessary to recount the Court's analysis in detail here, largely because the issues presented in this action are so similar to those in the *BLinC Case* that much of that analysis is repeated below.  In both cases, the plaintiffs' claims have turned on the University's uneven enforcement of the Human Rights Policy against RSOs.

### C.  The University's RSO Review and InterVarsity

In January 2018, Defendants Shivers, Nelson, and Kutcher met to discuss the Court's order granting BLinC's motion for preliminary injunction.  [ECF No. 57 ¶ 340].[6]  Each held (and still hold) administrative positions at the University.  Shivers was the Vice President of Student Life; Nelson was the Associate Dean for Student Organizations; and Kutcher was the Coordinator for Student Organization Development.  Shivers understood the Court's preliminary injunction order to mean that the University could not selectively enforce its RSO Policy, and she met with Nelson and Kutcher to ensure they had a common understanding of how the Court's order applied to the RSO Policy.  *Id.*; *see also id.* ¶ 251 (noting that Kutcher understood the ruling to mean the University could not selectively enforce its policies against some RSOs and not others); [ECF No. 21-3 at 37–38] (Nelson testifying he was told by University counsel that one of the Court's concerns was over the University's "inconsistent enforcement" of its policies).

So, beginning in January 2018, the University reviewed all RSO constitutions for compliance with the Human Rights Policy.  [ECF No. 40-1 ¶ 173].  Shivers supervised Nelson in this process, who in turn supervised Kutcher.  [ECF No. 57 ¶ 336].  The review was meant to

---

[6] On April 17, 2019, Plaintiffs submitted a Supplemental Statement of Material Facts in support of their Motion for Partial Summary Judgment.  [ECF No. 57].  The document contains 166 numbered paragraphs, each containing a different "fact" for the purposes of Federal Rule of Civil Procedure 56(c)(1).  Defendants did not respond to this document; the Court therefore finds Defendants have failed to properly address Plaintiffs' Supplemental Statement of Material Facts. Consequently, the facts therein are deemed undisputed for the purposes of Plaintiffs' Motion for Partial Summary Judgment to the extent they are consistent with the materials cited in support of each respective fact.  *See* Fed. R. Civ. P. 56(e)(2), (4) (allowing a district court to "consider [a] fact undisputed" or "issue any other appropriate order" when "a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c)"); *Peters v. Woodbury Cty.*, 979 F. Supp. 2d 901, 910 (N.D. Iowa 2013) (deeming statements of material fact to be admitted when the opposing party either failed to respond to them or improperly denied them without adequate references to the record); LR 56(b) ("The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact.").

ensure the governing documents of RSOs contained "all required statements," including the Human Rights Clause and a required financial statement. [ECF No. 40-1 ¶ 174]. Reviewers were also instructed to look for any language that might contradict the Human Rights Clause, including language that requires leaders or members to embrace certain "beliefs/purposes." *Id.* ¶¶ 175–77, 179. Reviewers were told that, although RSOs could have purposes or mission statements related to specific classes or characteristics in the Human Rights Clause, membership or leadership could not "be contingent on the agreement, disagreement, subscription to, etc., of the stated beliefs/purposes which are covered in the [Human Rights Clause]." *Id.* ¶ 180. Reviewers were instructed to review religious student groups first, and those groups were reviewed twice. *Id.* ¶¶ 181–82. At the direction of Nelson, Kutcher compiled a list of all religious organizations and submitted it to Nelson in February 2018. [ECF No. 57 ¶ 257]. Shivers had asked for a list of all religious RSOs so the University could determine if there were other religious groups that had religious leadership requirements similar to those of BLinC. *Id.* ¶ 343.

Eventually, all RSO constitutions were reviewed, but they were found to have a "low rate of compliance with the RSO policy." *Id.* ¶ 258. Kutcher began sending emails in April 2018 to noncompliant RSOs. *Id.* ¶ 259. The parties dispute precisely when the University contacted InterVarsity about problems with its constitution, but they agree InterVarsity corresponded with Kutcher about those problems in June 2018.

InterVarsity is one of several chapters of InterVarsity USA operating at the University. [ECF No. 40-1 ¶¶ 1, 3]. Both groups are Christian ministries that aim to establish and advance "witnessing communities of students and faculty who follow Jesus as Savior and Lord" and who are "growing in love for God, God's Word, God's people of every ethnicity and culture and God's purposes in the world." *Id.* ¶ 2. Although InterVarsity's general membership is open to "all who

wish to participate in the group's activities," its leaders are required to affirm the group's statement of faith.  [ECF No. 21-7 at 405].  As described in InterVarsity's constitution, the statement of faith encompasses "the basic biblical truths of Christianity."  *Id.* at 404.

Students who hold leadership positions in InterVarsity lead the group in various religious activities, such as Bible studies and religious services.  [ECF No. 40-1 ¶ 6].  InterVarsity views its leaders as "the primary embodiment of [its] faith and Christian message to the University."  *Id.* ¶ 8. For its part, InterVarsity USA invests time and resources to develop InterVarsity's leaders. InterVarsity USA works with InterVarsity to "provide significant religious training to [InterVarsity's] student leaders," which includes "both religious training retreats before the start of school and regular religious mentoring meetings during the school year."  *Id.* ¶ 7.

In June 2018, Kutcher informed InterVarsity that language in its constitution requiring its leaders to be Christian violated the Human Rights Policy.  *Id.* ¶¶ 191–92; [ECF No. 21-8 at 63]. InterVarsity, through its leader Katrina Schrock, responded that the group did not discourage individuals who did not subscribe to the group's faith from participating as members, but InterVarsity "recognize[d] that having Christian leadership is important to the fulfillment of [the group's] purpose."  [ECF No. 21-8 at 63].  Kutcher responded by stating that "[h]aving a restriction on leadership related to religious beliefs is contradictory to the [Human Rights Clause]."  *Id.* at 62. Shrock asked if it would be acceptable if leaders were "requested to subscribe" or "strongly encouraged to subscribe" to the group's beliefs, rather than required to subscribe.  *Id.* at 61. Kutcher relayed the question to the University's general counsel, who informed Kutcher that the proposed change was not permissible.  [ECF No. 57 ¶¶ 275–76].  Kutcher told Shrock the University would not approve the proposed change.  [ECF No. 21-8 at 61].

InterVarsity did not change its leadership requirements, and the University deregistered the group on or about June 18, 2018.  [ECF Nos. 40-1 ¶ 201; 57 ¶ 277].  As a result of the University's review, over thirty RSOs were deregistered for failing to comply with the RSO Policy.  [ECF No. 40-1 ¶ 202].  Some groups were deregistered because they failed to submit compliant governing documents or because they simply failed to re-register.  *See* [ECF No. 21-8 at 190–91] (email listing RSOs to be designated as defunct following the RSO review); [ECF No. 47-2 at 57–58] (listing RSOs that were deregistered and the reasons therefore).  However, several of the deregistered groups were religious groups that required their leaders to agree with their faith.  [ECF No. 40-1 ¶ 202].

InterVarsity's deregistration negatively impacted the group's activities and recruiting efforts that summer.  [ECF No. 57 ¶¶ 230–31, 235, 237].  It detracted from the ability of the group's leaders to prepare for ministry in the coming school year.  *Id.* ¶ 227.  Prior to initiating this lawsuit, InterVarsity USA expended monetary and other resources responding to the deregistration. *Id.* ¶ 228.  The University eventually reinstated InterVarsity and other religious groups pending the outcome of the *BLinC Case* and this litigation.  [ECF No. 50 at 30].  Still, InterVarsity's members have expressed concern over possible retaliation from the University, and its membership numbers have fallen from the high-thirties to the low-twenties.  [ECF No. 57 ¶¶ 240, 244–45].

### D.  The Present Lawsuit

Plaintiffs commenced this action on August 6, 2018.  [ECF No. 1].  Their seventeen-count Complaint asserts claims against all Defendants under 42 U.S.C. § 1983 for violations of InterVarsity's rights under the First and Fourteenth Amendments to the United States Constitution, as well as claims for violations of the Iowa Constitution and the Iowa Human Rights Act. *See id.* at 22–37.  Plaintiffs ask the Court to: (1) declare that the Iowa Constitution, the Iowa

Human Rights Act, and the First and Fourteenth Amendments to the United States Constitution require Defendants to cease discriminating against InterVarsity and to cease withholding RSO status on the basis of InterVarsity's religious leadership selection policies; (2) issue an injunction prohibiting the University from denying InterVarsity RSO status based on the content of those policies; (3) award Plaintiffs damages and nominal damages for the loss of InterVarsity's rights as protected by the United States and Iowa Constitutions; (4) award Plaintiffs the costs of this action and reasonable attorney's fees; and (5) award other relief the Court deems just and equitable. *Id.* at 37–38.

Plaintiffs now move for partial summary judgment on their First Amendment Religion Clauses (Counts I–II), free exercise (Counts III–IV), free association (Count VI), and free speech (Counts VII–VIII) claims. [ECF No. 21]. They seek the same declaratory and injunctive relief set out above. *Id.* at 3. Additionally, they ask the Court to award nominal damages; to declare and enter judgment that Defendants' enforcement of the Human Rights Policy against InterVarsity violated the group's clearly established constitutional rights; and to declare and enter judgment that the individual Defendants are personally liable for said violations and that their qualified immunity defense fails as it relates to those claims. *Id.* Defendants resist that motion and also move for partial summary judgment. [ECF No. 51]. Defendants seek summary judgment in their favor on Plaintiffs' Religion Clauses claims in Counts I and II, on the grounds that Plaintiffs have failed to state a claim on which relief can be granted; on all of Plaintiffs' claims brought under the Iowa Constitution, due to Plaintiffs' alleged failure to exhaust administrative remedies; on all of Plaintiffs' claims for declaratory and injunctive relief, on the grounds that those claims

are moot; and the individual Defendants seek summary judgment on Plaintiffs' claims for money

damages, based on the doctrine of qualified immunity.[7]  *Id.*

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014).

"A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict

for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City

of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 252 (1986)).  "Credibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of the judge."

*Anderson*, 477 U.S. at 255.  Even so, at the summary judgment stage, courts must view "the facts

in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable

inferences that can be drawn from the record."  *Pedersen v. Bio-Med. Applications of Minn.*,

775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539,

541 (8th Cir. 2014)).  To preclude the entry of summary judgment, the nonmovant must make a

---

[7] Defendants' motion states, "[t]he individual Defendants move for summary judgment on Plaintiff's [sic] claims for declaratory and injunctive relief based on the doctrine of qualified immunity."  [ECF No. 51 ¶ 1].  But Defendants' brief states, "[t]he individual Defendants move the Court to dismiss them in their individual capacities from each and every claim for money damages."  [ECF No. 54 at 6].  This discrepancy is potentially significant.  At least insofar as it pertains to Plaintiffs' federal constitutional claims, it is well-established that qualified immunity does not apply to claims for declaratory or injunctive relief.  *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994) ("There is no dispute that qualified immunity does not apply to claims for equitable relief.").  The Court raised the discrepancy with Defendants' counsel during the hearing on the parties' summary judgment motions, and counsel confirmed that the individual Defendants seek qualified immunity on Plaintiffs' claims for money damages.  The Court construes Defendants' motion accordingly.

sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). But "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Id.* at 324.

## III.  ANALYSIS

### A.  *Preliminary Matters*

The Court will begin by addressing whether the record establishes the individual Defendants' liability for the alleged constitutional violations in this matter. It will then proceed to analyze Plaintiffs' First Amendment claims—first, their free speech and free association claims; second, their free exercise claims; and third, their Religion Clauses claims. Afterward, the Court will address Plaintiffs' request for nominal damages and injunctive relief. The Court will then analyze the individual Defendants' qualified immunity defense, followed by Defendants' arguments related to Plaintiffs' state-law claims. The Court will conclude by addressing Plaintiffs' claims for declaratory relief.

The Court notes that Plaintiffs have broken down their free speech and free exercise claims into two counts each. Thus, for example, Count VII asserts a claim for violating the Free Speech Clause and is labeled "Compelled Speech." [ECF No. 1 at 29]. Count VIII asserts another claim for violating the Free Speech Clause, and it is labeled "Viewpoint Discrimination." *Id.* at 30. Rather than asserting distinct claims, Plaintiffs have presented in each count a different argument supporting a broader claim that—keeping with the example above—Defendants have violated InterVarsity's rights under the Free Speech Clause. The parties do not distinguish between the different counts when arguing for or against Plaintiffs' free speech and free exercise claims. The

-16-

Court finds no reason to deviate from the parties' approach and will treat Counts VII–VIII, and Counts III–IV, as single claims under the Free Speech and Free Exercise Clauses, respectively.

### B.   Claims against the Individual Defendants

#### 1.   Individual liability

Plaintiffs bring their federal constitutional claims pursuant to 42 U.S.C. § 1983, which allows for a cause of action against "[e]very person who, under color [of state law] *subjects, or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]."   42 U.S.C. § 1983 (emphasis added).   In actions under § 1983, "Government officials are personally liable only for their own misconduct."   *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

Setting aside for the moment the issue of qualified immunity, the undisputed facts show Defendants Shivers, Nelson, and Kutcher were actively involved in the review of RSO constitutions in 2018 and the enforcement of the Human Rights Policy against InterVarsity. Kutcher reviewed all RSO constitutions, submitted a list of religious RSOs to Nelson, notified InterVarsity and other groups of their noncompliance with University policies, informed InterVarsity that its leadership requirements (and proposed changes thereto) contradicted the Human Rights Clause, and told the group that it would be deregistered if it failed to remove the offending provisions from its constitution.   [ECF No. 57 ¶¶ 254–57, 259, 267–68, 274–276].   Nelson supervised this process and reported to Shivers.   *See* [ECF No. 57-2 at 11] (Shivers testifying that Nelson was "tasked with leading the review process"); [ECF No. 21-3 at 40] (Nelson testifying that Kutcher's supervisors reported to Nelson, who reported to Shivers).   Although acting in a supervisory capacity, Nelson and Shivers were actively involved

in the process that led to the deregistration of InterVarsity. *See* [ECF No. 57 ¶ 340] (noting that Shivers met with Nelson and Kutcher to discuss the Court's January 2018 preliminary injunction order in the *BLinC Case* to ensure they had a common understanding of how it applied to the University's treatment of RSOs); [ECF No. 57-2 at 11] (Shivers testifying that she was present at the meeting where the RSO review process was discussed); [ECF No. 21-3 at 40] (Nelson testifying that he reported issues to Shivers when they arose during the review, and she reported them to the University's Office of the President and Office of the General Counsel); [ECF No. 57 ¶¶ 257, 343] (stating that Nelson asked Kutcher to provide him with a list of religious RSOs and that Shivers had requested the same from Nelson to determine if there were groups with leadership requirements similar to those of BLinC); [ECF No. 57-2 at 14–15] (Shivers testifying that she was involved in the decision-making process to send notice to InterVarsity and other groups regarding the need to have the full Human Rights Clause in their constitutions and stating that she worked with Nelson to communicate to those groups that they would be deregistered if their constitutions were not made compliant).  The most pointed evidence of the involvement of Shivers, Nelson, and Kutcher comes from Shivers's deposition testimony, wherein she specifically names herself, Nelson, and Kutcher as the three "primary folks" involved in the decision to deregister InterVarsity.  [ECF No. 57-2 at 18].  If the Court finds the University violated InterVarsity's constitutional rights, Shivers, Nelson, and Kutcher would be liable under § 1983.

Evidence of the involvement of Shivers, Nelson, and Kutcher in InterVarsity's deregistration stands in contrast to that concerning the involvement of Baker and Harreld. Plaintiffs' statements of undisputed material facts do not mention Baker as having any involvement in the 2018 RSO review process or the decision to deregister InterVarsity.  At the hearing on the instant motions, Plaintiffs conceded that the record is inadequate to establish Baker's liability.

As for Harreld, Plaintiffs aim to hold him liable as a supervisor.

> A supervisor cannot be held liable for an employee's unconstitutional actions based on a theory of respondeat superior. Rather, a supervisor incurs liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see."

*Ottman v. City of Indep.*, 341 F.3d 751, 761 (8th Cir. 2003) (alteration in original) (citations omitted). "[A] supervisor can act with 'deliberate, reckless indifference' even when [he or she] does not act 'knowingly.'" *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) (first alteration in original) (citation omitted). "A supervisor can be found liable under § 1983 for deliberate indifference if [he or she] is aware of 'a substantial risk of serious harm,' even if [he or she] is not aware that the harm has, in fact, occurred." *Id.* (citation omitted).

Evidence of Harreld's involvement in InterVarsity's deregistration comes from Shiver's deposition testimony. That testimony shows Harreld was aware of the Court's January 2018 preliminary injunction order in the *BLinC Case*, and he discussed it with Shivers at least twice. [ECF No. 57-2 at 10]. Shivers did not specify what those conversations entailed. Further, Shivers testified Harreld was aware she planned to deregister RSOs that were noncompliant with the Human Rights Policy, but Shivers did not know if Harreld was ever informed of the particular groups subject to deregistration. *Id.* at 19. She testified her conversations with Harreld were at a fairly high level, for example, "in terms about talking about where we are, particularly when we—the timeline for deregistration, updating him on where we are with that and what the timeline is for groups to comply, that was really the extent of the in-depthness of our conversations." *Id.* at 30. However, Shivers also testified Harreld never identified any problems with the review and deregistration process. *Id.*

This record is sparse and does not establish Harreld's liability.  It shows he was aware of the 2018 RSO review and the general plan to deregister groups that were noncompliant with the Human Rights Policy, but it appears he was largely disengaged from the process.  It is not clear how often he spoke with Shivers about the review, what they discussed, what he knew, or what he did or did not approve.  Nor is it clear how he understood the process.  Notably, the record lacks evidence that he was aware of (or could have been expected to be aware of) the various groups that were permitted to maintain their RSO status despite their apparent violations of the Human Rights Policy.  On this record, the Court cannot conclude Harreld was either involved in the alleged constitutional violations at issue here or that he was deliberately indifferent to them.

Accordingly, Plaintiffs have not yet shown Baker and Harreld are liable in their individual capacities for the alleged constitutional violations in this matter.

### 2.   Official-capacity liability

Plaintiffs also seek to hold the individual Defendants liable under § 1983 in their official capacities.  This liability, however, only applies to Plaintiffs' claims for declaratory and injunctive relief.  *See Nix v. Norman*, 879 F.2d 429, 432–33 (8th Cir. 1989) (noting that "state officials sued in their official capacities for injunctive relief are 'persons' under section 1983 because official-capacity actions for prospective relief are not treated as actions against the state" (citing *Will v. Mich. Dep't of State Police.*, 491 U.S. 58 (1989))).  To establish official-capacity liability under § 1983, "a plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Id.* at 433 (citations omitted).

The record shows Shivers, Nelson, and Kutcher deregistered InterVarsity while carrying out University policies.  Should the Court find the application of those policies violated InterVarsity's constitutional rights, these Defendants would be liable in their official capacities.  However, for the reasons stated above with respect to Plaintiffs' individual-capacity claims, Plaintiffs' official-capacity claims against Baker and Harreld fail at this stage because the record does not show their actions violated InterVarsity's constitutional rights.

In sum, the facts show Shivers, Nelson, and Kutcher are liable in both their individual and official capacities, should the Court conclude their actions violated InterVarsity's constitutional rights.  However, the record does not establish liability for Baker and Harreld.  Accordingly, Plaintiffs' Motion for Partial Summary Judgment with respect to Baker and Harreld is DENIED.[8]

### C.  Free Speech, Free Association, and Free Exercise

As discussed in the subsections that follow, Defendants[9] are subject to strict scrutiny with respect to Plaintiffs' free speech, expressive association, and free exercise claims.  The Court will analyze the other elements of those claims before addressing Defendants' strict scrutiny burden.

### 1.  Free speech and free association claims

Plaintiffs allege Defendants violated InterVarsity's rights under the First Amendment's Free Speech Clause by adopting an interpretation of the Human Rights Policy that bans InterVarsity from accessing a forum for speech.  They argue this restriction is both unreasonable

---

[8] Defendants' counsel did not raise this issue on behalf of Baker and Harreld.  However, the Court has considered it *sua sponte* because the lack of relevant evidence concerning Baker and Harreld was apparent from the record and the parties' filings.

[9] Here and throughout the rest of this Order, any reference to Defendants that discusses their liability for violations of InterVarsity's First Amendment Rights excludes Harreld and Baker.  As discussed above, Plaintiffs have failed to show facts establishing the liability of Harreld and Baker, regardless of the alleged constitutional violation.

in light of the purposes of the forum and discriminates against InterVarsity's religious viewpoint. Plaintiffs also claim Defendants violated InterVarsity's freedom of association under the First Amendment.   As to that claim, Plaintiffs argue InterVarsity is an expressive association, and Defendants forbid it from associating with leaders who agree with and can express its religious viewpoints with integrity, which significantly harms InterVarsity's ability to express its viewpoints.

Universities "establish limited public forums by opening property 'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'"  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S 661, 679 n.11 (2010) (citation omitted).   The parties agree the University has created a limited public forum by granting recognition to student organizations.   When student groups in a limited public forum assert free speech and expressive association claims stemming from restrictions on their leadership criteria, "[*w*]*ho* speaks on [the group's] behalf . . . colors *what* concept is conveyed." *Id.* at 680.   In such circumstances, the Supreme Court of the United States has held that its "limited-public-forum precedents supply the appropriate framework for assessing [the group's] speech and association rights." *Id.*  Accordingly, the Court will assess Plaintiffs' speech and association claims together.

Universities may constitutionally restrict access to limited public forums so long as the access barriers are "reasonable and viewpoint neutral." *Id.* at 679.   The Court previously ruled in the *BLinC Case* that the Human Rights Policy was both reasonable and viewpoint neutral as written.   *See* Order on P.'s Mot. for Prelim. Inj. at 22–25, *BLinC Case*.   The Court need neither reaffirm nor revisit those determinations because the Human Rights Policy is not viewpoint neutral as applied to InterVarsity.

"If a state university creates a limited public forum for speech, it may not 'discriminate against speech on the basis of its viewpoint.'" *Gerlich v. Leath*, 861 F.3d 697, 704–05 (8th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). "Viewpoint discrimination is . . . an egregious form of content discrimination" that arises when "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. Such discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830; *see also id.* at 830–31, 837 (finding viewpoint discrimination where a school denied funds to a student group for the printing of a newspaper espousing Christian views on topics permitted under the relevant school policy); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 108–09 (2001) (finding viewpoint discrimination where the limited public forum was available to groups to teach morals and character development to children, but access was denied to a group which sought to teach those issues from a religious viewpoint).

When a regulation governs what speech is permitted in a limited public forum—and thus establishes the forum's limitations—the disparate application of that regulation can constitute viewpoint discrimination. *See Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017) ("To sustain an as-applied challenge based on viewpoint discrimination, [a plaintiff] must establish a 'pattern of unlawful favoritism' by showing that [he or she] 'was prevented from speaking while someone espousing another viewpoint was permitted to do so.'" (citations omitted)). Thus, university nondiscrimination policies are not viewpoint neutral if they are selectively applied to restrict the leadership and/or membership requirements of some student groups but not others. *See Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 803–04 (9th Cir. 2011) (remanding the case to the district court for further proceedings when evidence showed the defendant university granted

student groups other than the plaintiff exemptions from the university's nondiscrimination policy); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 866 (7th Cir. 2006) (finding that a university likely engaged in viewpoint discrimination where the evidence showed that "[f]or whatever reason, [it] applied its antidiscrimination policy to [the plaintiff] alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy"). *But see Martinez*, 561 U.S. at 694–95 (finding that a university's "all-comers" nondiscrimination policy was viewpoint neutral where it "[drew] no distinction between groups based on their message or perspective").[10]  In the *BLinC Case*, the Court found the Human Rights Policy was not viewpoint neutral as applied to BLinC because the evidence showed other student groups could "speak about religion, homosexuality," and other traits protected by the Human Rights Policy "through their leadership criteria," but BLinC, whose leadership criteria expressed a view about religion and homosexuality, could not.  Summ. J. Order at 20, *BLinC Case*.

Nothing about this case warrants a different outcome than that reached in the *BLinC Case*. The University purports to apply the Human Rights Policy to RSOs such that they may not speak about religion, gender, homosexuality, creed, and numerous other protected characteristics through their membership and leadership criteria.  But whereas InterVarsity may not require or even encourage its leaders to subscribe to its faith, other RSOs are free to limit membership and leadership based on the Human Rights Policy's protected characteristics.  The RSO Policy, on its face, exempts fraternities and sororities from the Human Rights Policy so they may speak about gender.  Categorically, sports clubs may speak about gender.  Various other groups may express

---

[10] Here, unlike the law school in *Martinez*, the University does not have an all-comers nondiscrimination policy.  Further, although the plaintiff in that case raised a "selective enforcement" argument similar to that at issue here, the *Martinez* court did not consider that argument because it was improperly raised for the first time on appeal.  *Martinez*, 561 U.S. at 697.

views on gender (Hawkapellas—Iowa and the Women in Science and Engineering Ambassadors), race (the Iowa Edge Student Organization), veteran status (Tau Sigma Military Dental Club), and creed (the Iowa National Lawyer's Guild and "lots" of other groups, [ECF No. 21-3 at 46]) by either limiting or encouraging membership and leadership based on those characteristics.  Some groups, such as Love Works, Zeta Beta Tau, and Pi Kappa Phi, can express their views on religion. This disparate treatment constitutes viewpoint discrimination against InterVarsity.

"Once it has opened a limited [public] forum . . . the State must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829.  Defendants have failed to do that here. The University's decision to deregister InterVarsity based on the Human Rights Policy is viewpoint discriminatory and is subject to strict scrutiny.  *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014) (stating that a law would be subject to strict scrutiny if it was either not content neutral or not viewpoint neutral).

## 2.   Free exercise claims

Plaintiffs argue the University has violated InterVarsity's rights under the First Amendment's Free Exercise Clause because its interpretation of the Human Rights Policy discriminates against InterVarsity's sincere religious beliefs and religious exercise in a manner that is neither neutral nor generally applicable.  The Free Exercise Clause protects against laws "prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  Thus, the First Amendment protects a citizen's right to his or her own religious beliefs.  *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) ("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires.").

Although the "[g]overnment may neither compel affirmation of a repugnant belief . . . nor penalize or discriminate against individuals or groups because they hold religious views abhorrent

to the authorities," *Sherbert v. Verner*, 374 U.S. 398, 402 (1963) (citations omitted), the Free Exercise Clause does not shield every act that may be infected with religiosity from government regulation, *see Smith*, 494 U.S. at 878–79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."). The Supreme Court has refused to interpret the Free Exercise Clause "to require exemptions from a generally applicable criminal law." *Id.* at 884. Consequently, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (citation omitted). Laws that are not neutral and generally applicable require heightened scrutiny and "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).

In *Lukumi*, the Supreme Court considered the neutrality of several municipal ordinances regulating the slaughter of animals. One of the ordinances prescribed punishments for "[w]hoever . . . unnecessarily . . . kills any animal." *Id.* at 537 (alteration in original). The court rejected the defendant's argument that the "ordinance is the epitome of a neutral prohibition." *Id.* In determining that the ordinance was not neutral, the court held:

> [B]ecause it requires an evaluation of the particular justification for the killing, this ordinance represents a system of "individualized governmental assessment of the reasons for the relevant conduct," . . . . As we noted in *Smith,* in circumstances in which individualized exemptions from a general requirement are available, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Respondent's application of the ordinance's test of necessity devalues religious reasons for killing by judging them to be of lesser import than nonreligious reasons. Thus, religious practice is being singled out for discriminatory treatment.

*Id.* at 537–38 (citations omitted).

Lower courts have used *Lukumi's* consideration of "individualized exemptions" as a basis to trigger heightened scrutiny when the government grants secular, but not religious, exemptions from otherwise neutral and generally applicable rules.  Notably, the United States Court of Appeals for the Third Circuit found a Free Exercise Clause violation in a case involving a police department's policy that prohibited officers from wearing beards.  *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999).  The purpose of the policy was to foster a uniform appearance.  *See id.* at 366.  The department denied two Sunni Muslims exemptions from the policy for their religious beliefs, even though medical exemptions were permitted under the policy.  *See id.* at 360–61.

Relying on *Smith* and *Lukumi*, the Third Circuit held that "the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny."  *Id.* at 365.  The court found the medical exemption undermined the police department's stated interest in uniformity, and thus it "raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not."  *Id.* at 366.  The court concluded by stating, "when the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny."  *Id.*  Courts within this circuit have taken a similar approach when analyzing free exercise claims involving rules that grant secular, but not religious, exemptions.  *See Rader v. Johnston*, 924 F. Supp. 1540, 1553, 1555–58 (D. Neb. 1996) (applying strict scrutiny to a university policy prohibiting freshmen from living off-campus after finding the university "created a system of 'individualized

government assessment' of the students' requests for exemptions, but have refused to extend exceptions to freshmen who wish to live [off campus] for religious reasons" (quoting *Smith*, 494 U.S. at 884)).

Thus, strict scrutiny applies when: (1) the government declines to grant religious exceptions to facially neutral rules for which secular exceptions are permitted; and (2) the circumstances indicate the government did so based on its judgment of the religious motivations in question. Applying these principles, the University's decision to deregister InterVarsity is subject to strict scrutiny.

The purpose of the Human Rights Policy is to "bring[] together in common pursuit of [the University's] educational goals persons of many nations, races, and creeds." [ECF No. 21-3 at 124]. In applying this policy to RSOs, the University aims to "provid[e] a safe environment for a great diversity of student voices, free of discrimination on the basis of protected characteristic[s] while allowing students equal access to the public education for which they—and Iowa taxpayers—have paid." [ECF No. 50 at 26]. It is undisputed that InterVarsity's leadership requirements are religiously motivated. InterVarsity views its leaders as "the primary embodiment" of its faith and Christian message. [ECF No. 40-1 ¶ 8]. It seeks to limit leadership eligibility to those who share its beliefs because it maintains that being led by someone who does not share its beliefs would undermine its mission. *Id.* The University does not allow this religiously motivated exception to the Human Rights Policy, but it allows exceptions that are secularly motivated in that they allegedly "serve the specific purposes of [the University's] limited public forum and educational mission." [ECF No. 50 at 29].

But like in *Fraternal Order of Police*, the University's secular exceptions to the Human Rights Policy undermine some of the policy's goals. *See* 170 F.3d at 366. Broadly, the University

does not ensure equal access to educational opportunities by allowing student groups to restrict membership or leadership on the basis of sex or creed.  Political student groups discriminating on the basis of creed undermine the University's interests in equal access and creating an environment for diverse viewpoints as much if not more than religious groups limiting leadership on the basis of religious belief.  *See Martinez*, 561 U.S. at 705 (Kennedy, J., concurring) (in the context of diversity in student organizations, observing that "[a] vibrant dialogue is not possible if students wall themselves off from opposing points of view").  Further, it is not clear how allowing fraternities and sororities to discriminate based on sex does anything to promote freedom from discrimination based on characteristics protected by the Human Rights Policy, and it may cause much more harm than granting InterVarsity the exception it seeks.  During his deposition, Kutcher was asked what harms from InterVarsity's leadership requirements justified the group's deregistration, to which Kutcher responded that someone who wanted to be a leader of the group might be denied a leadership position because of his or her religious beliefs.  [ECF No. 57-1 at 157].  At the same time, however, he admitted that the magnitude of similar harm caused by the University's fraternities and sororities restricting leadership and membership on the basis of sex was potentially far greater.  *Id.* at 158.

These examples show that, by granting the exceptions it has to the Human Rights Policy and refusing to make a similar exception for InterVarsity, the University has made a value judgment that its secular reasons for deviating from the Human Rights Policy are more important than InterVarsity's religious reasons for the deviation it seeks.  Because this reflects an impermissible "value judgment in favor of secular motivations," *Fraternal Order of Police*, 170 F.3d at 366, the University's decision to deregister InterVarsity is subject to strict scrutiny.

3.   Strict scrutiny

To withstand Plaintiffs' free speech, expressive association, and free exercise claims, Defendants must show the University's decision to deregister InterVarsity was "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981); *see also Lukumi*, 508 U.S. at 531–32.

The Court discussed in the previous section the University's interests in applying the Human Rights Policy to its RSO program, but they bear repeating: "providing a safe environment for a great diversity of student voices, free of discrimination on the basis of protected characteristic[s], while allowing all students equal access to the public education for which they—and Iowa taxpayers—have paid." [ECF No. 50 at 26].   These are worthy interests the University is entitled to pursue.   However, "[w]here the government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." *Lukumi*, 508 U.S. at 546–47.   That is the case here.

The evidence shows the University has not identified any actual harm to its interests caused by InterVarsity's religious leadership requirements.   Shivers testified in her deposition that the University did not discuss what harms would be caused if InterVarsity were permitted to continue imposing its requirements. [ECF No. 57-2 at 19].   As discussed above, Kutcher testified that the harm caused by InterVarsity's leadership requirements was that someone might be denied a leadership position in the group because he or she did not share its religious beliefs. [ECF No. 57-1 at 157].   But that is not a harm so much as it merely restates InterVarsity's leadership requirements.   Even if this was a distinct harm, Kutcher did not know how to quantify it and was not aware of any discussions in his office about how to do so. *Id.*  No student has ever filed a

complaint about InterVarsity's religious leadership requirements, [ECF No. 40-1 ¶ 9], including in the period since InterVarsity was reinstated pending the outcome of this litigation, [ECF No. 57-1 at 159]. Shivers testified that, since InterVarsity was reinstated, she was unaware of any harms caused by InterVarsity's continued selection of leaders who agree with its faith, and she had not received any reports or indications suggesting this practice had harmed the University. [ECF No. 57-2 at 20].

This leaves Defendants relying on theoretical harms to support the University's actions, but such harms cannot meaningfully be distinguished from the theoretical harms created by the University's exceptions to the Human Rights Policy. Nelson testified in a deposition that an individual's "creed" for the purposes of the Human Rights Policy covers his or her political views. *See* [ECF No. 21-3 at 45] (stating that a Republican group excluding a Democratic leader would qualify as discrimination on the basis of creed); *id.* at 66 (stating that the Iowa National Lawyer's Guild discriminated on the basis of creed by excluding those who do not subscribe to the group's political beliefs). Kutcher testified there would be no difference, from a student's perspective, in the harm caused by a student's rejection from a leadership position in a political group because of his or her political beliefs, versus rejection from a leadership position in a religious group because of his or her religious beliefs. [ECF No. 57-1 at 163]. The Court agrees, but Kutcher did not stop there. He confirmed that "the [U]niversity is willing to accept the harm when it comes to a political or ideological group but not a religious group." *Id.*; [ECF No. 57 ¶ 303]. The University is free to make such a calculated value judgment. However, by choosing to accept some such harms while restricting InterVarsity's leadership requirements—conduct protected by the First Amendment—the University's interests that support the restriction are not compelling. *See Lukumi*, 508 U.S. at 546–47.

The Court also finds the University's decision to deregister InterVarsity was not narrowly tailored to serve the University's allegedly compelling interests.  It is difficult to understand how the University could have narrowly tailored its response to InterVarsity's leadership requirements without knowing or understanding the harms they caused.  Further, the evidence shows Defendants did not meaningfully consider less-restrictive alternatives to deregistration.  *See, e.g.*, [ECF No. 57-1 at 160] (Kutcher testifying he was unaware of any attempt by the University to "fashion an alternative to deregistering InterVarsity entirely for its religious leadership requirements"); [ECF No. 57-2 at 20] (Shivers testifying she was not aware of any deliberative process whereby the University weighed allowing InterVarsity to change its leadership requirements to "strongly encourage" its leaders to share its faith).

Yet, Defendants argue:

> The University has tailored its application of the Human Rights Policy as narrowly as possible, in that it permits organizations to express their missions, goals, and beliefs . . . through their group constitutions and permits like-minded students to gather around any issue.  All that the University asks is that students are not excluded from any group on the basis of protected characteristic[s].

[ECF No. 50 at 26].  Of course, this is not true.  As noted throughout this Order, there are many RSOs for which the University does not ask "that students are not excluded . . . on the basis of protected characteristic[s]."  *Id.*  Still, the Court agrees with Defendants in this regard—it would be less restrictive to prohibit all RSOs from excluding students on the basis of protected characteristics than it is to selectively enforce the Human Rights policy against InterVarsity.  That would transform the University's RSO Policy into the type of all-comers policy the Supreme Court upheld in *Martinez*.  *See Martinez*, 561 U.S. at 694–95 (describing the defendant's all-comers policy as "textbook viewpoint neutral").  But the University has not adopted such a policy, so it has not—by its own assessment—"tailored its application of the Human Rights Policy as narrowly

as possible." [ECF No. 50 at 26]. Instead, the University took an extreme step—complete deregistration of InterVarsity—to discriminately prevent theoretical harms that may never materialize.

Defendants have failed to satisfy their strict scrutiny burden. Accordingly, the University, Shivers, Nelson, and Kutcher violated InterVarsity's First Amendment rights to free speech, expressive association, and free exercise of religion when they deregistered InterVarsity as an RSO for failure to comply with the Human Rights Policy. The Court therefore GRANTS Plaintiffs' Motion for Summary Judgment as to Counts III–IV and VI–VIII against all Defendants except Baker and Harreld. This finding goes to the issue of these Defendants' liability only. Plaintiffs must still prove any damages they are entitled to recover.

### D. Religion Clauses Claims

In Counts I and II, Plaintiffs assert additional claims under the First Amendment's Free Exercise and Establishment Clauses pertaining to the University's position on InterVarsity's governance and structure. Count I is labeled "Ministerial Exception" and Count II is labeled "Internal Autonomy." [ECF No. 1 at 22–23]. Summarizing these claims, Plaintiffs explain:

> InterVarsity is a religious group whose mission is marked by clear and obvious religious characteristics, and its officers are its religious leaders who minister to its members, personify its beliefs, and play an important role in conveying InterVarsity's religious message and carrying out its religious mission. Defendants accordingly violated InterVarsity's clearly established rights under the Free Exercise Clause to shape its own faith and mission through its appointments of religious leadership, and its Establishment Clause right against government entanglement in the same.

[ECF No. 21 at 2]. Plaintiffs argue the "claims are related—the [internal autonomy claim] is a right against government interference in internal religious affairs, and the [ministerial exception claim] is a specific application of that right to a religious ministry's selection of its ministers."

[ECF No. 60 at 13].  Defendants argue they are entitled to summary judgment on Counts I and II because Plaintiffs have failed to state therein a claim upon which relief can be granted.

Plaintiffs are correct that the First Amendment's Religion Clauses limit the government's involvement in a religious organization's selection of its leaders.  As the Supreme Court has summarized:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.  By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.  According the state the power to determine which individuals will minister to the faithful also violates the Establishment Cause, which prohibits government involvement in such ecclesiastical decisions.

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012).  Put simply, "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."  *Id.* at 184.

But given the facts of this case, these principles do not endow Plaintiffs with greater protections than those the Court has already recognized.  As a threshold matter, the "ministerial exception," as it has been recognized by federal courts, does not apply to this dispute.  The ministerial exception is an affirmative defense, "grounded in the First Amendment, that precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its members."  *Id.* at 188.  The Supreme Court first recognized this exception in *Hosanna-Tabor*, a case involving a minister/teacher at a religious school who was terminated from employment after she was diagnosed with narcolepsy.  *Id.* at 178–79.  The teacher filed a claim with the Equal Employment Opportunity Commission

("EEOC") alleging a violation of the Americans with Disabilities Act, and the EEOC subsequently

sued the church.  *Id.* at 179–80.  After determining the teacher was a minister for the purposes of

the ministerial exception, the Court found the exception applied, thus requiring the dismissal of

the EEOC's employment discrimination suit.  *Id.* at 194.  However, the Supreme Court expressly

limited the scope of its ruling:

> The case before us is an employment discrimination suit brought on
> behalf of a minister, challenging her church's decision to fire her.
> Today we hold only that the ministerial exception bars such a suit.
> We express no view on whether the exception bars other types of
> suits, including actions by employees alleging breach of contract or
> tortious conduct by their religious employers.

*Id.* at 196.

It is important to identify the liberty interests implicated in any First Amendment claim,

Prior to *Hosanna-Tabor*, the United States Circuit Courts of Appeals had long-applied the

ministerial exception in matters involving religious organizations' employment disputes.  *See id.*

at 188 n.2 (collecting cases).  In the years since *Hosanna-Tabor*, the ministerial exception remains

an affirmative defense available to religious organizations in such matters.  *See, e.g.*, *Lee v. Sixth

Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018); *Fratello v.

Archdiocese of New York*, 863 F.3d 190, 199 (2d Cir. 2017); *Colon v. InterVarsity Christian

Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015).[11]

It is important to identify the liberty interests implicated in any First Amendment claim,

but it is another matter to identify the proper framework for assessing government action that

---

[11] Citing the concurring opinion of Justice Alito in *Hosanna-Tabor*, which Justice Kagan joined, Plaintiffs argue that "[w]hile courts have often labeled this Religion Clause protection as the 'ministerial exception,' they have 't[aken] pains to clarify that the label was a mere shorthand." [ECF No. 24 at 27] (second alteration in original) (quoting *Hosanna-Tabor*, 565 U.S. at 202 (Alito, J., joined by Kagan, J., concurring)).  This observation, however, concerned the fact that the "ministerial" exception is not limited to members of the clergy; the observation had nothing to do with the types of disputes to which it applied.

encroaches upon those interests.  The great weight of authority makes clear that the ministerial exception does not provide that framework for Plaintiffs' Religion Clauses claims.  In the *BLinC Case*, the plaintiff asserted Religion Clauses claims similar to those Plaintiffs assert in this action, and the Court determined that those claims were properly analyzed under the *Smith* and *Lukumi* line of free exercise precedents, rather than the ministerial exception.  *See* Summ. J. Order at 29, *BLinC Case*.  The Court reaches the same conclusion here.

Plaintiffs' reliance on the ministerial exception is misguided.  The Supreme Court recognized in *Hosanna-Tabor* that the ministerial exception represents a marriage of interests protected by the Establishment and Free Exercise Clauses.  *Hosanna-Tabor*, 565 U.S. at 188–89 (recognizing that the ministerial exception is "grounded in the First Amendment" and discussing the different protections to a religious group's leadership selection accorded by the Establishment and Free Exercise Clauses).  But Plaintiffs' Religion Clauses claims are really a single claim under the Free Exercise Clause: the University has not "appointed ministers" for InterVarsity in violation of the Establishment Clause; rather, it has "interfer[ed] with the freedom of [InterVarsity] to select [its] own [leaders]" in violation of the Free Exercise Clause.  *Hosanna-Tabor*, 565 U.S. at 184.  The record does not indicate the University can actually select InterVarsity's leaders or install them over the group's objections.  At worst, the University, through threats of deregistration or other penalties, could "impos[e] an unwanted [leader]" on InterVarsity, thereby "infring[ing] the Free Exercise Clause."  *Id.* at 188.

Looking at Plaintiffs' Religion Clauses claims through the lens of the Free Exercise Clause, it is significant that this case involves a limited public forum in which the University offers benefits to student groups, including religious groups, in exchange for their agreement to abide by certain rules.  Plaintiffs argue the University violates InterVarsity's free exercise rights by conditioning

RSO status on compliance with any rule that would impact its ability to select its leaders.  [ECF No. 60 at 17].  Not so.  Although *Martinez* is predominantly a free speech case, the Supreme Court also rejected in that case a free exercise challenge to the all-comers policy at the University of California, Hastings College of Law, which required all school-approved groups to "allow any student to participate, become a member, or seek leadership positions in the organization, regardless of [his or her] status or beliefs."  *Martinez*, 561 U.S. at 671 (citation omitted).  The plaintiff, a Christian student group, sought to exclude prospective members based on their religious beliefs and sexual orientation.  *Id.* at 672–73.  The plaintiff argued Hastings's failure to grant the group an exemption to the nondiscrimination policy violated its rights under the Free Exercise Clause.  *Id.* at 697 n.27.  The Supreme Court rejected this claim, stating, "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct."  *Id.*  It added, "[i]n seeking an exemption from Hastings' across-the-board all-comers policy, [the plaintiff], we repeat, seeks preferential, not equal, treatment; it therefore cannot moor its request for accommodation to the Free Exercise Clause."  *Id.*

*Martinez* is of limited value in this case because the University does not have an all-comers policy.  But it suffices to delineate the boundaries of the Free Exercise Clause and confirms that, in some circumstances, a university can impose restrictions on a religious student group's membership and leadership selection when imposed in exchange for registered status and its concomitant benefits.  Once that is established, the question turns to whether the regulation that purports to limit the group's leadership selection—here, the Human Rights Policy—is a neutral law of general application.  The Court has already conducted that analysis and need not repeat it.

In raising their Religion Clauses claims, Plaintiffs seek relief based on rights that are broader than those the Court has recognized with respect to Plaintiffs' free exercise claims in

Counts III and IV.  Plaintiffs are not entitled to that relief given the circumstances presented by this case.  Accordingly, the Court DENIES Plaintiffs' motion for summary judgment on its Religion Clauses claims in Counts I and II and GRANTS Defendants' motion for summary judgment on the same.

### E.  Nominal Damages and Permanent Injunction

Plaintiffs seeks nominal damages and a permanent injunction "prohibiting enforcement of the University's Human Rights Policy against InterVarsity based on the content of InterVarsity's leadership selection policies."  [ECF No. 21 at 3].  Having established a free speech violation, Plaintiffs are entitled to nominal damages as a matter of law.  *See Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) ("[N]ominal damages must be awarded when a plaintiff establishes a violation of the right to free speech.").

Turning to Plaintiffs' request for a permanent injunction, "[c]onsideration of a permanent injunction involves essentially the same factors as for a preliminary injunction."  *Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1181 (S.D. Iowa 2016).  The Court thus considers: (1) whether Plaintiffs have shown success on the merits of their claims; (2) the threat of irreparable harm to Plaintiffs in the absence of an injunction; (3) the balance of harms between Plaintiffs and Defendants; and (4) whether the injunction will serve the public interest.  *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc)).

The first of these factors weighs in Plaintiffs' favor.  As set out above, Plaintiffs have demonstrated success on the merits of their free speech, free association, and free exercise claims.  Also, "it is axiomatic that protection of First Amendment rights serves the public interest."  *Id.*  Thus, the fourth factor also favors granting an injunction.

The second and third factors require an assessment of potential harms that might befall InterVarsity in the absence of an injunction. While this case was pending, the Iowa legislature passed a new law mandating, in relevant part, that

> a public institution of higher education shall not deny any benefit or privilege to a student organization based on the student organization's requirement that the leaders of the student organization agree to and support the student organization's beliefs, as those beliefs are interpreted and applied by the organization, and to further the student organization's mission.

Iowa Code § 261H.3(3). Defendants argue this law makes it unreasonable to expect the constitutional violations at issue will recur, thus rendering moot Plaintiffs' request for injunctive relief. Defendants cite the "clarity with which the Iowa Legislature has set forth its expectations," and argue, "[i]n order to continue enforcing its policy against InterVarsity, the University of Iowa would have to knowingly violate state law and expose itself to further student complaints and potential litigation." [ECF No. 54 at 33–34].

In cases involving the *voluntary* cessation of illegal activity, the case becomes moot "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Strutton v. Meade*, 668 F.3d 549, 556 (8th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).[12] In such cases, "[t]he burden of showing that the challenged conduct is unlikely to recur rests on the party asserting mootness." *Id.* Both parties rely on voluntary cessation cases when arguing in favor of or resistance to Defendants' position on mootness. The Court finds nothing voluntary about the University's compliance with section 261H.3(3), and there does not appear to be a

---

[12] To be clear, section 261H.3(3) does not moot Plaintiffs' claims for money damages, nominal damages, or declaratory relief. Plaintiffs' entitlement to those forms of relief is based on Defendants' past conduct, which is not impacted by the new state legislation.

separate test for determining mootness in the case of *involuntary* cessation.  But the Court discerns no reason why the "absolutely clear" standard should not still apply here—the question simply becomes whether section 261H.3(3) makes absolutely clear Defendants' wrongful acts cannot reasonably be expected to recur.

The Court does not question Defendants' intent to comply with the law, but other circumstances weigh against a finding in Defendants' favor.  By invoking the "clarity with which the Iowa Legislature has set forth its expectations," [ECF No. 54 at 34], Defendants imply the law is unambiguous and leaves the University no reasonable avenue to limit InterVarsity's leadership requirements.  The Court disagrees.  Section 261H.3(3) only protects groups that require leaders to "agree to and support the student organization's beliefs, *as those beliefs are interpreted and applied by the organization*."  Iowa Code § 261H.3(3) (emphasis added).  The emphasized language creates a factual issue on which leadership criteria could be challenged in the future.  Additionally, the law does not prevent the University "from prohibiting harassment." *Id.* § 261H.3(5).  It is not unreasonable to imagine a University administrator taking the position that discriminatory leadership practices are a form of harassment directed at excluded students.

One problem these examples highlight is that the new law is untested.  The Court is not entirely confident the new law will survive judicial scrutiny.  Moreover, even if it were upheld, Defendants admit the University is "working to implement" the new law, [ECF No. 54 at 33], but it is unknown how the University will interpret its provisions.  Also, Defendants have not given the Court any reason to trust the University will implement the new law in a manner that protects its students' civil liberties.  In its January 2018 preliminary injunction order in the *BLinC Case*, the Court found the University likely violated a student group's free speech rights by selectively enforcing the Human Rights Policy.  The Court would never have expected the University to

respond to that order by homing in on religious groups' compliance with the policy while at the same time carving out explicit exemptions for other groups. But here we are.

Turning back then to the preliminary injunction analysis, the Court finds the second factor, the threat of irreparable injury, weighs in favor of an injunction. There is a reasonable threat InterVarsity may again suffer a deprivation of its First Amendment rights. The United States Court of Appeals for the Eighth Circuit has held that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Finally, the third factor (balance of harms) favors Plaintiffs. Whereas InterVarsity's injury would be irreparable, any injury the injunction may cause the University would be less severe, given that it already allows other RSOs to operate in violation of the Human Rights Policy.

Because all four factors weigh in Plaintiffs' favor, the Court finds Plaintiffs are entitled to a permanent injunction. The Court will enjoin all Defendants except Harreld and Baker[13] from enforcing the University's Human Rights Policy against InterVarsity based on the content of InterVarsity's leadership selection policies, provided: (1) InterVarsity does not materially alter its leadership selection policies or its statement of faith from those contained in the copy of its constitution filed at ECF No. 21-7 at 404–07; (2) the University continues to allow other RSOs exceptions to the Human Rights Policy for their membership or leadership criteria; and (3) InterVarsity otherwise maintains its eligibility for RSO status.[14] With respect to the second

---

[13] Harreld and Baker are excepted from the injunction because Plaintiffs have not established their liability for the constitutional violations at issue. Their exception should not be interpreted as authorization from the Court to take any particular action.

[14] The University may not discriminate against InterVarsity by deviating from its normal procedures for enforcing its eligibility requirements.

condition, it bears emphasis that the injunction does not grant InterVarsity a special exemption if the University applies the Human Rights Policy in a manner permitted by the Constitution.

### F.   Qualified Immunity

Individual Defendants Harreld, Baker, Shivers, Nelson, and Kutcher seek summary judgment under the doctrine of qualified immunity as to "each and every claim for money damages outlined in Plaintiff[s'] [Complaint]."   [ECF No. 54 at 6].   At this time, the Court will limit its analysis to whether Defendants are entitled to qualified immunity on Plaintiffs' First Amendment claims in Counts I–IV and VI–VIII.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).   Thus, the Court must determine: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Foster v. Mo. Dep't of Health & Sr. Servs.*, 736 F.3d 759, 762 (8th Cir. 2013).

The Court has granted summary judgment to Defendants on Plaintiffs' Religion Clauses claims in Counts I and II.   Thus, the individual Defendants' qualified immunity defense is moot as to those claims.   However, the Court has found Shivers, Nelson, and Kutcher violated InterVarsity's First Amendment rights to free speech, expressive association, and free exercise of religion.   As to those violations, the Court turns to the second qualified immunity factor—whether the constitutional rights were clearly established.   As discussed below, the Court finds Shivers,

Nelson, and Kutcher violated InterVarsity's clearly established rights under the Free Speech Clause.  Accordingly, the Court will focus its analysis on that constitutional right.[15]

Discussing the "clearly established" prong of the qualified immunity analysis, the Supreme Court has said:

> Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  While this Court's case law "'do[es] not require a case directly on point'" for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  In other words, immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"

*White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alteration in original) (citations omitted).  The "'clearly established law' should not be defined 'at a high level of generality'" and "must be 'particularized' to the facts of the case."  *Id.* at 552 (citations omitted).  "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'"  *Id.* (alteration in original) (citations omitted).  Thus, in *White*, the Supreme Court overturned the denial of qualified immunity when the circuit court "failed to identify a case where an officer acting under similar circumstances as [the defendant]" was found to have violated the Constitution, relying instead on cases laying out the relevant legal principles "at only a general level."  *Id.*

Defendants correctly recognize that the viability of their qualified immunity defense depends on how the constitutional issue is framed.  They offer the following:

---

[15] Each First Amendment violation in this case was caused by the same underlying conduct, and Plaintiffs have confirmed their damages do not vary depending on the constitutional violation. Therefore, it is not necessary for the Court to analyze Defendants' qualified immunity defense as to every violation if the defense fails for any one of them.

> The question before the court is whether clearly established law exists which sets forth the course a University official should take in protecting the First Amendment and civil rights of protected groups when those rights come into direct conflict with one another, such that the official could be said to be reasonably apprised of the law at the time of the alleged violations. More specifically: does a university's requirement that a student group adhere to its nondiscrimination and equal opportunity policies in order to receive state funding, recognition, and other peripheral benefits, violate that group's First Amendment Rights when that group's sincerely held religious beliefs are in direct conflict with state and federal civil rights law?

[ECF No. 54 at 9].[16]  This framing misses the mark because it does not address the University's disparate application of the Human Rights Policy.  Instead, the constitutional issue in this case is whether a university violates a student group's right to free speech in a limited public forum when it enforces its nondiscrimination policy to limit the group's ability to choose its leaders, but allows other groups to restrict membership or leadership in a manner that would similarly violate the policy.  So framed, the law on this issue was clearly established no later than January 2018, particularly as it relates to the University and the Human Rights Policy.

The broad contours of the relevant law have been established for some time; that is, the selective application of regulations by a university in a limited public forum can constitute impermissible viewpoint discrimination.  In *Rosenberger*, the Supreme Court in 1995 found that a rule prohibiting the reimbursement of student activity fees for religious activities constituted viewpoint discrimination when applied in such a way that it barred religious viewpoints on otherwise permitted subjects.  *See Rosenberger*, 515 U.S. at 831.  There, "the University [did] not

---

[16] This is, verbatim, the same framing offered by the defendants in the *BLinC Case*. *See* D.'s Br. in Supp. of Mot. for Partial Summ. J. at 4, *BLinC Case* (Oct. 22, 2018), ECF No. 70-1.

exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.*

In *Martinez*, the Supreme Court in 2010 applied *Rosenberger* and other viewpoint discrimination precedents in a case involving a nondiscrimination policy not unlike the University's Human Rights Policy. *See Martinez*, 561 U.S. at 684–85. The Court found the policy—which required student groups to accept *any* student regardless of his or her status or beliefs—was viewpoint neutral. *Id.* at 675, 694–95. However, the Supreme Court limited its holding to the all-comers policy before it. *Id.* at 668; *id.* at 698 (Stevens, J., concurring).

It may have been unclear after *Martinez* how the First Amendment applied to a nondiscrimination policy that was not an all-comers policy. But appellate courts before and after *Martinez* offered guidance. Four years before *Martinez*, the United States Court of Appeals for the Seventh Circuit found there was "strong evidence" a university engaged in viewpoint discrimination where evidence showed it selectively applied its antidiscrimination policy to a Christian student group's membership requirements, even though other student groups discriminated in their membership requirements in ways that were also prohibited by the same policy. *Walker*, 453 F.3d at 866. One year after *Martinez*, the United States Court of Appeals for the Ninth Circuit observed that "[a] nondiscrimination policy that is viewpoint neutral on its face may still be unconstitutional if not applied uniformly." *Reed*, 648 F.3d at 803. The court remanded that case for determination of whether: (1) exemptions to the policy were granted to student groups; and (2) the plaintiff student group was denied an exemption due to its religious viewpoint. *Id.* at 804.

In the *BLinC Case*, the Court found the individual defendants were entitled to qualified immunity. The Court reasoned that the University's compelling interests in the Human Rights

Policy, along with the university setting, potentially complicated the case, and *Martinez*, *Reed*, and *Walker* did not offer clear conclusions as to the selective application of a nondiscrimination policy. Summ. J. Order at 34–35, *BLinC Case*.  But what the individual defendants in the *BLinC Case* did not have when BLinC's constitutional rights were violated in 2017, and what the individual Defendants in this case *did* have by June 2018, was an order that squarely applied *Martinez*, *Reed*, and *Walker* to a case involving the selective application of the Human Rights Policy to a religious group's leadership requirements.

The Court is referring to its January 2018 order in the *BLinC Case* granting the plaintiff's motion for a preliminary injunction.  The Court has summarized that order elsewhere in this opinion, and a labored account of it here is unnecessary.  It is enough to note that the Court identified the University's RSO program as a limited public forum after applying *Martinez* and other cases; recognized that the record showed at least one other RSO was permitted to require its leaders to share its faith in apparent violation of the Human Rights Policy; and, applying *Reed* and *Walker*, concluded that "[i]n light of this selective enforcement [of the Human Rights Policy]. . . BLinC has established the requisite fair chance of prevailing on the merits of its claims under the Free Speech Clause."  Order on P.'s Mot. for Prelim. Inj. at 28, *BLinC Case*.

The Court acknowledges that a finding of likelihood of success on the merits is not the same as a final determination that a constitutional violation has occurred.  Still, a case need not be "directly on point," so long as it "place[s] the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (citations omitted).  Even if the Court's preliminary injunction order is not "directly on point," any ambiguity as to whether the University could selectively enforce its Human Rights Policy against a religious student group should have been firmly resolved when that order was filed in January 2018.  And although not dispositive, the record is clear Shivers, Nelson,

and Kutcher each understood the preliminary injunction order to mean that the University could not selectively enforce the Human Rights Policy against some RSOs but not others.  *See* [ECF No. 57 ¶ 340] (Shivers); *id.* ¶ 251 (Kutcher); [ECF No. 21–3 at 37–38] (Nelson).

Yet despite their (accurate) interpretation of that order, Shivers, Nelson, Kutcher, and others who are not involved in this lawsuit proceeded to broaden enforcement of the Human Rights Policy in the name of uniformity—applying extra scrutiny to religious groups in the process—while at the same time continuing to allow some groups to operate in violation of the policy and formalizing an exemption for fraternities and sororities.  The Court does not know how a reasonable person could have concluded this was acceptable, as it plainly constitutes the same selective application of the Human Rights Policy that the Court found constitutionally infirm in the preliminary injunction order.

Although Defendants did not raise this in their briefing, the record contains scattered references to Shivers, Nelson, and Kutcher consulting with the University's general counsel at various times during the 2018 RSO review.  *See, e.g.*, [ECF No. 57 ¶¶ 275–76] (noting that Kutcher relayed to general counsel InterVarsity's proposal to change its constitution so that its leaders would only be strongly encouraged to share its beliefs); [ECF No. 57-2 at 10] (Shivers testifying that she had a discussion about the preliminary injunction order with Harreld while general counsel was present); [ECF No. 23-1 at 37] (Nelson testifying that general counsel informed him that one of the Court's concerns in the preliminary injunction order was over the University's inconsistent enforcement of the Human Rights Policy).  This does not alter the reasonableness of the individual Defendants' conduct in this case.  A different judge in this district recently summarized the law relating to a defendant's reliance on counsel in the context of a qualified immunity defense:

> Defendants' conduct is not immunized from First Amendment scrutiny simply because they consulted with counsel.  "[A]n

> attorney's advice cannot transform . . . patently unlawful activity into objectively reasonable conduct." "While [Defendants]' reliance on counsel's advice may be a factor in the qualified immunity analysis," "reliance on the advice of counsel alone will not satisfy an official's burden of acting reasonably," . . . . A Court should give weight to a defendant's reliance on counsel where the defendant faced an "extraordinary" or "perilous" situation that required prompt action.

*Gerlich*, 152 F. Supp. 3d at 1176–77 (alterations in original) (citations omitted). There was nothing extraordinary or perilous about the University's RSO review. Given the clarity of the Court's preliminary injunction order, the individual Defendants' reliance on counsel—to the extent it has been established by the record—does not make their actions reasonable.[17]

In their brief in support of their motion for partial summary judgment, Defendants quote *Morgan v. Swanson*, in which the United States Court of Appeals for the Fifth Circuit observed that "educators are rarely denied immunity from liability arising out of First-Amendment disputes. The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional." 755 F.3d 757, 760 (5th Cir. 2014) (per curiam) (citation omitted). The Court's preliminary injunction order in the *BLinC Case* was such a precedent, and Defendants have not shown the facts in this case make that order somehow inapposite.[18]

Shivers, Nelson, and Kutcher violated InterVarsity's clearly established right to free speech. They are not entitled to qualified immunity on Plaintiffs' claims for money damages in Counts VII and VIII of the Complaint. Thus, their Motion for Partial Summary Judgment on the

---

[17] Defendants state "[t]he material facts are undisputed" for the purposes of summary judgment on their qualified immunity defense and that they are entitled to summary judgment as a matter of law. [ECF No. 51 ¶¶ 5–6]. Given these assertions, the Court finds any evidence of the individual Defendants' reliance on counsel that has not been made part of the record is immaterial for the purposes of Defendants' motion.

[18] Defendants never discuss the Court's January 2018 preliminary injunction order in their brief in support of their Motion for Partial Summary Judgment.

grounds of qualified immunity is DENIED as to those counts.  It is DENIED as moot as to Counts I and II because the Court granted summary judgment to Defendants on the merits of those claims.  It is DENIED as moot as to Counts III, IV, and VI, because each constitutional violation was founded on the same underlying conduct and Plaintiffs' damages do not vary depending on the violation.

Further, although the Court found the record is insufficient to establish the liability of Baker and Harreld, the same analysis and conclusions above would apply to their qualified immunity defense if Plaintiffs can establish their liability at trial.  Accordingly, the Court DENIES Defendants' Motion for Partial Summary Judgment on qualified immunity grounds as to Baker and Harreld with respect to Counts VII and VIII of the Complaint.  It DENIES the motion as moot as to Counts I–IV and VI for the same reasons set out above for Shivers, Nelson, and Kutcher.

### G.  Plaintiffs' State-Law Claims

Defendants ask the Court to grant them summary judgment on Plaintiffs' claims under the Iowa Constitution on the grounds that Plaintiffs failed to exhaust administrative remedies. Additionally, individual Defendants seek summary judgment on Plaintiffs' state law claims on the grounds of qualified immunity.  In resisting Defendants' motions, Plaintiffs state, "[s]hould this Court follow its approach in [the *BLinC Case*] and rule for InterVarsity on the leading federal claims, the state-law claims would also likely take the same track as [in the *BLinC Case*] and fall out of the case."  [ECF No. 60 at 19].  In the *BLinC Case*, the plaintiff moved for summary judgment on its First Amendment claims.  The Court granted that motion in part, and the plaintiff voluntarily dismissed its remaining claims.  *See* P.'s Unopposed Rule 41 Mot., *BLinC Case* (Feb. 18, 2019), ECF No. 122.  Here, the Court has ruled for Plaintiffs on their free speech, free association, and free exercise claims.  Given Plaintiffs' suggestion that they may now dismiss

their remaining claims, Plaintiffs are hereby ORDERED to file, by no later than October 18, 2019, either: (1) a motion to voluntarily dismiss their remaining claims; or (2) notice that they will continue pursuing them.  The Court will take the remainder of Defendants' Motion for Partial Summary Judgment under advisement until Plaintiffs make the aforementioned filing.

### H.  Declaratory Judgment

Finally, Plaintiffs ask the Court to declare: (1) "the First Amendment . . . requires Defendants not to discriminate against InterVarsity or withhold registered status based on InterVarsity's religious leadership selection policies"; (2) "Defendants' enforcement of the University's policy against InterVarsity violated InterVarsity's clearly established constitutional rights"; and (3) the individual-capacity Defendants are personally liable for these violations and their qualified immunity affirmative defense fails as it relates to these claims."  [ECF No. 21 at 3].

The Declaratory Judgment Act states, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "District courts are afforded broad discretion" over claims for declaratory relief.  *Marty H. Segelbaum, Inc. v. MW Capital, LLC*, 673 F. Supp. 2d 875, 882 (D. Minn. 2009) (citing *Alsager v. Dist. Court of Polk Cty.*, 518 F.2d 1160, 1163 (8th Cir. 1975)); *see also* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").  A court may deny declaratory relief when the adjudication of other claims in the case necessarily encompasses the declarations sought.  *Compare Simmons v. Butler*, 4:19CV10 HEA, 2019 WL 2231081, at *3 (E.D. Mo. May 22, 2019) (denying declaratory relief after finding the resolution of the plaintiffs' constitutional and wrongful termination claims would "necessarily settle the

issues of the parties' rights, status, and legal relationships"), *with Mary H. Segelbaum, Inc.*, 673 F. Supp. 2d at 882 (denying a motion to dismiss a declaratory judgment claim, the scope of which was broader than the plaintiff's accompanying breach of contract claim).

Plaintiffs' second and third requests for declaratory relief were squarely addressed in the Court's analysis of the individual Defendants' qualified immunity defense. As for Plaintiffs' first request for declaratory relief—relating to Defendants' obligations to InterVarsity under the First Amendment—the Court addressed those issues in its analysis of Plaintiffs' First Amendment claims and when granting Plaintiffs' request for a permanent injunction. The permanent injunction sets out what Defendants may or may not do vis-à-vis InterVarsity's First Amendment rights. Plaintiffs are not entitled to a broader declaration.

The Court finds the resolution of Plaintiffs' First Amendment claims and the individual Defendants' qualified immunity defense necessarily encompasses all the declaratory relief Plaintiffs seek and to which they are entitled. It is therefore unnecessary to award this relief and the Court will exercise its discretion not to do so.

## IV.  CONCLUSION

For the reasons set out in this Order:

(1)    Plaintiffs' Motion for Partial Summary Judgment, [ECF No. 21], is:

      (a)  GRANTED as to Counts III–IV and VI–VIII against the University and individual Defendants Shivers, Nelson, and Kutcher;

      (b)  DENIED in its entirety as to Defendants Harreld and Baker;

      (c)  DENIED as to Counts I and II against all Defendants;

      (d)  DENIED as to all requested declaratory relief.

(2)    Plaintiffs are entitled to nominal damages in the amount of one dollar.

(3)    The University, Shivers, Nelson, and Kutcher may not enforce the University's Human Rights Policy against InterVarsity based on the content of InterVarsity's

leadership selection policies, provided: (1) InterVarsity does not materially alter its leadership selection policies or its statement of faith from those contained in the copy of its constitution filed at ECF No. 21-7 at 404–07; (2) the University continues to allow other RSOs exceptions to the Human Rights Policy for their membership or leadership criteria; and (3) InterVarsity otherwise maintains its eligibility for RSO status.

(4)     With respect to Plaintiffs' First Amendment claims in Counts I–IV and VI–VIII, Defendants' Motion for Partial Summary Judgment, [ECF No. 51], is:

(a)   GRANTED as to Counts I and II;

(b)   GRANTED as to Plaintiffs' request for declaratory relief;

(c)   DENIED as to the individual Defendants' qualified immunity defense with regards to Counts VII and VIII;

(d)   DENIED AS MOOT as to the individual Defendants' qualified immunity defense with regards to Counts I–IV and VI; and

(e)   DENIED as to Plaintiffs' request for injunctive relief.

(5)     The remainder of Defendants' Motion for Partial Summary Judgment is taken under advisement.

(6)     By no later than October 18, 2019, Plaintiffs must file either a motion to dismiss their remaining claims or notice they will continue pursuing them.

If Plaintiffs dismiss their remaining claims, this case will proceed to trial as to the liability of Baker and Harreld (should Plaintiffs choose to pursue that issue) and Plaintiffs' damages. The Court will await Plaintiffs' filing regarding the status of their remaining claims and schedule a status conference in due course.

IT IS SO ORDERED.

Dated this 27th day of September, 2019.

STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT