# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3389
_____

Intervarsity Christian Fellowship/USA; Intervarsity Graduate Christian Fellowship

*Plaintiffs - Appellees*

v.

University of Iowa; Bruce Harreld, in his official capacity as President of the University of Iowa and in his individual capacity; Melissa S. Shivers, in her official capacity as Vice President for Student Life and in her individual capacity; William R. Nelson, in his official capacity as Associate Dean of Student Organizations and in his individual capacity; Andrew Kutcher, in his official capacity as Coordinator for Student Organization Development and in his individual capacity; Thomas R. Baker, in his official capacity as Student Misconduct and Title IX Investigator and in his individual capacity

*Defendants - Appellants*

------------------------------

Jewish Coalition for Religious Liberty

*Amicus on Behalf of Appellee(s)*

Asma T. Uddin

*Amicus Curiae*

State of Nebraska; State of Alabama; State of Alaska; State of Arizona; State of Arkansas; State of Indiana; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Oklahoma; State of South Carolina; State

of South Dakota; State of Texas; State of Utah; The Navigators; Campus Crusade for Christ, Inc. (Cru); Foundation for Individual Rights in Education; The Cardinal Newman Society; Ethics and Religious Liberty Commission of the Southern Baptist Convention; The Lutheran Church-Missouri Synod; Religious Student Organizations; Christian Legal Society; Council for Christian Colleges & Universities

*Amici on Behalf of Appellee(s)*

———————

Appeal from United States District Court
for the Southern District of Iowa - Davenport

———————

Submitted: January 13, 2021
Filed: July 16, 2021

———————

Before LOKEN, GRASZ, and KOBES, Circuit Judges.

———————

KOBES, Circuit Judge.

Employees of the University of Iowa targeted religious student organizations for discriminatory enforcement of its Human Rights Policy. After the district court ordered it to stop selectively enforcing the policy against one religious group, the University deregistered another—InterVarsity Graduate Christian Fellowship. InterVarsity filed suit. On cross-motions for summary judgment, the district court[1] held that University employees violated InterVarsity's First Amendment rights and denied qualified immunity. We affirm.

---

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

I.

*A. University Policies for Student Organizations*

The University of Iowa, like other state institutions of higher learning, allows students to form organizations. Those organizations, called Registered Student Organizations (RSOs), are "voluntary special interest group[s] organized for educational, social, recreational, and service purposes and [are] comprised of [their] members." InterVarsity App. 445. RSOs get a variety of benefits, including money, participation in University publications, use of the University's trademark, and access to campus facilities. Once there are enough students interested in forming an RSO, they submit a proposed constitution. University officials review the constitution before approving the group.

RSOs must comply with campus rules, including the University's Policy on Human Rights. They must also include similar language to the Human Rights Policy in their constitutions. The Policy provides:

> [I]n no aspect of [the University's] programs shall there be differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all.

InterVarsity App. 455.

RSOs must also abide by the RSO Policy in selecting members and leaders. The RSO Policy says that membership and engagement "must be open to all students without regard to race, creed, color, religion, national origin, age, sex [unless the organization is exempt under Title IX][2] . . . sexual orientation, gender identity . . . or any other classification that deprives the person of consideration as an individual." InterVarsity App. 446. But, noting the importance of students' ability to "organize and associate with like-minded students," the RSO policy also allows:

> [A]ll registered student organizations [are] able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the [Human Rights Policy]. . . . [T]herefore any individual who subscribes to the goals and beliefs of a student organization may participate in and become a member of the organization.

*Id.* This is not an "all-comers policy," which would require RSOs to accept any student as a member or leader of the group.

The University permits RSOs to base membership and leadership on specific traits protected under the Human Rights Policy. For example, sports clubs and Greek organizations may hinge membership and leadership on sex, and the a cappella group, the "Hawkapellas," is limited to women. Some groups prefer or require membership

---

[2]The exemption for Title IX organizations was added in 2018 to encompass sororities and fraternities.

in a racial group.[3]  Other groups require their members to be United States military veterans or subscribe to a certain ideological viewpoint or mission.[4]

The University has also permitted religious groups to require members or leaders to affirm certain beliefs.  In 2003, it allowed the Christian Legal Society to require its members to sign "a statement of faith" affirming Christian beliefs.  InterVarsity App. 2256.  It also approved the constitutions of other religious groups like the Imam Mahdi Organization, which requires leaders "to refrain from major sins" and requires both leaders and voting members to "[b]e Muslim, Shiea."  InterVarsity App. 2240.  The University never thought these groups violated the Human Rights Policy.

### B.  Business Leaders in Christ

Things changed in 2017, when a student filed a complaint against Business Leaders in Christ (BLinC).  He was denied a leadership role after refusing to affirm the group's belief that same-sex relationships were against the Bible, and he claimed the decision was because he is gay.  The University agreed that BLinC violated the Human Rights Policy.  It deregistered BLinC because requiring leaders to affirm BLinC's beliefs would "effectively disqualify individuals from leadership positions on the basis of sexual orientation and gender identity."  D. Ct. Dkt. 74 at 8.

---

[3]These groups include the Chinese Basketball Club, the African Student Association, Society of Hispanic Professional Engineers, and the South Asian Student Alliance, among many others.  InterVarsity App. 2243–45.

[4]The UI Veteran's Association restricts membership to those that are "past or current military personnel" and their dependents.  InterVarsity App. 2243.  Students for the Right to Life requires "that members of this organization hold pro-life beliefs," InterVarsity App. 2241, and the Feminist Majority Leadership Alliance requires its members to "submit written agreement with the Feminist Majority Foundation's purpose and principles."  InterVarsity App. 2240 (citation omitted).

BLinC filed suit, asserting violations of free speech, free association, and free exercise of religion under the First Amendment. BLinC argued that the University selectively applied its Human Rights Policy[5] and sought a preliminary injunction to restore its status as an RSO while the litigation was pending. That was granted. The district court[6] noted in the preliminary injunction order that BLinC had "a fair chance of succeeding on the merits of its claims under the Free Speech Clause" and found that the University selectively applied its Human Rights Policy.[7] Iowa App. 30.

In response to the preliminary injunction, the University, through its Center for Student Involvement and Leadership, began a "Student Org Clean Up Proposal" and reviewed all RSO constitutions to bring them into compliance with the Human Rights Policy.[8] In charge of this review were Melissa Shivers, the Vice President for Student

---

[5] BLinC pointed to LoveWorks, a Christian group that required its leaders to affirm same-sex relationships (and was formed by the same student who submitted the complaint against BLinC). The University approved LoveWorks's constitution, claiming it was compliant with the Human Rights Policy; but BLinC's similar—but contradictory—requirement was not.

[6] BLinC's case was before Judge Rose, who would later oversee InterVarsity's litigation.

[7] BLinC's case proceeded to summary judgment, where the district court found that while the University violated BLinC's free speech, free association, and free exercise rights, the University and individual defendants were entitled to qualified immunity because the law was not clearly established. *See Bus. Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885, 908–09 (D. Iowa 2019) (*BLinC I*). On appeal, we held that the law was clearly established that the University could not engage in viewpoint discrimination against BLinC. *See Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969 (8th Cir. 2021) (*BLinC II*). We granted the individual defendants qualified immunity on the free exercise claim. *Id.*

[8] While the BLinC preliminary injunction did not *order* the University to review all RSOs for compliance with the Human Rights Policy, the Administrators "understood [the order] to mean that the University could not selectively enforce its

Life; William Nelson, Associate Dean of Student Organizations; and Andrew Kutcher, Coordinator for Student Development. Reviewers were told to "look at religious student groups first" for language that required leaders to affirm certain religious beliefs. InterVarsity App. 2287 (internal quotation marks omitted).

Around the same time the reviewers turned their focus to religious groups, the University amended the Human Rights Policy to expressly exempt sororities and fraternities from the policy prohibiting sex discrimination. But the University did deregister 38 student groups—most for failure to submit updated documents—and several were deregistered for requiring their leaders to affirm statements of faith. *See* D. Ct. Dkt. 74 at 13; InterVarsity App. 2388. InterVarsity was one of them.

### C. InterVarsity

InterVarsity has been active at the University for over twenty-five years. The group is affiliated with InterVarsity Christian Fellowship/USA, "a national ministry" to "establish university-based witnessing communities of students and faculty who follow Jesus as Savior and Lord, and who are growing in love for God, God's Word, and God's people of every ethnicity and culture." InterVarsity Br. 4 (citation omitted) (cleaned up).

Membership and participation in the University's chapter of InterVarsity is open to all students, but those who seek leadership roles are required to affirm a statement of faith, which includes "the basic biblical truths of Christianity." InterVarsity App. 2019.

---

RSO Policy." D. Ct. Dkt. 74 at 10. In response, the Administrators decided to review all RSO constitutions for compliance with the Human Rights Policy.

Over twenty-five years, Iowa had no problem with InterVarsity. But in June 2018, Andrew Kutcher charged that InterVarsity's constitution violated the Human Rights Policy. InterVarsity's leader, Katrina Schrock, responded that the constitution did not prevent anyone from joining if they did not subscribe to the group's faith, but that only its leaders were required to affirm their statement of faith. Kutcher countered that "[h]aving a restriction on leadership related to religious beliefs is contradictory to [the Human Rights Policy]." InterVarsity App. 2095.

Schrock asked Kutcher if the University would accept amended language that "requested [leaders] to subscribe" or that they "are strongly encouraged to subscribe" to the statement of faith. InterVarsity App. 2094. Kutcher consulted with the University's general counsel, who told him that the proposed amended language was not allowed.

InterVarsity did not bend, and so the University deregistered the group a few weeks later. Afterwards, InterVarsity struggled with recruiting members, organizing activities, and spent money and other resources in fighting its deregistration. After the preliminary injunction in BLinC's case was extended, the University ultimately reinstated InterVarsity and the other religious groups it deregistered. But after having lost a significant number of members and out of fear of "retaliation from the University," InterVarsity brought this action for First Amendment violations. D. Ct. Dkt. 74 at 13.

### D. Litigation

InterVarsity sued the University of Iowa; Bruce Harreld, the President of the University; Thomas Baker, the Student Misconduct and Title IX Investigator; Melissa Shivers; William Nelson; and Andrew Kutcher under 42 U.S.C. § 1983 in both their official and individual capacities for violations of its rights to free speech, free association, and free exercise under the First Amendment. It also asserted violations

of its right to select its own leadership under the Religion Clauses of the First Amendment and state law claims. InterVarsity sought damages and a permanent injunction prohibiting the University from denying RSO status. Everyone cross-moved for summary judgment, and the individual defendants sought qualified immunity.

The district court first found that the University and the individual defendants violated InterVarsity's First Amendment rights and granted summary judgment on its free speech, free association, and free exercise claims.[9] It also granted summary judgment to the University and individual defendants on InterVarsity's Religion Clauses claim.

As for qualified immunity, the court denied the individual defendants qualified immunity on the free speech and association claims, finding that the law was clearly established that the University could not discriminate based on viewpoint. The court noted that while the defendants in *BLinC I* got qualified immunity, the court's preliminary injunction order "squarely applied" First Amendment law on the "selective application of the Human Rights Policy to a religious group's leadership requirements." D. Ct. Dkt. 47 at 46. Noting that the "finding of likelihood of success on the merits is not the same as a final determination that a constitutional violation has occurred," the district court held that its preliminary injunction order in BLinC's

---

[9]The district court found that the University, Shivers, Nelson and Kutcher violated InterVarsity's First Amendment rights. But as for Baker and Harreld, the court denied those individual defendants summary judgment on the constitutional violations, explaining that "the record is insufficient to establish [their] liability . . . [but] the same analysis and conclusions [] would apply to their qualified immunity defense if Plaintiffs can establish their liability at trial." D. Ct. Dkt. 74 at 49. On appeal, the individual defendants ask us to assume that the district court denied qualified immunity to all defendants, including Harreld and Baker. We accept that invitation and will analyze the qualified immunity question as to all individual defendants.

-9-

case put the question beyond debate and clearly established the University's actions as unconstitutional. *Id.* at 46. Turning to InterVarsity's free exercise claim, the court found a free exercise violation and denied qualified immunity as moot because "each constitutional violation was founded on the same underlying conduct" and InterVarsity's damages did not vary depending on the violation. *Id.* at 49.

The individual defendants appealed. They suggest that even if their actions violated InterVarsity's rights to free speech, they are entitled to qualified immunity because the law was not clearly established. InterVarsity did not cross-appeal.[10]

II.

We review a district court's denial of summary judgment on the basis of qualified immunity *de novo*. *Morris v. Zefferi*, 601 F.3d 805, 808 (8th Cir. 2010) (citation omitted). "In doing so, we grant the nonmoving party 'the benefit of all relevant inferences.'" *Id.* (citation omitted).

"Qualified immunity shields public officials from liability for civil damages if their conduct did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Turning Point USA at Ark. St. Univ. v. Rhodes*, 973 F.3d 868, 875 (8th Cir. 2020) (citation omitted), *cert. denied*, *Hoggard v. Rhodes*, 2021 WL 2742809 (U.S. July 2, 2021) (No. 20-1066). We determine "(1)

---

[10]InterVarsity argues on appeal that its rights under the Free Exercise Clause and the Religion Clauses were also clearly established. But because the free exercise claim is not properly raised before us in an appeal or cross-appeal, we lack jurisdiction to consider it. *See El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) ("Absent a cross-appeal, an appellee may 'urge in support of a decree any matter heard in the record,' . . . but may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'") (citation omitted).

whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* (cleaned up).

### A. Constitutional Violation

InterVarsity's free speech and free expressive association claims merge into one because "[w]ho speaks on [InterVarsity's] behalf . . . colors *what* concept is conveyed." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 680 (2010). So, we look to precedent dealing with limited public forums and the right to free speech and association. *See also BLinC II*, 991 F.3d at 980.

"A university establishes limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Gerlich v. Leath*, 861 F.3d 697, 704–05 (8th Cir. 2017) (citation omitted) (cleaned up). There is no dispute that the University of Iowa created a limited public forum by granting RSOs official recognition and access to a variety of benefits. *See BLinC II*, 991 F.3d at 981. And when a university does, it may restrict access to that limited public forum so long as the "access barrier [is] reasonable and viewpoint neutral." *Martinez*, 561 U.S. at 679. "If a state university creates a limited public forum for speech, it may not 'discriminate against speech on the basis of its viewpoint.'" *Gerlich*, 861 F.3d at 704–05 (citation omitted).

The district court found that the University's Human Rights Policy was reasonable and viewpoint neutral, but not as applied to InterVarsity. D. Ct. Dkt. 74 at 22. We agree. A reasonable "nondiscrimination policy that is viewpoint neutral on its face may still be unconstitutional if not applied uniformly." *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 803 (9th Cir. 2011). "The government must abstain from regulating speech when the specific motivating ideology or the opinion

-11-

or the perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

That is what the University and individual defendants did to InterVarsity. For decades, the University permitted RSOs to base their membership and leadership on religious affirmations or other traits that are protected by the Human Rights Policy. They did this for religious groups (e.g., the Christian Legal Society and Imam Mahdi Organization) and secular groups (e.g., sororities and fraternities, ideological groups, and groups that prefer their members or leaders to identify as a racial minority). In fact, the University still permits this; but it didn't for InterVarsity.

The district court found that the defendants likely violated BLinC's constitutional rights and ordered the University to apply the Human Rights Policy equally to all RSOs. But instead of doing that, the University started a compliance review that prioritized religious organizations. That review led to InterVarsity's deregistration, along with other religious groups. The University's fervor dissipated, however, once they finished with religious RSOs. Sororities and fraternities got exemptions from the Human Rights Policy. Other groups were permitted to base membership on sex, race, veteran status, and even some religious beliefs.

Take LoveWorks, for example. It was formed by the student who was denied a leadership role in BLinC. LoveWorks requires its members and leaders to sign a "gay-affirming statement of Christian faith.'" *BLinC II*, 991 F.3d at 973. Despite that requirement—which violates the Human Rights Policy just as much as InterVarsity's—the University did nothing.

We are hard-pressed to find a clearer example of viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). The University's choice to selectively apply the Human

-12-

Rights Policy against InterVarsity suggests a preference for certain viewpoints—like those of LoveWorks—over InterVarsity's. The University focused its "clean up" on specific religious groups and then selectively applied the Human Rights Policy against them. Other groups were simply glossed over or ignored.

Because the University and individual defendants violated InterVarsity's First Amendment rights, the question is whether their actions satisfy strict scrutiny. The University "can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. City of Phila., Pa.*, 593 U.S. __, __–__ (2021) (slip op., at *13) (citation omitted). Here, the district court found that the University did not have a compelling government interest in singling out InterVarsity for deregistration because it could not point to "any actual harm to [the University's] interests caused by InterVarsity's religious leadership requirements." D. Ct. Dkt. 74 at 30. The court further found that the University's decision to deregister InterVarsity was not narrowly tailored because it "did not meaningfully consider less-restrictive alternatives to deregistration." *Id.* at 32.

On appeal, the University and individual defendants do not try to argue their actions survive strict scrutiny. That is wise. Of course, the University has a compelling interest in preventing discrimination. But it served that compelling interest by picking and choosing what kind of discrimination was okay. Basically, some RSOs at the University of Iowa may discriminate in selecting their leaders and members, but others, mostly religious, may not. If the University honestly wanted a campus free of discrimination, it could have adopted an "all-comers" policy like the one in *Martinez*. *See* 561 U.S. at 671 ("[T]he Nondiscrimination Policy, as it relates to the RSO program . . . mandates acceptance of all comers: School-approved groups must 'allow any student to participate, become a member, or seek leadership positions in the organization, regardless of her status or beliefs.'") (cleaned up).

The University could also have made an explicit exemption for religious beliefs like it did for sororities and fraternities. But it "offers no compelling reason why it has a particular interest in denying an exception to [InterVarsity] while making them available to others." *Fulton*, slip op. at *15. "Instead, the University took an extreme step—complete deregistration of InterVarsity—to discriminately prevent theoretical harms that may never materialize." D. Ct. Dkt. 74 at 33.

The University and individual defendants' selective application of the Human Rights Policy against InterVarsity was viewpoint discrimination in violation of the First Amendment. It cannot survive strict scrutiny.

### B. Clearly Established

We now consider whether it was clearly established that the University violated InterVarsity's First Amendment rights. We do not "define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (citation omitted). Instead, "we look for a controlling case or a robust consensus of cases of persuasive authority." *Turning Point USA*, 973 F.3d at 879 (citation omitted). We do not need "a prior case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 880 (citation omitted).

The University and individual defendants say that the law is not clearly established when there is a direct conflict between civil rights laws and First Amendment protections in the University setting. InterVarsity, on the other hand, argues that its right to be free from viewpoint discrimination when speaking in a university's limited public forum was clearly established at the time of the violation.

In denying the individual defendants qualified immunity below, the district court treated its preliminary injunction in the BLinC case as precedent. The court explained that the order applied the appropriate First Amendment cases and put the

individual defendants on notice that their actions were unconstitutional. It remarked, "[t]he Court would never have expected the University to respond to that order by homing in on religious groups' compliance with the policy while at the same time carving out explicit exemptions for other groups. But here we are." D. Ct. Dkt. 74 at 40–41.

While we share the district court's frustration with the University's conduct, we do not consider the BLinC preliminary injunction as precedent that clearly established the individual defendants' conduct was unconstitutional. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 730 n.7 (2011) (citation omitted). "Many Courts of Appeals therefore decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity." *Id.* While the Eighth Circuit "subscribes to a broad view of what constitutes clearly established law," and we often look to "state courts, other circuits and district courts," for what is clearly established, *K.W.P. v. Kan. City Pub. Schs.*, 931 F.3d 813, 828 (8th Cir. 2019) (citation omitted), we will not rely on a district court's preliminary injunction as clearly established law in this case.

But when the district court denied the individual defendants qualified immunity, it did not have the benefit of our decision in *BLinC II*. We found that the law was clearly established that universities may not engage in viewpoint discrimination against RSOs based on a nondiscrimination policy. *BLinC II*, 991 F.3d at 985–86. In reaching that conclusion, we relied on Supreme Court precedent, our own case law, and other circuit decisions. The Supreme Court has clearly stated that universities may not single out groups because of their viewpoint.[11] Our own

---

[11] *See, e.g.*, *Healy v. James*, 408 U.S. 169, 187–88 (1972) (finding a First Amendment violation where the university refused to recognize a student group's

-15-

precedent clearly establishes that this is a violation of the First Amendment.[12] Out-of-circuit decisions also define the selective application of a nondiscrimination policy against religious groups as a violation of the First Amendment.[13]

Relying on those precedents, we held that the University's choice to deregister BLinC while permitting other student organizations to base membership and leadership on specific traits or affirmations of beliefs was viewpoint discrimination and a violation of the First Amendment that was clearly established. *See BLinC II*, 991 F.3d at 986. The University and individual defendants in that case took action against BLinC well before InterVarsity was ever on their radar. If the law was clearly

---

official status because the university saw the group's views as "abhorrent"); *Widmar v. Vincent*, 454 U.S. 263, 277 (finding a university's exclusion of religious groups from accessing campus facilities because they were religious was in violation of the "fundamental principle" of the First Amendment); *Rosenberger*, 515 U.S. at 837 (finding that withholding benefits from a religious group solely because it is religious "is a denial of [the group's] right of free speech guaranteed by the First Amendment."). *See also Martinez*, 561 U.S. at 694–95 (finding that the university's "all-comers" policy was viewpoint neutral so it was in line with the First Amendment).

[12]*See, e.g.*, *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 368 (8th Cir. 1988) (finding a First Amendment violation where the university denied funding to a student group that advocated for gay rights because the "government may not discriminate against people because it dislikes their ideas"); *Gerlich*, 861 F.3d at 709 (denying qualified immunity to the university after it denied the use of its trademark to a group that advocated for marijuana law reform).

[13]*See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 866–67 (7th Cir. 2006) (reversing a district court's denial of a preliminary injunction because the student group showed a likelihood of success that the university had selectively applied its nondiscrimination policy against it); *Reed*, 648 F.3d at 804–05 (remanding for trial whether a nondiscrimination policy was selectively enforced when it prohibited membership restrictions based on race, gender, religion, and sexual orientation).

-16-

established when the University discriminated against BLinC, it was clearly established when they did the same thing to InterVarsity.

We acknowledge that the intersection of the First Amendment and anti-discrimination principles can present challenging questions. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018) (noting that the conflict between Colorado's anti-discrimination law and a baker's First Amendment rights created "issues [] difficult to resolve"). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). And, if applied properly, it protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation omitted).

But as Justice Thomas asked in *Hoggard v. Rhodes*, "why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?" __ S.Ct. __, *1 (2021) (Thomas, J., statement regarding denial of certiorari). What the University did here was clearly unconstitutional. It targeted religious groups for differential treatment under the Human Rights Policy—while carving out exemptions and ignoring other violative groups with missions they presumably supported. The University and individual defendants turned a blind eye to decades of First Amendment jurisprudence or they proceeded full speed ahead knowing they were violating the law. Either way, qualified immunity provides no safe haven.

### III.

The judgment of the district court is affirmed.

_____